EXHIBIT B

**Westlaw.**

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 1

Only the Westlaw citation is currently available.

Florida Circuit Court.

In re FLORIDA MICROSOFT ANTITRUST LITIGATION.

No. 99-27340.

Aug. 26, 2002.

Indirect purchasers brought antitrust action against maker of personal computer operating system software, and moved for class certification. The Circuit Court, Eleventh Judicial Circuit, Miami-Dade County, Shapiro, J., held that: (1) indirect purchasers of a monopolist's or price fixer's product could bring suit under the Florida Deceptive and Unfair Trade Practices Act (DTPA); (2) named plaintiffs were adequate class representatives, even though some were employed by law firms seeking to represent class; (3) common issues regarding damages predominated over damage issues that were individual; and (4) class action was superior to other methods of adjudication.

Motion for class certification granted.

West Headnotes

[1] **Trade Regulation** 864
382k864
Indirect purchasers of a monopolist's or price fixer's product may bring suit under the Florida Deceptive and Unfair Trade Practices Act (DTPA). West's F.S.A. § 501.211.

[2] **Parties** 35.67
287k35.67
Named plaintiffs in indirect purchaser antitrust action under the Florida Deceptive and Unfair Trade Practices Act (DTPA) against maker of personal computer operating system software were adequate class representatives for putative class action, where all named plaintiffs alleged that they were harmed by the same anticompetitive actions that maker allegedly took to maintain monopolies in the personal computer operating systems and applications software markets, sought the same relief for themselves and the class members, intended to vigorously prosecute the case, and had retained attorneys whose competency in litigating antitrust class actions and other complex litigation was well-established and had not been challenged by software maker. West's F.S.A. RCP Rule 1.220.

[3] **Parties** 35.67
287k35.67
Named plaintiffs in indirect purchaser antitrust action under the Florida Deceptive and Unfair Trade Practices Act (DTPA) against maker of personal computer operating system software were not inadequate class representatives for putative class action because they were employees of one of the law firms seeking to represent the class, where record reflected no testimony by any of such named plaintiffs indicating a lack of independence from counsel due to their employment. West's F.S.A. RCP Rule 1.220.

[4] **Parties** 35.67
287k35.67
Named plaintiffs in indirect purchaser antitrust action under the Florida Deceptive and Unfair Trade Practices Act (DTPA) against maker of personal computer operating system software were not inadequate class representatives for putative class action because they lacked receipts to prove how much they paid for computers installed with maker's software, absent showing that possession of such receipts was necessary for plaintiffs to prove that they or any class member were impacted by software maker's behavior, or to prove damages. West's F.S.A. RCP Rule 1.220.

[5] **Parties** 35.67
287k35.67
Individual issues did not predominate with respect to determination of whether alleged monopolization impacted or caused some harm to class members and quantification of that impact to arrive at class member damages, for purposes of deciding whether common legal or factual issues predominated over issues that were individual to each class member and thus whether putative class action brought by indirect purchasers against maker of personal computer operating system software could be certified, as plaintiffs' expert proferred reasonable economic theories and methodologies to prove fact of injury and damages on a class-wide basis, support for plaintiffs' expert's methods could be found in the work of other leading economists, and resolution of dispute on such issues between plaintiffs' expert and software maker's expert was beyond the scope of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 2

class certification inquiry. West's F.S.A. RCP Rule 1.220(b)(3).

[6] Parties 35.67
287k35.67

Courts may infer antitrust impact despite pricing diversity, and non-uniformity of the prices at which plaintiffs purchased their goods is not fatal to class certification. West's F.S.A. RCP Rule 1.220(b)(3).

[7] Parties 35.67
287k35.67

Although damage amounts may vary among plaintiffs, this fact alone, particularly in antitrust actions, will not defeat certification. West's F.S.A. RCP Rule 1.220(b)(3).

[8] Parties 35.37
287k35.37

At the class certification stage, plaintiffs are not required to prove their case regardless of how much data has been collected through discovery. West's F.S.A. RCP Rule 1.220.

[9] Parties 35.67
287k35.67

Class action was superior to other methods of adjudication, for purposes of class certification of indirect purchasers' antitrust action against maker of personal computer operating system software, as there was a very large number of claimants with relatively small amounts at stake, individual actions by claimants would impose a strangling harness on the judiciary as well as the parties, and separate actions would produce duplication of effort, increase the cost of litigation, create the risk of inconsistent results for parties who were similarly situated, and consume judicial resources to wasteful levels. West's F.S.A. RCP Rule 1.220(b)(3).

Daniel Hume, Alan M. Grunspan, Robert J. Parks, and James J. Thompson of Kirby, McInerney & Squire, New York, N.Y., for plaintiffs.

Sara Ford of Lightfoot, Franklin & White, Birmingham, Ala., Charles B. Casper of Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Daryl A. Libow of Sullivan & Cromwell, Washington, D.C., and Hilarie Bass of Greenberg Traurig, Miami, Fla., for defendant.

ORDER GRANTING CLASS CERTIFICATION

SHAPIRO, J.

*1 This matter having come for hearing before the Court in the 12th Floor Courtroom of the Dade County Courthouse, Miami, Florida on April 18-19 and May 22, 2002, pursuant to Plaintiffs' Motion for Class Certification, dated July 20, 2001, Plaintiffs, Shelby Hartman, Julia Frow, Barbara Diaz, Eric Lazarus, and B. Lazarus, Inc. ("Plaintiffs"), appearing through counsel, and Defendant Microsoft Corporation ("Microsoft"), appearing through counsel, and having thoroughly reviewed and considered the memoranda and materials submitted by the parties together with the statements, oral arguments of counsel, the live testimony given by the respective experts for Plaintiffs and Defendant through direct and cross-examination, and all of the records on file, the Court hereby grants Plaintiffs' motion in its entirety.

I. PROCEDURAL BACKGROUND.

1. Plaintiffs are residents of the State of Florida who seek certification of two classes pursuant to Florida Rule of Procedure 1.220 encompassing a class period of November 16, 1995 to the present. The two classes are:

A. All persons and entities who indirectly, i.e., not from Microsoft, acquired for their own use, and not for further selling, leasing or licensing, a license in Florida for an Intel-compatible PC version of MS-DOS, Windows 95, upgrades to higher MS-DOS versions, upgrades to or of Windows 95, Windows 98, on or after November 16, 1995; and

B. All persons and entities who indirectly, i.e., not from Microsoft, acquired for their own use, and not for further selling, leasing or licensing, a license in Florida for an Intel and Windows 95 and later compatible PC version of Microsoft Word or any upgrade of Microsoft Word, Microsoft Excel or any upgrade of Microsoft Excel, whether by themselves or as part of a software package or "suite" such as Microsoft Office or any upgrade of Microsoft Office, on or after November 16, 1995.

Both classes exclude Microsoft and its co-conspirators; their parents, subsidiaries, affiliates, officers, directors, and employees. Also excluded are any federal, state or local governmental entity, and any judge or judicial officer presiding over this matter, judicial staff, and the members of their immediate families.

2. Plaintiffs allege that Microsoft established a monopoly in the market for operating system software through various anticompetitive acts and has maintained this monopoly since the late 1980's. According to Plaintiffs, Microsoft has used its monopoly power to stifle innovation in the operating system market, create a monopoly in the applications market, and overcharge consumers in both markets in violation of Florida's deceptive and unfair trade

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 3

practices laws.

3. In support of their motion for class certification, Plaintiffs submitted the following:
 a. Memorandum of Law in Support of Plaintiffs' Motion for Class Certification;
 b. Affidavit of Dr. Keith B. Leffler, dated 6/17/01 ("Leffler Aff.");
 c. Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification;
 *2 d. Reply Affidavit of Dr. Keith B. Leffler, dated 2/04/01 ("Reply Aff.");
 e. Other Exhibits, including relevant case law.
Plaintiffs also sat for depositions taken on October 23-25, 2002.

4. Defendant submitted the following in opposition to Plaintiffs' Motion for Class Certification.
 a. Defendant Microsoft Corporation's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification;
 b. Affidavit of Dr. Jerry Hausman, dated 11/28/01;
 c. Transcripts of Plaintiffs' Depositions;
 d. Other exhibits, including additional affidavits from Microsoft witnesses, case law and other documents.

5. Each expert was deposed in other Microsoft antitrust litigation by counsel who also appeared on behalf of the parties here at an evidentiary hearing held on April 18-19 and May 22, 2002. During the hearing, the Court heard oral argument from counsel for both parties on Plaintiffs' Motion and live expert testimony from Dr. Leffler and Dr. Hausman.

II. INDIRECT PURCHASER ANTITRUST SUITS IN FLORIDA.

6. Under the Florida Deceptive and Unfair Trade Practices Act ("the Florida DTPA"), Chapter 501, Part II, Florida Statutes (1993), Florida consumers who are injured by a violation of the Florida DTPA's provisions may seek to recover monetary damages from the violator. The relevant language of the Florida DTPA states:
 In any individual action brought by a consumer who has suffered a loss as a result of a violation of this part, such consumer may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105.
FLA. STAT. ANN. § 501.211(2) (West 1985). The statute defines a "violation of this part" as any violation of this act and may be based upon the violation of: (1) any rules promulgated pursuant to the Federal Trade Commission Act, (2) any rules promulgated pursuant to the Federal Trade Commission and interpreted by the Federal Trade Commission or the federal courts; and (3) any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair deceptive or unconscionable acts or practices. See FLA. STAT. ANN. § 501.203(3).

[1] 7. Indirect purchasers of a monopolist's or price fixer's products, such as Plaintiffs here, may bring suit under the Florida DTPA. See *Mack v. Bristol Myers Squibb Co.*, 673 So.2d 100 (Fla. 1st DCA 1996). The plaintiff in *Mack* filed a putative class action alleging that the defendants had violated the Florida Antitrust Act and the Florida DTPA by engaging in price-fixing for infant formula. The trial court dismissed the plaintiff's claim under Florida's antitrust statute on the ground that Florida antitrust law paralleled federal antitrust law and incorporated the federal bar against indirect purchaser suits as articulated in *Illinois Brick Co. v. Illinois* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). While the Supreme Court later ruled in *California v. ARC America Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) that states could exempt their antitrust laws from *Illinois Brick*, Florida has not so amended its Antitrust Act. The trial court also dismissed the DTPA claim on the theory that the DTPA should not be used to avoid the effect of Illinois Brick. The appellate court disagreed, and reversed the dismissal of the Florida DTPA claim. In so doing, the *Mack* court effectively declared Florida an *Illinois Brick* "repealer" state.

*3 8. The First District Court of Appeal is the highest state court in Florida to have addressed the question of an indirect purchaser's standing for antitrust claims under the Florida DTPA. Since no appellate court in this District has addressed the question, *Mack* is binding precedent for this Court. See *Pardo v. State*, 596 So.2d 665, 666 (Fla.1992). Accordingly, Plaintiffs have standing to pursue their claims under the Florida DTPA.

III. OTHER MICROSOFT ANTITRUST CLASS CERTIFICATION DECISIONS.

9. Plaintiffs in several other *Illinois Brick* "repealer" jurisdictions also have sued Microsoft for antitrust violations substantially identical to those alleged here. With one exception, [FN1] every other court in a repealer jurisdiction has granted class certification to indirect purchasers seeking redress against Microsoft for antitrust violations. See *Howe v. Microsoft Corp.*, 2002 WL 199130 (N.D.Dist.Ct. Jan. 16, 2002), appeal pending, Supreme Court No.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 4

20020075 (N.D.); *In re South Dakota Microsoft Antitrust Litig.*, Civ. No. 00-235 (6th Jud. Cir. Ct., Hughes Co., S.D., May 31, 2001), petition for permission to take a discretionary appeal granted, Appeal No. 22306 (S.D. March 22, 2002); *Bellinder v. Microsoft Corp.*, 2001 WL 1397995 (Kan.Dist.Ct. Sept. 7, 2001), application for permission to take an interlocutory appeal denied, Case No. 02-88795-A (Kan.Ct.App. May 7, 2002), denial of application affirmed, Case No. 02-88795-A (Kan. July 11, 2002); *A & M Supply v. Microsoft Corp.*, No. 00-301123-NZ (Mich. Cir. Ct., Wayne Co., Aug. 21, 2001), application for leave to appeal granted, Court of Appeals Case No. 236398 (Mich.Ct.App. Nov. 2, 2001); *Capp v. Microsoft Corp.*, No. 00-CV-0637 (Wis. Cir. Ct., Dane Co., June 28, 2001); *Friedman v. Microsoft Corp.*, CV 2000-000722 (Consol.) (Ariz.Super. Ct., Maricopa Co., Nov. 15, 2000 & July 13, 2001); *Gordon v. Microsoft Corp.*, 2001 WL 366432 (Minn.Dist.Ct. Mar.30, 2001), petition for discretionary review denied, No. C8-01-701 (Minn.Ct.App. May 8, 2001), denial of petition affirmed 645 N.W.2d 393, 2002 WL 1291887 (Minn. Jun.13, 2002); [FN2] *Coordination Proceedings Special Title*, (Rule 1550(b)) *Microsoft-I Cases*, NO. J.C.C.P. No. 4106 (Cal.Super. Ct., San Francisco Co., Aug. 29, 2000). Most, if not all, of the same arguments Microsoft made before this Court also were made and rejected in these other courts.

    FN1. *Melnick v. Microsoft Corp.*, 2001 WL 1012261 (Me.Super.Ct. Aug. 24, 2001), held that plaintiffs, who also had submitted Dr. Leffler's testimony, did not meet Maine's requirements for class certification.

    FN2. This Court takes notice of the opinion of the Minnesota Supreme Court issued after the conclusion of the class motion hearing here. The Court notes that the Minnesota Supreme Court's opinion only addressed the question of whether the Minnesota Court of Appeals, when denying Microsoft's petition for interlocutory review, applied the correct criteria in doing so. Neither the Minnesota Court of Appeals nor the Supreme Court addressed the merits of Microsoft's challenge to the propriety of class certification in that state.

## IV. STANDARDS FOR DETERMINING CLASS CERTIFICATION

10. To obtain certification of a case as a class action, Plaintiffs must satisfy the prerequisites set forth in Florida Rule of Civil Procedure 1.220(a) and at least one of the provisions of Rule 1.220(b). See *Execu-Tech Business Systems, Inc. v. Appleton Papers, Inc.* 743 So.2d 19, 22 (Fla. 4th DCA 1999).

11. Class certification determination is wholly procedural, and does not depend on whether Plaintiffs will ultimately prevail on the substantive merits of their claims. See *OCE Printing Systems, USA, Inc. v. Mailers Data Services, Inc.* 760 So.2d 1037, 1045 (Fla. 2d DCA 2000) ("matters of proof that go to the merits of the claim are inappropriate when considering class certification"); *Execu-Tech*, 743 So.2d at 21 (noting with approval that the lower court did not make inquiry into or require proof of the merits of the case in determining whether class certification was appropriate); see also *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). [FN3]

    FN3. Because Florida Rule of Civil Procedure 1.220 is based on and closely parallels Federal Rule of Civil Procedure 23, Florida courts may look to and rely on federal case authority construing Rule 23 as persuasive authority when passing on class certification motions. See *Brom v. Philip Morris Companies, Inc.*, 641 So.2d 888, 889 n. 1 (Fla. 3d DCA 1994); *Concerned Class Member v. Sailfish Point, Inc.*, 704 So.2d 200, 201 (Fla. 4th DCA 1998).

## V. RULE 1.220(a) CRITERIA

*4 12. Microsoft has never challenged Plaintiffs' showing that they have satisfied the Rule 1.220(a)(1)-(3) requirements of numerosity, commonality, and typicality. Microsoft does contest the adequacy of the named Plaintiffs under 1.220(a)(4) in this putative class action.

13. Based on the record before the Court and the lack of opposition from Microsoft, the Court finds that Rule 1.220(a)(1)-(3) requirements of numerosity, commonality, and typicality have been met. Numerosity is satisfied here because the broad definition of Plaintiffs' classes and Microsoft's dominance in the operating systems and applications software markets will result in classes consisting of thousands of Florida consumers. Commonality exists because there are at least some issues to be resolved that are common to each class member. Microsoft does not contest that these include the overall question of its liability for illegally creating and/or maintaining monopolies in the markets at issue

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 5

Typicality is satisfied because the Plaintiffs and class members assert the same claims against Microsoft and will rely upon the same facts and evidence to prove liability for each of those claims. None of the proposed class representatives are subject to unique defenses.

14. In addition to the foregoing requirements, a class representative must be able to fairly and adequately protect and represent the interests of each member of the class. See Fla. R. Civ. P. 1.220(a)(4). This adequacy requirement is satisfied if "the named representatives have interests in common with the proposed class members and the representatives and their qualified attorneys will properly prosecute the class action." *Broin*, 641 So.2d at 892.

[2] 15. The evidence before the Court indicates that the named Plaintiffs are adequate class representatives for this putative class action. All of the Plaintiffs allege that they were harmed by the same anticompetitive actions that Microsoft allegedly took to maintain monopolies in the personal computer operating systems and applications software markets. The named Plaintiffs seek the same relief for themselves and the class members. These plaintiffs intend to vigorously prosecute this case. Pursuant to that end, they have retained attorneys whose competency in litigating antitrust class actions and other complex litigation is well-established and has not been challenged by Microsoft. These facts demonstrate that the Plaintiffs have met Rule 1.220(a)'s adequacy requirement.

[3] 16.. Microsoft contends that three of the five Plaintiffs are not adequate class representatives because they are employees of one of five law firms seeking to represent the class. Microsoft argues that this relationship between three of the Plaintiffs and one of the law firms prosecuting this case alone warrants a finding of inadequacy.

17. This Court rejects Microsoft's attack upon the adequacy of Plaintiffs Hartman, Frow, and Diaz. Microsoft took their depositions. The record reflects no testimony by any of the three indicating a lack of independence from counsel due to their employment, and the Court declines Microsoft's invitation to disqualify them *per se*. See *Robertson v. National Basketball Association* 389 F.Supp. 867 (S.D.N.Y.1975) ("Class action determination will not be denied ... in the absence of a showing that the alleged potential conflicts are real probabilities and not mere imaginative speculation"). Even if such a concern existed, Eric Lazarus and B. Lazarus, Inc. are not employees of any of the law firms representing Plaintiffs. Their presence in this lawsuit eliminates Microsoft's basis for doubting the independence of the class representatives. See *Shroder v. Suburban Coastal Corporation*, 729 F.2d 1371, 1376 (11th Cir.1984); *Susman v. Lincoln American Corp.*, 561 F.2d 86, 90, n. 7 (7th Cir.1977); *Wellman v. Dickinson*, 79 F.R.D. 341, 347 (S.D.N.Y.1978); *Sommers v. Abraham Lincoln Federal Savings and Loan Association* 66 F.R.D. 581, 589 (E.D.Pa.1975).

*5 18. Microsoft does challenge the adequacy of Plaintiffs Eric Lazarus and B. Lazarus, Inc. on other grounds. Microsoft asserts that Eric Lazarus purchased a computer for B. Lazarus, Inc. pursuant to a discount program run by another entity, and implies some wrongdoing thereby. However, the record indicates no such wrongdoing. Thus, the Court rejects Microsoft's allegations of impropriety. Even if the Court did accept Microsoft's allegations, the misconduct it alleges would not require a finding of inadequacy. See *Newberg on Class Actions*, § 3.36 ("Plaintiffs have been challenged as inadequate representatives because their backgrounds were alleged to include unrelated, unsavory, unethical, or even illegal conduct. Most cases have rejected such challenges as irrelevant to the issue of adequacy ..."). The Court finds that Mr. Lazarus and B. Lazarus, Inc. are adequate class representatives for the putative class.

[4] 19. Microsoft contends that Plaintiffs Frow and Diaz are not adequate class representatives because they lack receipts to prove how much they paid for computers installed with Microsoft software. The Court rejects this argument. Microsoft has made no showing that possession of such receipts is necessary for Plaintiffs to prove that they or any class member were impacted by Microsoft's behavior, or to prove damages.

20. There is no need for this Court to address Microsoft's attack on Plaintiffs' adequacy based on the lack of a written fee agreement between Plaintiffs and their counsel. Plaintiffs have submitted to the Court a fee agreement that satisfies the requirements of Florida Rule of Professional Conduct 4-1.5(f)(2).

VI. RULE 1.220(b)(3) PREDOMINANCE
21. Besides satisfying the requirements of Florida Rule of Civil Procedure 1.220(a), Plaintiffs also must satisfy Rule 1.220(b)(1), (2), or (3). Here, Plaintiffs have moved under (b)(3), which requires that the common legal or factual issues predominate over any

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 6

issues that are individual to each class member. Such common issues need not be dispositive of the entire litigation. See 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure 1778, n. 11 (2d ed.1986); Lockwood Motors, Inc. v. General Motors Corp., 162 F.R.D. 569, 580 (D.Minn.1995) ("common questions need only predominate, they need not be dispositive of the litigation").

22. Predominance exists when there is "generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." In re Potash 159 F.R.D. 682, 693 (D.Minn.1995); see also Cheatwood v. Barry University, Inc., 2001 WL 1769914 (Fla.Cir.Ct. Dec.26, 2001) (quoting Lockwood, 162 F.R.D. at 580). The fundamental question "is whether the group aspiring to class status is seeking to remedy a common legal grievance." Lockwood, 162 F.R.D. at 580. Moreover, only questions relating to the defendant's violations must predominate. Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1197 (6th Cir.1988); see also Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir.1975) ("[t]he amount of damages is invariably and individually in question and does not defeat class action treatment"), and the predominance inquiry under Rule 23(b)(3) is directed toward the issue of liability. Dura-Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 93 (S.D.N.Y.1981).

*6 23. "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." AmChem Products, Inc. v. Windsor, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The predominance inquiry under Rule 1.220(b)(3) should be directed toward the issue of liability. Dura-Bilt Corp., 89 F.R.D. at 93.

24. "Where an antitrust conspiracy has been at issue, the courts have tended to find that common questions predominated despite the existence of individual questions." Jennings Oil Co., Inc. v. Mobil Oil Corp. 80 F.R.D. 124, 130 (S.D.N.Y.1978). See also Newberg on Class Actions, § 18.25 at p. 81 ("common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues").

Plaintiffs assert that questions of law or fact common to all members of the proposed class predominate, including:
  a. Whether Microsoft is a monopolist in the markets for operating system applications software, and the definition of those markets;
  b. Whether Microsoft engaged in anticompetitive conduct in order to unlawfully maintain or acquire its monopoly power in these markets;
  c. Whether Microsoft's conduct violated the Florida Deceptive and Unfair Trade Practices Act;
  d. Whether Microsoft's conduct caused harm to the proposed class; and
  e. Whether Plaintiffs and the putative class are entitled to damages and the appropriate measure of such damages.

25. Microsoft does not dispute that the issues of market definition, its monopoly position with respect to those markets, and whether its alleged acts violated the Florida DTPA, can be determined through common proof. This Court agrees. Such determinations are functions of the operating system and applications market places in general, and of Microsoft's business. These affect all class members equally, and therefore are ideally suited for class-wide determination.

[5] 26. Microsoft has asserted that individual issues will predominate with respect to any determination of whether its alleged monopolization impacted or caused some harm to class members, and quantification of that impact to arrive at class member damages. Plaintiffs have retained an expert economist, Dr. Keith Leffler, to opine on whether, contrary to Microsoft's argument, a "'reasonable methodology [exists] for generated proof of class-wide impact and damages." Execu-Tech, 743 So.2d at 21. Dr. Leffler has presented such methods to this Court through his affidavits and live testimony. Microsoft retained its own expert, Dr. Jerry Hausman, to discredit Dr. Leffler's opinions. In large measure, the Court's determination that Plaintiffs have satisfied their burden to proffer a reasonable methodology for generalized proof of class-wide impact and damages turns on the testimony of these two experts.

A. PLAINTIFFS EXPERT.

27. Dr. Leffler is an Associate Professor of Economics at the University of Washington in Seattle, Washington where his teaching and research experience is in the area of industrial organization. His specialty is antitrust economics including the study of monopolies and the impact of monopolies on consumers. Dr. Leffler has taught classes and conducted research in industrial organization and antitrust economics for over twenty-five years. He has performed complex economic analysis in antitrust cases for more than two and one-half

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

decades and has been qualified as an economic expert in proceedings before federal and state courts, and federal and state regulatory agencies. Dr. Leffler has analyzed economic issues relating to class certification in a number of industries including infant formula, propane, residential doors and prescription drugs. He also has experience in analyzing markets involving computer operating systems and software. Of particular relevance here, Dr. Leffler assisted the Federal Trade Commission and the Justice Department in their investigation of Microsoft's activities in the 1980's and 1990's.

\*7 28. Dr. Leffler has also provided similar testimony for class certification in a number of other antitrust cases filed against Microsoft in repealer states, including Kansas, Maine, Minnesota, North Dakota, Michigan, South Dakota, Tennessee, New Mexico, and Wisconsin.

29. The Court finds Dr. Leffler to be qualified for the task given to him with respect to this class certification motion, i.e., to proffer a "reasonable methodology for generalized proof of class-wide impact and damages." *Execu-Tech*, 743 So.2d at 21.

B. FACT OF INJURY (HARM/IMPACT)

30. Plaintiffs assert that Microsoft harmed the class by charging supra-competitive (i.e., artificially high or inflated) prices for its software. There are two steps to proving this assertion. First, Plaintiffs will have to show that Microsoft charged supra-competitive prices for the products at issue, resulting in overcharges to the entities purchasing those products directly from Microsoft. Second, Plaintiffs will have to show that at least some portion of these overcharges were passed on to the indirect purchaser end users that make up the classes here. A separate issue, discussed below, is quantifying the overcharges and the amount of overcharge passed on to class members.

31. With respect merely to establishing that Microsoft imposed overcharges to at least some degree on the products at issue, Dr. Leffler testified that "the underlying principle of antitrust is that competition benefits consumers, and in a situation in which that competition had been artificially suppressed through allegedly illegal means, the direct implication of that basic economic principle would be that the prices that the consumers paid would be higher than if that competition had been allowed to thrive and impact the marketplace." *See* Transcript of Class Certification Hearing, April 19, 2002, at p. 89.

The significance of Dr. Leffler's observation is that "the presence of more effective competition would have impacted the entire pricing structure and led to lower prices to all class members." Reply Aff. ¶ 9. In other words, economic principles, rather than evidence particular to any individual class member, dictate that the lack of competitive factors necessarily results in a monopolist charging supra-competitive prices for its products. Thus Dr. Leffler proposes that "a class wide analysis of Microsoft's monopolization activities provides the proper economic basis to determine the fact of impact on these end-users ...." *Id.*

32. With respect to the pass on issue, Dr. Leffler explained that he is assuming Plaintiffs will prove that "the monopolization activity and overcharges at issue here regarding operating systems substantially predate the class period, [so that] a Microsoft operating system overcharge would impact prices at all levels of distribution ... prior to the beginning of the class period." Reply Aff. ¶ 4c; 4/19/2002 Tr. at 87, 92. If this assumption is proved, according to Dr. Leffler, the embedded nature of Microsoft's operating system overcharge acts as a tax imposed on each unit sold by the overcharged original computer equipment manufacturers ("OEMs") and other distributors. According to Dr. Leffler, "regardless of whether a price increase by Microsoft in, for example, 1996 caused an immediate increase in the overcharge to end-users, all class members were likely already paying higher prices because of the prior monopolization and overcharges." Leffler Aff. ¶ 10. Thus Dr. Leffler proposes that (as with the fact of overcharges), economic principles, rather than individual class member evidence, can be used to prove the fact that some portion of those overcharges were passed on to every class member.

\*8 33. The Court finds that Dr. Leffler has proposed reasonable methods, based on standard economic principles, for establishing with common evidence that each class member was impacted to some extent by Microsoft's alleged behavior. Microsoft has not convinced the Court that the principles upon which Dr. Leffler relies are false or unsound. As set forth below, other established economists support Dr. Leffler's assertion that Microsoft's monopolization resulted in overcharges that were passed on, at least in part, to end users. Whether a fact-finder actually should or will accept Plaintiffs' common evidence on this issue is beyond the scope of the class certification inquiry.

C. CALCULATION OF DAMAGES

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 8

34. Plaintiffs need not calculate the exact extent of each class member's damages individually. *See Exxon-Tech*, 743 So.2d at 21, n. 4. *See also South Dakota Microsoft* at 30 ("Plaintiffs ... need not present a method to calculate each class member's damage individually"), *citing Zenith Radio Corp. v. Hazeltine Research, Inc.* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). In *Zenith*, the Supreme Court held that "damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs ..."' *Id.* at 123-124

35. "The willingness on the part of courts to accept some uncertainty with respect to damages stems from a simple equitable notion that a wrongdoer should not be allowed to profit by insistence upon an unobtainable standard of proof." *South Dakota Microsoft* at 17, *citing California Microsoft* at 17; *Gordon* at *11; *see also J. Truett Payne Co. v. Chrysler Motors Corp.* 451 U.S. 557, 566, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) ("The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation") Aggregation is accepted because courts have recognized that common issues can be found to predominate in an antitrust case despite "the fact that each class member's damages will be different and, thus, will require individualized treatment ..." *In re Alcoholic Beverages Litigation* 95 F.R.D. 321, 327 (E.D.N.Y.1982). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim ... Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery" (*Bigelow v. RKO Radio Pictures, Inc.* 327 U.S. 251, 264-265, 66 S.Ct. 574, 90 L.Ed. 652 (1946)), and "to accept such an argument uncritically would leave 'little if any place for the class action device in the adjudication of antitrust claims.''' *Town of New Castle v. Yonkers Contracting Co., Inc.* 131 F.R.D. 38, 42 (S.D.N.Y.1990), *citing In re Alcoholic Beverages*, 95 F.R.D. at 327-28. *See Story Parchment Co. v. Paterson Parchment Paper Co.* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) ("The wrongdoer is not entitled to complain that [the damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise ... [T]he risk of the uncertainty should be thrown upon the wrongdoer, instead of upon the injured party").

\*9 36. Microsoft argues that the distribution of its own products is so complex that any class wide damages calculations will be impossible. Based on Dr. Leffler's testimony, the Court disagrees. Through Dr. Leffler, Plaintiffs have presented reasonable methods for estimating damages for each class member that a fact-finder could accept.

37. These methods begin with the construction of a " 'but for' world in which Microsoft faced competition in the operating system market. This "but for" world does not contain the "tax" or overcharge built into every layer of the operating system and applications distribution chain. *See* Leffler Aff. at ¶¶ 13-14.

38. Once the "but for" world without Microsoft domination is established, Dr. Leffler proposes three separate ways to measure the lower operating system and applications prices that would prevail in such a world:

> A but-for price from which the overcharge can be calculated is frequently estimated using a yardstick or benchmark. One well-accepted yardstick is a comparison price from a comparable market that was not affected by anticompetitive activity. A second alternative yardstick can be based on margins earned by sellers in a comparable market free from antitrust violations. A third well-accepted yardstick is a price in the market at issue during a period free of the anticompetitive conduct.
> In this case each of these three alternative yardstick approaches likely can be used to estimate the overcharges that resulted from Microsoft's monopolization actions. Under the first approach, Microsoft's prices and price changes are compared with the prices of software that faced competition and had types of revenue opportunities comparable to those of the relevant products. The second yardstick approach involves comparing the rates of return earned by Microsoft operating systems and applications software with those earned by software products facing competition. The third yardstick approach extrapolates competitive prices for Microsoft's software from the period in which Microsoft faced limited competition to subsequent periods in which its monopoly was established.

Leffler Aff. ¶¶ 15-16, *see also* ¶¶ 13-24 and Reply Aff. ¶¶ 31-40. According to Dr. Leffler, most

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 9

of his work so far has involved the third benchmark. With respect to the other two, he noted that "I have no doubt that economically they're reasonable approaches. The issues concern data availability, what will be coming forth, the ability to implement them, and currently I don't know the answer to whether the data will be available to implement. It's being pursued. It's being studied and evaluated." 4/19/02 Tr. at 112.

39. The next step after "but for" or "benchmark" prices have been determined is to deduct the "benchmark" price from the actual price charged to arrive at the overcharge. See *Image Technical Services, Inc. v. Eastman Kodak Co.*, 1994 U.S. Dist. LEXIS 12652, *9 (N.D.Cal.1994) ("*Kodak II*"), on remand from *Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). This is "a likely method for determining class damages." *In re Domestic Air Transp.* 137 F.R.D. 677, 692-93 (N.D.Ga.1991); *Kodak II* at *9; *Green-haw v. Lubbock County Beverage Association* 721 F.2d 1019,1026-29 (5th Cir.1983) (affirming jury award in antitrust class action based on presentation of benchmark evidence) overruled on other grounds by *International Woodworkers of America v. Champion International Corp.* 790 F.2d 1174 (5th Cir.1986); *Catfish*, 826 F.Supp. at 1043 (certifying class based on proposed benchmark methodology); *Potash*, 159 F.R.D. at 697-98 (same).

*10 40. The Court finds Dr. Leffler's benchmark method to be a reasonable way of establishing the difference between prices that Microsoft would have been able to charge for the products at issue in a competitive environment, and the prices that Microsoft actually charged during the class period. Calculating the numbers themselves and evaluating those calculations are for trial and beyond the scope of the class certification inquiry.

41. Plaintiffs will have to establish the extent that overcharges to Microsoft's direct customers were passed on to the indirect purchaser end user class members. In his affidavits, Dr. Leffler explains that the "pass on" to end users of Microsoft's overcharge can be estimated using a class-wide statistical determination of the relationship between the costs faced by Microsoft's customers and the prices paid by end-users. Leffler Aff. ¶ 5d; see also Reply. Aff. ¶ 4h. "[A]nalyses of how the prices charged end users were in fact impacted by comparable cost changes to Microsoft's customers will show how the overcharge damaged end users ... [This] requires a relatively simple statistical estimation." Leffler Aff. ¶ 26; see also Reply Aff. ¶ 43. Dr. Leffler says that the data he needs to perform this statistical estimation can be gleaned from examining price information for computer components. He points out that "OEMs and system builders have continually faced reduced costs for many components such as disk drives and hard drives," and that "[the] ... cost reductions can be statistically related through regression analysis to actual end users' prices. The end-user price impact of different overcharges to Microsoft customers can then be inferred from such regression analysis". Leffler Aff. ¶ 28; see also *In re Polypropylene Carpet* 996 F.Supp., 18, 22- 30 (N.D.Ga.1997) (regression analysis used by the plaintiffs' expert satisfied the predominance requirement of Rule 23(b)(3)). Plaintiffs can also look to the costs and charges for computer system upgrades when calculating the amount of overcharge consumers pay for Microsoft's OS products. As Dr. Leffler points out

OEMs and system builders also offer additions and upgrades to their products. The impact on the final price to end-users from the inclusion or exclusion of upgrades of a cost comparable to the Microsoft overcharge should also provide a reliable guide as to how the final price would have changed absent the overcharge.

Leffler Aff. ¶ 29.

42. The Court finds that Dr. Leffler has presented methods which a reasonable fact finder could accept for estimating the amount of any overcharges that were passed on to the class members. See *Microsoft I-V Cases*, slip op. at 17-18; *Gordon*, 2001 WL 366432 at ----11-12; see also, *In re Cardizem* 200 F.R.D. 326, 347-51 (E.D.Mich.2001); *Lumco Industries, Inc. v. Jeld-Wen, Inc.* 171 F.R.D. 168, 174-75 (E.D.Pa. 1997).. Although Microsoft's expert challenged the use of regression analysis for this task, this Court is convinced that the regression methods proposed by Dr. Leffler are reasonable. Whether a fact-finder actually would accept the results of the regression analysis that Dr. Leffler proposes is not an issue for class certification.

D. THERE IS AMPLE SUPPORT FOR DR. LEFFLER'S METHODOLOGY IN THE ECONOMICS COMMUNITY.

*11 43. Support for Dr. Leffler's methods can be found in the work of other leading economists who have identified methodologies that show how consumers were impacted by Microsoft's monopolistic behavior. Since being retained by

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 10

Microsoft, Dr. Robert E. Hall testified that "we can determine pass-through by building a pass-through model. Again, that's doable." [FN4] Professor Daniel L. Rabinfeld of the University of California at Berkeley and Professor Franklin M. Fisher of the Massachusetts Institute of Technology (both Department of Justice economists in *U.S. v. Microsoft*) have similarly concluded that Microsoft has inflicted harm on *all* consumers. [FN5] In January, 1999, the Consumer Federation of America published a comprehensive report that confirms consumer harm on a nationwide basis was caused by Microsoft's monopoly. [FN6] Professor Herbert Hovenkamp, a distinguished antitrust law authority, has explained the economics simply: "A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below." [FN7] Dr. Robert G. Harris and Professor Lawrence A. Sullivan (economics professor and antitrust law professor, respectively) explain: "Through simple analytic models we show that in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule. [FN8]

  FN4. *See* page 130 from the transcript of the December 10, 2001 hearing in the MDL Proceeding. *See also* Reply Aff. at ¶ 46.

  FN5. Franklin M. Fisher and Daniel L. Rubinfeld, *Did Microsoft Harm Consumers?: An Economic Analysis*, Chapters 1 and 4 (2000).

  FN6. *See* Consumer Federation of America, Media Access Project, U.S. Public Interest Research Group, *The Consumer Cost of the Microsoft Monopoly: $10 Billion of Overcharges and Counting* (January 1999).

  FN7. Herbert Hovenkamp, *Federal Antitrust Policy, the Law of Competition and Its Practice*, Chapter 16, "Private Enforcement," at 564 (1994).

  FN8. Robert G. Harris and Lawrence A. Sullivan, "Passing On The Monopoly Overcharge: A Comprehensive Policy Analysis," 2 U. Penn. L.Rev., 128 at 276 (1979).

44. Another of Microsoft's own experts, Dr. Richard Schmalensee, admitted during the *U.S. v. Microsoft* trial that all operating system consumers would be harmed if Microsoft engaged in monopoly overcharging. Dr. Schmalensee admitted that a monopoly overcharge by Microsoft necessarily would cause harm to every ultimate consumer because "OEMs pass the price of the operating system through to consumers as part of the overall price of the computer." [FN9] The other courts which have certified classes against Microsoft found such testimony compelling. *See, e.g., Gordon*, 2001 WL 366432, at *10.

  FN9. Direct Testimony of R. Schmalensee, *United States v. Microsoft Corp.* ¶ 2.

45. Based in part on Dr. Schmalensee's admissions, the trial court in the United States Government's antitrust case against Microsoft found at trial that "[m]any of [Microsoft's] actions have harmed consumers in ways that are immediate and easily discernible. They have also caused less direct, but nevertheless serious and far-reaching, consumer harm by distorting competition ... The ultimate result is that some innovations that would truly benefit consumers never occur for the sole reason that they do not coincide with Microsoft's self-interest," *United States v. Microsoft Corp.* 84 F.Supp.2d 9, 112 (D.D.C.1999).

46. Finally, Microsoft's expert here, Dr. Hausman, has admitted that economic models exist for calculating damages in antitrust cases. *See Coordination Proceedings* at 15 (emphasis added):

  ... the opposing experts agree that equilibrium economic models can be used to calculate damages in antitrust case. *According to the defense expert, Professor Hausman:* "Economists have developed various theoretical models of competition in markets with limited numbers of sellers. These models are based on a series of strong simplifying assumptions. They can provide useful bases for suggestive theoretical analyses, but they do not provide reliable bases for calculating damages unless carefully designed and calibrated to fit the actual conditions of the market in question."

*12 47. Dr. Hausman also testified that statistical methods are available to show class wide injury in indirect purchaser cases, instead of having to trace any alleged overcharge through every company in the distribution chain for every single class member.

Q. Okay. Now, I take it that your testimony then at bottom, Professor Hausman, is that we would need to do here in Florida is look to particular individual consumers who have purchased a product at a particular point in time and recreate the circumstances that led through the distribution chain for that individual's purchase. Is that correct?
A. Not for each individual in the but-for-world, but

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 11

groups of individuals. You always take a sample in statistics and from that extrapolate to the population.

... I said you don't have to look at every company. You know, for like the white box, Taiwanese, you could look at a sample of them, and we discussed that at my deposition.

So, it's not the case that you have to look at every one, but you have to cover all the main paths of distribution and the main types of customers.

Transcript of Class Certification Hearing, May 22, 2002 at pp. 101, 102.

E. DR. HAUSMAN'S ATTACKS ON DR. LEFFLER

48. Microsoft argues that it will be impossible to prove with common evidence that any Microsoft overcharge actually made its way to the class members. Its expert, Dr Hausman, gave three reasons why Microsoft believes this to be so. Dr. Hausman's arguments in this regard have been rejected by other courts as reasons for denying class certification against Microsoft, and this Court rejects them as well. *See, e.g., Michigan Microsoft* at 8 ("The discrepancies among the experts and the accurateness of their opinions are not dispositive at this juncture. It is sufficient that plaintiff has demonstrated through Professor Leffler that impact might be shown by common proof."), *see also South Dakota Microsoft* at 25-29.

49. First, Dr. Hausman claims that any rise or fall in prices would not be immediately passed on to consumers. Dr. Leffler explains that such an observation, even if true, is irrelevant here because it does not take into account the long-run nature of Microsoft's monopolistic conduct. By the start of the class period, Microsoft had already been reaping monopoly profits for its operating systems for years. *See* Leffler Aff. ¶ ¶ 6-7, Reply Aff. ¶ ¶ 8-9. As Dr. Leffler explains, "absent [these] activities predating the class period, the prices of Microsoft's operating systems would likely have been substantially below the prices in fact charged by Microsoft." Leffler Aff. ¶ 7. Accordingly, Dr. Leffler points out that Microsoft's overcharges have been embedded into OEMs' and other distributors retail prices since well before the start of this class period. Leffler Aff. ¶ 10. By the beginning of the class period, regardless of whether or not subsequent increases occurred, all consumers were impacted by Microsoft's illegal anti-competitive activity pre-class period. Dr. Leffler explains that it is irrelevant whether OEMs charge more or less for different Windows versions during the class period because any overcharges at issue would have been embedded in the costs at each level of distribution long before the beginning of the class period. *See* Leffler Aff. ¶ ¶ 7-10. The embedded overcharge cost would have worked through the distribution sector long prior to the start of the class period. Reply Aff. ¶ ¶ 11-14. As Dr. Leffler explains at Reply Aff. ¶ 4c:

*13 Since the monopolization activity and overcharges at issue here ... substantially predate the class period, a Microsoft ... overcharge would impact prices at all levels of distribution and for all end-users prior to the beginning of the class period.... Therefore, contrary to [Dr.] Hausman's claims, any lag between price increases by Microsoft during the class period and the resulting price increases to the end-users does *not* show that "(f)inal purchasers who made their purchase during those intervals suffered no injury."

*See also id.* at ¶ ¶ 10-11:

Throughout his Affidavit, Professor Hausman refers to the possibility that there may be a lag between a price increase by Microsoft and a resultant price increase by distributors, OEMs or retailers. He argues that this is sufficient to conclude that not all class members would be impacted by a Microsoft overcharge since the overcharge "may be passed through only after a long period of time." It is not necessary to consider the general economic validity of this argument because Professor Hausman's argument simply has no applicability to the plaintiffs' allegations in this case.

... [A]s explained above, I have economically analyzed a situation in which I assume plaintiffs will demonstrate that Microsoft had effectively eliminated competition in the market for Intel compatible operating systems before the beginning of the class period. Thus, at the beginning of the class period, the price of Microsoft's operating system at all distribution levels would have included an overcharge. Plaintiffs allege that during the class period Microsoft engaged in other activity that enhanced and maintained Microsoft's monopoly position. That subsequent activity, or the continuing effects of the prior monopolization activity, may have caused increases in the Microsoft overcharge ... during the class period. [But][r]egardless of whether there were any lags in the passing on of subsequent price or overcharge increases, all end-users would have paid a precedent, embedded overcharge.

50. The Court finds Dr. Leffler's analysis of this issue to be reasonable, and that Microsoft's "pass on

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 12

ing" argument does nothing other than raise a possible issue for jury determination.

51. Second, Dr. Hausman argues that Microsoft's methods for distributing operating systems and applications products to the class members are complex, usually involving one or more distribution layer. This, he argues, makes difficult the task of figuring out the amount of overcharge, if any, paid by consumers. However, supposed "complexity" in the subject product's market does not prevent courts from certifying classes of antitrust victims. As Dr. Leffler pointed out in his reply affidavit, "there is nothing unique about estimating Microsoft's 'but for' price and overcharge compared to other overcharge situations ... Domestic airline travel, residential doors, flat glass, NASDAQ stock transactions, brand name drugs, and many other industries in which classes were certified are equally or more complex than the sale of Microsoft operating systems and applications. Microsoft produces relatively few relevant products, sells them to relatively few buyers, and changes prices relatively infrequently." Reply Aff. ¶ 32.

*14 [6][7] 52. Indeed, courts may infer antitrust impact despite pricing diversity. See *In re Workers Compensation* 130 F.R.D. 99, 108-110 (D.Minn. 1990):

> Non-uniformity of the prices at which plaintiffs purchased their goods is not fatal to certification. As long as the existence of a conspiracy is the overriding question, then the class has met its predominance requirement.... To prove injury, plaintiffs need only demonstrate they have suffered *some* damage from the unlawful conspiracy ... Such a showing may be made on a class basis if the evidence demonstrates that the conspiracy succeeded in increasing prices above the competitive level.
> 'Common proof of impact is possible even though prices are individually negotiated.... 'Proof of impact typically follows proof of a price-fixing conspiracy where the defendants are shown to have sufficient market power' .... *Although damage amounts may vary among plaintiffs, this fact alone, particularly in antitrust actions, will not defeat certification* .... Individual questions of damages are often a problem encountered in an antitrust action and are rarely a barrier to certification. [emphasis added].

53. Even assuming complex distribution and/or diverse pricing in the market for DOS and Windows, Dr. Leffler explains why the common denominator will be lower prices in the but-for world paid by all re-sellers of these products. "The 'but-for' world ... being evaluated in this case is one in which *every* distributor, OEM and retailer purchasing from Microsoft faces a lower price for each relevant product throughout the class period. Whatever the array of Microsoft prices, the entire array of such prices is lower absent the monopolization. Every distributor, OEM and retailer would be making resale pricing decisions in an environment in which it and every one of its competitors faces a lower cost. Common sense and basic economic principles imply lower prices to end-users will result." Reply Aff. ¶ 15.

54. The California, Kansas, Michigan, Minnesota, North Dakota, and South Dakota courts rejected Microsoft's "complexity" claims and granted class certification. See, e.g., Coordination Proceedings at 17 (while "the task [of proving antitrust impact] is formidable," it is "not impossible .... At this point, the court is not persuaded that a comprehensible analysis of these issues cannot be made within the context of properly managed trial proceedings").

55. These rejections of Microsoft's complexity arguments are consistent with accepted antitrust case law. For example, in *In re NASDAQ Market-Makers Antitrust Litigation* 169 F.R.D. 493, 499 (S.D.N.Y.1996), the court certified a class even though plaintiffs had accused 33 defendants of conspiring through A492 Nasdaq market-makers, making markets in 5,393 stocks with "11 market-makers for each Nasdaq stock." The *NASDAQ* court certified the class despite this obvious complexity, holding: "Neither a variety of prices nor negotiated prices is an impediment to class certification if it appear that plaintiffs may be able to prove at trial that ... the price range was affected generally." *Id.* at 523.

*15 56. The court in *Little Caesar Enterprises, Inc. v. Smith* 172 F.R.D. 236, 246 (E.D.Mich.1997) explained why defendants' claims of complexity should not bar certification:

> Defendants argue that the damages or fact of damage issue is too complicated for class treatment.... The gestalt of much of defendants' argument is an attempt to make this case appear overwhelmingly complicated and thereby remove the class action tool from plaintiffs' hands.... If it is ultimately proven that defendants violated the Sherman Act, it seems unfair and ironic that the party who caused the complexity on liability and damages should benefit from such acts by disarming the plaintiffs and the Court of the most

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 13

efficient and effective tool for resolving the issues.

57. The Court finds Dr. Leffler's analysis of this issue to be reasonable, and that Microsoft's "complexity" argument also does nothing other than raise a possible issue for jury determination.

58. Third, Dr. Hausman asserts that most retail prices end in 99 or 49. From this, Dr. Hausman surmises that a distributor who experienced an increase in Microsoft's operating system may not pass on that increase to consumers, because such a pass-on might result in the new retail price not ending in the preferred 99 or 49.

59. Dr. Leffler asserted that in the highly competitive computer industry, distributors must increase their retail prices in response to cost increases. Thus, contrary to Dr. Hausman's logic, Professor Leffler believes that a small increase in the cost of the operating system necessarily would cause a seller to move from its chosen focal price point. Reply Aff ¶¶ 19-20. In the world that would have existed "but-for" Microsoft's allegedly illegal conduct, a cost decrease "would be of substantial consequence in such a highly competitive industry." Id. at ¶ 20. "Under any reasonable competitive conditions, when competitors at the retail and the distribution stages all incur lower costs because of the elimination of the overcharge ... competition among distributors and retailers will result in price reductions to end-users." Id.

60. The Court finds Dr. Leffler's analysis of this issue to be reasonable, and that Microsoft's "focal point pricing" argument, like the other two arguments discussed above, does nothing other than raise a possible issue for jury determination.

61. Accordingly, this Court rejects Microsoft's arguments that proving impact and estimating damages with common evidence will be impossible tasks. Dr. Leffler's testimony is credible and the methods proposed by him for accomplishing these tasks through common evidence at trial are reasonable.

F. A BATTLE OF THE EXPERTS IS NOT APPROPRIATE AT THIS STAGE

62. Plaintiffs' expert has proffered reasonable economic theories and methodologies to prove fact of injury and damages on a class-wide basis. Microsoft's expert claims that these methods will not work at trial. When the experts for the parties both are well credentialed and even if both offer compelling arguments, resolution of such a "duel" is beyond the scope of the class certification inquiry. See Kansas Microsoft at 12 ("Now is not the time to resolve [a] 'battle of the experts.' ... Whether Dr. Leffler is correct in his opinions or not is an issue for the trier of fact"), quoting Potash 159 F.R.D. at 697. In Gordon, the Minnesota court explained:

*16 It is apparent that [Microsoft] hotly disputes Plaintiffs' pass through theory, and both positions have merit. Now is not the time to resolve that dispute. The court concludes that Plaintiffs have proposed a viable methodology and theory for proving the fact of class-wide injury to a jury. [Microsoft's] many counter-arguments can be better considered in that forum.
2001 WL 366432 at *11, aff'd, 645 N.W.2d 353, 2002 WL 1291887.

63. The South Dakota, Michigan, and North Dakota courts all agreed. See, e.g., South Dakota Microsoft at 22: "The bulk of [Microsoft's] arguments challenge the merits of [Dr. Leffler's] conclusions. The courts routinely reject such arguments, observing that they are improper at this stage of the litigation. The fact that the defendants' expert disagrees with the methodology and the conclusions propounded by [Dr. Leffler] is no reason to deny class certification." Quoting In re Cardizem CD Antitrust Litigation, 200 F.R.D. 326, 350 (E.D.Mich.2001). See also Michigan Microsoft at 8: At the class certification stage, it is "unnecessary to resolve the dispute between the experts, or to delve into the merit based issue of whether Professor Leffler is correct in his assessment of impact."

64. These decisions rest on a sound foundation of Federal antitrust case law. See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292 (2nd Cir.1999). In reversing a denial of class certification, the Caridad court held that the district court's critique of plaintiffs' expert "may prove fatal at the merits stage, [but] the Class Plaintiffs need not demonstrate at this stage that they will prevail on the merits ... More detailed statistics might be required to sustain the Plaintiffs' burden of persuasion, but this report, in conjunction with the anecdotal evidence, satisfies the Class Plaintiffs' burden of demonstrating commonality for purposes of class certification." Id. at 292-3 (internal citation omitted). The court concluded that "[i]n deciding a certification motion, district courts must not consider or resolve the merits of the claims of the purported class. Here, the District Court credited Metro-North's expert evidence over that of the Class Plaintiffs. Such a weighing of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 14

evidence is not appropriate at this stage in the litigation." Id. at 293. See also In re Visa Check/Mastermoney Antitrust Litig., 192 F.R.D. 68, 79 (E.D.N.Y.2000) ("a district court is not permitted to indulge 'dueling' between opposing experts at the class certification stage"), aff'd 280 F.3d 124 (2nd Cir.2001), cert. denied, 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002); In re Sumitomo Copper Litig., 182 F.R.D. 85, 91 (S.D.N.Y.1998) (deficiency in expert's affidavit "is a matter to be ascertained by trial and not for a determination as to the appropriateness of class certification"); In re Industrial Diamonds Litig., 167 F.R.D. 374, 384 (S.D.N.Y.1996) ("it is for the jury to evaluate ... conflicting evidence and to determine what weight to give the expert's conclusions"); Krueger v. New York Tel. Co., 163 F.R.D. 433, 442 (S.D.N.Y.1995) ("The plaintiffs have laid a sufficient evidentiary foundation which, if believed, supports their allegations of common questions of law and fact"); Domestic Air Transp., 137 F.R.D. at 692 ("It is not the function of the Court at this time to determine whether [plaintiffs' expert] is correct. The weight to be given his testimony and its effect is for the fact-finder in assessing the merits of plaintiffs' claims at a later date").

*17 65. Avoiding a "battle of the experts" at the class certification stage clearly is in keeping with the basic principle of Eisen that on a motion for class certification, the court must not endeavor to decide the merits of the case. See Coordination Proceedings at p. 15:

> The question at this stage is not whether plaintiffs will be able to carry their burden of proving that their experts' analyses are reliable, but whether it appears that the differences between the experts can be intelligently presented and evaluated within the frame-work of a class action. On a motion for class certification, it is inappropriate to resolve a "battle of the experts." "Whether or not [plaintiffs' expert] is correct in his assessment of common impact/injury is for the trier of fact to decide at the proper time").

66. The Court thus finds that the arguments made by Microsoft and its expert with respect to Dr. Leffler's proposed methods for proving impact and damages at most raise issues for a fact-finder later in the case.

G. CONSUMER BENEFITS

67. Microsoft claims that some class members were not harmed and may have even benefited from its conduct. For example, Microsoft argues that some class members benefited by getting a free web browser if Internet Explorer ("IE") was included in their version of Windows. Dr. Leffler rebutted this assertion to the Court's satisfaction in his reply affidavit: "[T]o the extent that the web browser is a separate product from the operating system, as found by Judge Jackson, there is no economic basis to offset operating system overcharges because of predatory actions with respect to browsers. The predatory browser action may benefit consumers in the browser market in the short run until Microsoft establishes its monopoly in the browser market but this has no implications as to the injury and the amount of injury suffered by consumers in the separate operating system market. Moreover, the competitive browser price may have been zero, given that Netscape and Microsoft have given away their browsers for several years. If so, there is no consumer benefit to including IE with Windows. Finally, as emphasized in Judge Jackson's findings, the competitive harm from the browser tie-in by Microsoft included computer performance degradation and costs to consumers that were independent of the price charged for the browser." Reply Aff. ¶ 28. At most, Microsoft's arguments regarding supposed benefits of its monopolistic conduct are matters for the fact finder to consider.

H. EMPIRICAL DATA

68. Microsoft claims that Plaintiffs and their expert have had the necessary data available to employ Dr. Leffler's proposed methods, and thus could have already performed the analyses they propose. It argues that nothing prevented Plaintiffs from using this data or obtaining more information through studies and focused class certification discovery, if needed.

[8] 69. First of all, this is beside the point because at the class certification stage, Plaintiffs are not required to prove their case regardless of how much data has been collected through discovery. In any event, Dr. Leffler testified that at the time of the hearing, Plaintiffs did not yet have all of the data necessary for actually employing his methods. Dr. Leffler testified that Plaintiffs, together with plaintiffs in other antitrust litigation against Microsoft, are engaged in a large scale coordinated discovery process. Dr. Leffler further testified that he expects the necessary data will be gathered in time for the preparation of final expert reports and trial. Microsoft has not shown that collection of such data is impossible. The extent to which any necessary data actually is present or lacking will be for the fact-

Not Reported in So.
2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))

Page 15

finder to decide.

### VII. RULE 1.220(b)(3) SUPERIORITY

*18 70. Lastly, Plaintiffs must demonstrate that the class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Rule 1.220(b)(3) sets forth several factors that this Court should consider in its determination and the Court has done so here.

[9] 71. The prosecution of separate actions by members of the class would create a risk of inconsistent adjudications and would substantially impair and impede the administration of justice. There are questions well suited for class resolution that would assuredly require needless duplication of proof if each Plaintiff was required to prosecute his/her/its claim apart from the rest. See *In re Infant Formula Antitrust Litigation*, 1992 WL 503465 at *5 (N.D.Fla. Jan. 13, 1992) ("A class action is often the only realistic method for litigating a large number of claims"). See also *Catfish*, 826 F.Supp. at 1044-45: "In light of the large number of potential class members and the strong predominance of issues, the court concludes, without reservation, that a class action is superior to other methods of adjudication. The court is convinced that individual actions by claimants would impose a strangling harness on the judiciary, as well as the parties. Separate actions would produce similar duplication of effort, increase the cost of litigation, create the risk of inconsistent results for parties who are similarly situated and consume judicial resources to wasteful levels." Any notion that Plaintiffs' monopolization claims could be litigated individually is unrealistic and contrary to the tenets of Rule 1.220.

72. The Court does not believe that prosecution of this case as a class action would be unmanageable. Courts confronted with far larger and even more complex antitrust class actions than this one have found such cases to be manageable. See e.g., *In re General Motors Corp. Pickup Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 800 (3d Cir.1995) (nationwide class of 6 million truck owners); *Domestic Air Transportation*, 137 F.R.D. at 694 (nationwide class of "close to 12.5 million [airline ticket] purchasers"); *Allender v. Schweiker*, 550 F.Supp. 1348, 1359 (S.D.N.Y.1982) (nationwide class of 2.8 million middle-age survivor benefit recipients). Regardless, any problems which arise in the management of a class action such as this one involving numerous small claims do not justify the Court permitting Microsoft to retain the benefits of its alleged wrongful conduct and to continue that conduct with impunity. See *Coordination Proceedings*, slip op. at 20.

73. This case involves a very large number of claimants with relatively small amounts at stake. Most consumers have little incentive to file suit independently since the high cost of litigation would far exceed their potential recovery. Yet at the same time, any monetary relief received is not so insignificant to support the proposition that individual consumers would not be motivated to pursue their claims in any resolution of this class action or that a favorable outcome would only benefit the attorneys involved.

*19 74. There can be little question that the class action device here would be of substantial benefit to the litigants and to this Court. See *Cardizem*, 200 F.R.D. at 350-51. Under the circumstances, the Court finds and concludes that allowing the case at hand to proceed as a class action is far superior to any other available method of adjudication.

### VIII. CONCLUSION

75. Based on the foregoing, this Court finds and concludes that Plaintiffs have satisfied the requirements for class certification set forth in Florida Rule of Civil Procedure 1.220(a) and 1.220(b)(3), to wit:
 a. The class is so numerous that joinder of all members is impracticable;
 b. There are questions of law or fact common to the class;
 c. The claims or defenses of the representative parties are typical of the claims or defenses of the class;
 d. Representative parties will fairly and adequately protect the interests of the class;
 e. The questions of law or fact common to members of the class predominate over any questions affecting only individual members; and
 f. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Based on the foregoing, IT IS SO ORDERED, that the classes proposed by Plaintiffs as set forth herein, *supra*, are certified, that the named Plaintiffs, Shelby Hartman, Julia Frow, Barbara Diaz, Eric Lazarus and B. Lazarus, Inc., are certified as class representatives, that counsel for the named Plaintiffs as designated in Pretrial Order Number One are appointed counsel for the class, and that an appropriate notice be sent to

Not Reported in So. 2002 WL 31423620 (Fla.Cir.Ct.)
**(Cite as: 2002 WL 31423620 (Fla.Cir.Ct.))**

Page 16

class members as soon as practicable in accordance with Florida Rule of Civil Procedure 1.220(d)(2).

2002 WL 31423620 (Fla.Cir.Ct.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.