Westlaw.

2004 WL 2601794
--- F.Supp.2d ---
(Cite as: 2004 WL 2601794 (N.D.Ohio))

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
N.D. Ohio,
Western Division.

DEFIANCE HOSPITAL, INC., et al., Plaintiffs
v.
FAUSTER-CAMERON, INC., et al., Defendants

No. 3:01 CV 7578.

Nov. 17, 2004.

**Background:** Hospital and medical services provider sued medical clinic and its employees, alleging monopolization and attempt to monopolize in violation of state and federal law, wrongful acts and unfair competition, interference with recruiting efforts, deceptive trade practices, and defamation. Parties cross-moved for summary judgment.

**Holdings:** The District Court, Carr, J., held that:
(1) plaintiffs had antitrust standing to sue;
(2) defendants had monopoly power in relevant market;
(3) factual issues precluded summary judgment on monopolization claim under Sherman Act;
(4) factual issues precluded summary judgment on claim under Sherman Act for attempted monopolization;
(5) factual issues precluded summary judgment on state-law claims for monopolization and attempted monopolization;
(6) plaintiffs lacked standing to challenge clinic's noncompete agreements with its nurse anesthetists; and
(7) defendants were not liable for deceptive trade practices or defamation under Ohio law.
Motions granted in part and denied in part.

**[1] Monopolies ⬤�longdash28(1.6)**

265k28(1.6) Most Cited Cases
Hospital and medical services provider, which worked together and were owned by same entity, had antitrust standing to sue medical clinic, its owner-operator doctors, and nurse anesthetists for monopolization and attempted monopolization of market for anesthesia services, inasmuch as causal connection existed between clinic's alleged refusal to deal, with intent to cause harm, and financial losses caused by inability of hospital and provider to operate profitable anesthesia service to cope with clinic's refusal to deal, refusal to deal caused antitrust injury to hospital as both consumer and forced competitor, hospital and provider suffered actual losses in operating anesthesia service that could not secure sufficient market share to be profitable and were direct victims of clinic's alleged anticompetitive conduct, and potential for duplicative recovery did not exist. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[2] Monopolies ⬤�longdash12(1.2)**
265k12(1.2) Most Cited Cases
Sherman Act protects competition, not competitors. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[3] Monopolies ⬤�longdash28(1.6)**
265k28(1.6) Most Cited Cases
Test for antitrust standing consists of five factors: (1) causal connection between antitrust violation and harm to plaintiff, and whether that harm was intended to be caused, (2) nature of plaintiff's alleged injury, including status of plaintiff as consumer or competitor in relevant market, (3) directness or indirectness of injury, and related inquiry of whether damages are speculative, (4) potential for duplicative recovery or complex apportionment of damages, and (5) existence of more direct victims of alleged antitrust violation.

**[4] Monopolies ⬤�longdash28(1.4)**
265k28(1.4) Most Cited Cases
**[4] Monopolies ⬤�longdash28(1.6)**
265k28(1.6) Most Cited Cases
Fact that antitrust claimant's injuries are somewhat speculative should not in itself foreclose antitrust standing.

**[5] Monopolies ⬤�longdash12(1.3)**

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

Page 2

265k12(1.3) Most Cited Cases
Under Sherman Act, "monopoly" consists of two elements: (1) possession of monopoly power in the relevant market, and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[6] Monopolies ⟷12(1.3)**
265k12(1.3) Most Cited Cases
In the context of monopoly claim under Sherman Act, "relevant market" consists of two components: product or service market and geographic market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[7] Monopolies ⟷12(1.3)**
265k12(1.3) Most Cited Cases
Reasonable interchangeability standard used to ascertain relevant product market for monopolization claim under Sherman Act involves identifying those products or services that are either identical to or available substitutes for defendant's product or service, and reasonable interchangeability may be determined by considering product uses, such as whether substitute products or services can perform the same function, or cross-elasticity of demand, which involves consumer sensitivity to price levels at which they elect substitutes for defendant's product or service. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[8] Monopolies ⟷12(1.3)**
265k12(1.3) Most Cited Cases
In the context of Sherman Act claim for monopolization, "geographic market" is an area of effective competition; the area is not defined by metes and bounds, but is the locale in which consumers of a product or service can turn for alternative sources of supply. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[9] Monopolies ⟷12(1.3)**
265k12(1.3) Most Cited Cases
**[9] Monopolies ⟷12(11)**
265k12(11) Most Cited Cases
Market for inpatient and outpatient anesthesia services, rather than market for physician services, was relevant product market for monopolization claim asserted by hospital and medical services provider under Sherman Act against medical clinic, its owner-operator doctors, and nurse anesthetists, given that hospital and provider did not allege or attempt to show monopolization or attempted monopolization of general physician services, physician services were not reasonably interchangeable with those of anesthesiologists, and defining product market as one for physician services ignored anesthesia services provided by nurse anesthetists. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[10] Monopolies ⟷12(1.3)**
265k12(1.3) Most Cited Cases
**[10] Monopolies ⟷12(11)**
265k12(11) Most Cited Cases
Twenty-minute vicinity around hospital was relevant geographic market for claim asserted by hospital and related medical services provider against medical clinic, its owner-operator doctors, and nurse anesthetists alleging monopolization of market for anesthesia services in violation of Sherman Act, given that hospital qualified as consumer of anesthesia services for antitrust purposes, and that, as consumer of anesthesia services, hospital was limited through its use of on-call paging system to satisfy state law and economic realities of operating hospital in rural area to securing anesthesia services from providers within 20-minute radius of hospital. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2; Ohio Administrative Code §§ 3701-84-46(C)(1), (D).

**[11] Monopolies ⟷12(1.3)**
265k12(1.3) Most Cited Cases
In the context of monopoly claim, a market definition must take into account the realities of competition. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[12] Monopolies ⟷12(1.3)**
265k12(1.3) Most Cited Cases
Plaintiff may establish that defendant holds monopoly power by presenting either (1) direct evidence of actual control over prices or actual exclusion of competitors, or (2) circumstantial evidence showing a high market share within a defined market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[13] Monopolies ⟷12(11)**
265k12(11) Most Cited Cases
Medical clinic, its owner-operator doctors, and nurse anesthetists possessed monopoly power in the relevant market of anesthesia services within 20-minute radius of rural hospital, given that they

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

had more than 60 percent market share and that they refused to share on-call time with anesthesiologist retained by medical services provider affiliated with hospital and to provide anesthesia services to independent physicians who did not sign primary source agreements with clinic, thereby compelling hospital and provider even though portion of market not controlled by clinic was insufficient to support that service financially. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[14] Monopolies** ☞**12(1.3)**
265k12(1.3) Most Cited Cases
Generally, establishing monopoly power for purposes of Sherman Act claim requires proof of more than 60 percent market power. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[15] Monopolies** ☞**12(1.3)**
265k12(1.3) Most Cited Cases
Market share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share; factors such as competitiveness of the market, number and strength of competitors, market trends, and the presence or absence of significant barriers to entering the market also are useful in determining whether defendant has monopolized a market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[16] Monopolies** ☞**12(1.3)**
265k12(1.3) Most Cited Cases
To prevail on claim for monopolization under Sherman Act, plaintiffs must prove willful acquisition or maintenance of monopoly power, which requires a showing that monopoly power was used to foreclose competition, to gain a competitive advantage, or to destroy a competitor. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[17] Monopolies** ☞**12(1.3)**
265k12(1.3) Most Cited Cases
Under element of Sherman Act claim for monopolization requiring proof of willful acquisition or maintenance of monopoly power, plaintiffs must prove a general intent on the part of the monopolist to exclude; however, proof of specific intent is not required, as no monopolist monopolizes unconscious of what he is doing. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[18] Monopolies** ☞**12(1.3)**
265k12(1.3) Most Cited Cases

Defendant may escape liability for monopolization under Sherman Act if its actions can be explained by legitimate business justifications. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[19] Federal Civil Procedure** ☞**2484**
170Ak2484 Most Cited Cases
Material issues of fact existed as to whether medical clinic, its owner-operator doctors, and nurse anesthetists intended to exclude competition in relevant market of anesthesia services within 20-minute radius of rural hospital when they refused to share on-call time with anesthesiologist retained by medical services provider affiliated with hospital and to provide anesthesia services to independent physicians who did not sign primary source agreements with clinic, precluding summary judgment on Sherman Act claim for monopolization for either hospital and provider or for clinic, doctors, and nurse anesthetists. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[20] Monopolies** ☞**12(1.3)**
265k12(1.3) Most Cited Cases
Plaintiff alleging attempt to monopolize in violation of Sherman Act must prove (1) defendant has engaged in predatory or anticompetitive conduct, (2) with a specific intent to monopolize, (3) thereby creating a dangerous probability of achieving monopoly power. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[21] Monopolies** ☞**12(1.3)**
265k12(1.3) Most Cited Cases
In the context of Sherman Act claim for attempt to monopolize, predatory or anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[22] Monopolies** ☞**12(11)**
265k12(11) Most Cited Cases
Medical clinic, its owner-operator doctors, and nurse anesthetists engaged in anticompetitive conduct, for purposes of Sherman Act claim for attempt to monopolize, when they refused to work with anesthesiologist retained by medical services provider affiliated with rural hospital, sought new primary source agreements for such services with independent physicians in area shortly after anesthesiologist's arrival, and refused to provide anesthesia services to independent physicians who refused to sign such agreements, thereby forcing hospital and provider to implement comprehensive anesthesia service capable of providing services 24

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

hours a day, seven days a week. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[23] Monopolies** ⌸ **12(1.3)**
265k12(1.3) Most Cited Cases
As a general rule under antitrust law, there exists no duty to deal, so long as the determination is made unilaterally, but when a business possesses monopoly power, the business may be held to a different standard.

**[24] Monopolies** ⌸ **17(2.2)**
265k17(2.2) Most Cited Cases
Under antitrust law, business possessing monopoly power ordinarily cannot wilfully refuse to deal with a competitor if the refusal is designed and calculated to foreclose competition or to remove or exclude a competitor by unfair, unreasonable, or predatory practices or conduct.

**[25] Monopolies** ⌸ **12(1.3)**
265k12(1.3) Most Cited Cases
In the context of Sherman Act claim for attempt to monopolize, specific intent to monopolize may be inferred from anticompetitive conduct, but not from legitimate business practices aimed at succeeding in competition. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[26] Federal Civil Procedure** ⌸ **2484**
170Ak2484 Most Cited Cases
Material issues of fact existed as to whether medical clinic, its owner-operator doctors, and nurse anesthetists acted with specific intent to monopolize when they engaged in anticompetitive conduct with respect to provision of anesthesia services in area of rural hospital, or whether they had legitimate business justifications for their actions, precluding summary judgment for either clinic, doctors, and nurse anesthetists or for hospital and related medical services provider on Sherman Act claim for attempted monopolization asserted by hospital and provider. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[27] Monopolies** ⌸ **12(11)**
265k12(11) Most Cited Cases
Medical clinic, its owner-operator doctors, and nurse anesthetists, which had monopoly power in relevant market of anesthesia services within 20-minute radius of rural hospital due to their more than 60 percent share of market for anesthesia services, lack of competition, and unique access to customers presenting barrier to market entry, likewise possessed dangerous probability of achieving monopoly power for purposes of

attempted monopolization claim asserted under Sherman Act by hospital and related medical services provider. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[28] Monopolies** ⌸ **12(1.3)**
265k12(1.3) Most Cited Cases
To determine whether there is a dangerous probability of achieving monopoly power, for purposes of claim under Sherman Act for attempted monopolization, courts consider the relevant market and defendant's ability to lessen or control competition in that market; the greater a firm's market power, the greater the probability of successful monopolization. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[29] Monopolies** ⌸ **12(1.3)**
265k12(1.3) Most Cited Cases
To have a dangerous probability of success in achieving monopoly power, for purposes of Sherman Act claim for attempted monopolization, firm must possess market strength that approaches monopoly power, including the ability to control prices and exclude competition. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[30] Monopolies** ⌸ **12(1.3)**
265k12(1.3) Most Cited Cases
Plaintiff cannot succeed on attempted monopolization claim under Sherman Act unless defendant possesses market power. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[31] Monopolies** ⌸ **12(1.3)**
265k12(1.3) Most Cited Cases
In considering the likelihood of achieving monopoly power, for purposes of Sherman Act claim for attempted monopolization, courts employ the same concept of market power as used in monopolization claims: defendant's relevant market share in light of other market characteristics, including barriers to entry. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[32] Monopolies** ⌸ **12(1.3)**
265k12(1.3) Most Cited Cases
A lesser degree of market power may be sufficient to establish an attempted monopolization claim than that needed to establish a completed monopolization claim under Sherman Act. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[33] Monopolies** ⌸ **12(1.3)**
265k12(1.3) Most Cited Cases
Market share of 30 percent is presumptively insufficient to establish a dangerous probability of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

success in achieving monopoly power required to establish claim under Sherman Act for attempted monopolization. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[34] Monopolies ☞12(1.3)**
265k12(1.3) Most Cited Cases
Those with market shares between 30 and 50 percent may be found to have a dangerous probability of success in achieving monopoly power, if other factors are present, for purposes of attempted monopolization claim under Sherman Act. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[35] Federal Civil Procedure ☞2484**
170Ak2484 Most Cited Cases
Material issues of fact existed as to whether medical clinic, its owner-operator doctors, and nurse anesthetists acted with intent to exclude competition in relevant market of anesthesia services within 20-minute radius of rural hospital, and whether such defendants acted with specific intent to monopolize when they engaged in anticompetitive conduct with respect to provision of anesthesia services in area of rural hospital, precluding summary judgment for either defendants or for hospital and related medical services provider on claims for monopolization and attempted monopolization asserted by hospital and provider under Ohio law. R.C. § 1331.01et seq.

**[36] Contracts ☞185.1**
95k185.1 Most Cited Cases
**[36] Contracts ☞187(1)**
95k187(1) Most Cited Cases
Hospital and related medical services provider were not parties to noncompete agreements between medical clinic and its nurse anesthetists nor third-party beneficiaries thereof, and thus lacked standing to sue to enforce or void such agreements under Ohio law.

**[37] Torts ☞10(1)**
379k10(1) Most Cited Cases
**[37] Torts ☞12**
379k12 Most Cited Cases
Under Ohio law, claim for tortious interference with business relationships requires proof of (1) a business relationship or contract, (2) knowledge of the relationship or contract by the wrongdoer, (3) intentional or improper action taken by the wrongdoer to prevent a contract formation, procure a contractual breach, or terminate a business relationship, (4) a lack of a privilege or

justification, and (5) resulting damages.
**[38] Contracts ☞185.1**
95k185.1 Most Cited Cases
**[38] Contracts ☞187(1)**
95k187(1) Most Cited Cases
Under Ohio law, only a party to a contract or an intended third-party beneficiary may bring an action on the contract.

**[39] Contracts ☞117(2)**
95k117(2) Most Cited Cases
Under Ohio law, noncompete agreements between medical clinic and its employees that prevented employees from competing with clinic within 25-mile radius of clinic office for one year following employment termination, and included buyout provision allowing employee to buy his or her way out of agreement by paying clinic $50,000, contained reasonable geographical and temporal restrictions, and thus were enforceable.

**[40] Contracts ☞116(1)**
95k116(1) Most Cited Cases
**[40] Contracts ☞116(2)**
95k116(2) Most Cited Cases
Under Ohio law, noncompete agreement between employer and employee does not violate public policy if it is reasonably necessary for the protection of the employer's business and not unreasonably restrictive upon the rights of the employee.

**[41] Trade Regulation ☞862.1**
382k862.1 Most Cited Cases
Absence of evidence that disparaging statements were made about hospital, related medical services provider, and their anesthesiologist by medical clinic, its owner-operator doctors, or nurse anesthetists precluded liability of clinic, doctors, and nurse anesthetists for deceptive trade practices claim asserted by hospital and provider under Ohio law. R.C. § 4165.01et seq.

**[42] Federal Civil Procedure ☞1275**
170Ak1275 Most Cited Cases
In opposing summary judgment motion, hospital and medical services provider were not entitled to order requiring medical clinic, its owner-operator doctors, and nurse anesthetists to identify those patients whose surgical procedures were shifted by certain doctors to other hospitals in connection with their state-law claim for deceptive trade practices, given failure of hospital and provider to offer, as required by court, nonhearsay support for their assertion that disparaging comments were made

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794                                                                                    Page 6
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

about them and their anesthesiologist by clinic, doctors, and nurse anesthetists.

**[43] Libel and Slander** ⟺112(1)
237k112(1) Most Cited Cases
Absence of evidence that disparaging statements were made about hospital, related medical services provider, and their anesthesiologist by medical clinic, its owner-operator doctors, and nurse anesthetists precluded defamation liability on part of clinic, doctors, and nurse anesthetists under Ohio law.

**[44] Libel and Slander** ⟺1
237k1 Most Cited Cases
Under Ohio law, a claim for defamation requires proof of (1) a false and defamatory statement concerning another, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Amy N Natyshak, Marshall & Melhorn, Toledo, David Marx, Jr., McDermott, Will & Emery, Chicago, IL, John A. Borell, Jr., Marshall & Melhorn, Marshall A. Bennett, Jr., Marshall & Melhorn, Toledo, for Defiance Hospital, Incorporated, ProMedica West Physicians, Alan Gardner, M.D., Plaintiffs.

David W. Wicklund, Shumaker, Loop & Kendrick, Toledo, Walter F. Ehrnfelt, III, Waldheger Coyne, Westlake, for Fauster-Cameron, Incorporated, Terry Howarth, CRNA, Douglas Lee, CRNA, John Yeoman, CRNA, Kathyrn Schwindl Watson, CRNA, William H Richter, M.D., John W. Shaw, M.D., Jeffrey A. Pruitt, M.D., John J. Racciato, M.D., John Doe, Defendants.

ORDER

CARR, District J.

**\*1** This is antitrust action arising under § 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs, Defiance Hospital, Inc. (Hospital) and ProMedica West Physicians, LLC (ProMedica West), [FN1] allege that defendants, Fauster-Cameron, Inc., d.b.a. as the Defiance Clinic (Clinic) and its employees [FN2] monopolized and attempted to monopolize the Defiance, Ohio, market for anesthesia services by engaging in anticompetitive conduct designed to

drive plaintiffs, defendants only competitors, out of the market.

Plaintiffs' first amended complaint also asserted claims under the Ohio Valentine Act, O.R.C. § 1331.01 et seq. for monopolization and attempted monopolization, as well as claims for wrongful acts and unfair competition, interference with recruiting efforts, deceptive trade practices in violation of O.R.C. § 4165.01, et seq., and defamation. [FN3]

Pending is defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment. For the following reasons, defendants' motion shall be granted as to Counts Three, Four, Five, and Six of plaintiffs' complaint and denied as to Counts One and Two.

Plaintiffs' cross motion for summary judgment shall be granted as to Counts One and Two on the issues of possession of monopoly power in the relevant market, predatory or anticompetitive conduct, and dangerous probability of achieving monopoly power. Plaintiffs' motion shall be denied as to Counts One and Two on the issues of general intent to exclude and specific intent to monopolize. Plaintiffs' motion shall also be denied as to Counts Three, Four, Five, and Six of plaintiffs' complaint.

Background

Plaintiff, Defiance Hospital, is an Ohio non-profit corporation engaged in the business of providing hospital services to patients in the Defiance, Ohio, area. ProMedica West, an Ohio limited liability company formed by ProMedica Health Systems, provides medical services to patients and medical institutions, including the Hospital.

Fauster-Cameron, an Ohio for profit corporation, operates Defiance Clinic, a medical clinic in Defiance. The doctors named in this litigation own and operate the Clinic, which employs Certified Registered Nurse Anesthetists (CRNAs).

In the 1980s, two organizations, the Clinic and Northwest Ohio Anesthesia Services, Inc., provided anesthesia services at the Hospital. Northwest Ohio Anesthesia Services exited the market in the late 1980s, and by 1991 the remaining providers of anesthesia services were Defiance Clinic and an

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794                                                              Page 7
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

independent CRNA, James Fellabaum. Early that year, Mr. Fellabaum also left Defiance.

In December, 1990, the Clinic for the first time entered into non-competition agreements with its CRNAs. Those agreements prohibited the CRNAs from providing anesthesia services within twenty-five miles of the Clinic for one year following termination of their employment.

Subsequently, in a letter dated February 8, 1991, Chad Peter, Defiance Clinic's Administrator, contacted Mark Marchetti, Defiance Hospital's Assistant Administrator to discuss an arrangement by which the Clinic would become the exclusive provider of anesthesia services at the Hospital. After a meeting of the Hospital's Professional Relations Committee, the Hospital declined to enter into the arrangement.

**\*2** In response to the Hospital's refusal, the Clinic sought to enter into anesthesia services agreements with independent physicians in the area. Pursuant to these contracts, the physicians agreed to use the Clinic's CRNAs as their "primary source" for anesthesia services. Plaintiffs contend that these agreements created "serious anesthesia coverage problem[s] for the hospital":

> If the patient of a non-signing physician presented himself at the Defiance Hospital for emergency medical treatment requiring anesthesia, and the Clinic declined to provide anesthesia service because of the refusal of that patient's physician to sign the "primary source" contract, the patient could suffer great detriment.

(Doc. 113, 115, at 6.)

Due to these concerns, the Hospital reopened discussions regarding an exclusive arrangement with the Clinic for anesthesia services, but the parties failed to reach an agreement. By September 3, 1991, with the exception of one physician, D. Said Shehata, all independent physicians in the community had entered into primary source agreements with the Clinic. [FN4] One year later, that physician also entered into a primary source agreement with the Clinic.

In May, 1999, the Hospital began exploring the feasibility of adding an anesthesiologist to its staff. The Clinic responded by developing a contingency plan which contemplated challenging the Hospital's right to limit or exclude Clinic CRNAs, asserting that surgeons and patients are allowed to choose an anesthetist, and suggesting that if all else fails, patients should be taken to other facilities where Clinic CRNAs are used. (Doc. 113, 115, at 10.)

On May 19, 2000, ProMedica West and Alan Gardner, M.D., an anesthesiologist, entered into an employment agreement. The Hospital and ProMedica West planned to use Dr. Gardner in a coordinated effort with the Clinic's CRNAs to provide anesthesia services at the Hospital.

The Clinic reacted by refusing to work with and share call coverage with Dr. Gardner, thereby requiring Dr. Gardner to supervise the CRNAs twenty-four hours a day, seven days a week.

Shortly after Dr. Gardner's arrival, the Clinic issued a letter to all independent physicians demanding that they sign new primary source contracts. These contracts required that at least ninety percent of the physicians' anesthesia services in any thirty day period must be provided by the Clinic. None of the independent physicians signed the Clinic's contracts.

Dr. Jeffrey Pruitt, on behalf of the Clinic, informed Robert Coholich, President of the Hospital, that effective October 13, 2000, the Clinic CRNAs would provide anesthesia services for only patients of those physicians who signed the new primary source contracts. Mr. Coholich reminded Dr. Pruitt of the CRNAs' obligations under the Medical Staff bylaws to provide on-call services to any patient seeking surgical services at the Hospital regardless of their attending physician. The Clinic, however, reaffirmed its determination to refuse to serve the patients of physicians who did not sign the new agreements.

**\*3** The Clinic's actions forced the Hospital to create its own comprehensive anesthesia service. Shortly thereafter, the Hospital entered into an exclusive service agreement with ProMedica West, Dr. Gardner's employer, to provide anesthesia services.

## Discussion
### A. Sherman Act § 2: Monopolization and Attempted Monopolization

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

Page 8

Count One of plaintiffs' complaint alleges that, contrary to § 2 of the Sherman Act, 15 U.S.C. § 2, defendants monopolized and attempted to monopolize the market for anesthesia services by: 1) entering into non-competition agreements with its employees; 2) refusing to work with or share on-call rotations at the Hospital with Dr. Gardner; 3) demanding that independent physicians in the Defiance area enter into primary source agreements; and 4) refusing to provide anesthesia services to patients of physicians who did not enter into primary source agreements.

Defendants contend that they have not violated § 2 because: 1) plaintiffs have failed to define the geographic scope of the relevant market; 2) defendants do not have sufficient market power to monopolize or attempt to monopolize; and 3) plaintiffs have not suffered an antitrust injury and therefore lack standing to bring an antitrust claim.

For the following reasons, I decline to grant summary judgment in full for either party on plaintiffs' monopolize and attempt to monopolize claims.

### 1. Standing

[1] Defendants contend that plaintiffs have not suffered an antitrust injury, and thus lack standing to bring an antitrust claim.

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

[2] The Sherman Act protects competition, not competitors. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,* 323 F.3d 366, 372 (6th Cir.2003) (citing *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)). In *Spectrum Sports* the Supreme Court explained the purpose of the Sherman Act:

The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is

competitive, evenseverely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.

506 U.S. at 458.

Standing requirements for antitrust litigation are rooted in the purpose of antitrust laws. The Sixth Circuit described this connection:

Antitrust standing ... is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws. The requirement of antitrust standing ensures that antitrust litigants use the laws to prevent anticompetitive action and makes certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense. Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

**\*4** *HyPoint Tech., Inc. v. Hewlett-Packard Co.,* 949 F.2d 874, 877 (6th Cir.1991).

[3] The test for antitrust standing consists of five factors:

(1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Southhaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1085 (6th Cir.1983) (citing *Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 537-44, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ).

I find that plaintiffs have antitrust standing.

Under the first *Southaven* factor, plaintiffs have

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794                                                                    Page 9
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

set forth sufficient evidence of a causal connection between the Clinic's anticompetitive conduct and the plaintiffs' financial losses arising from their inability to operate a profitable anesthesia service. The Clinic insisted that independent physicians in the Defiance area enter into primary source agreements, refused to work with or share rotations with Dr. Gardner, and would not provide anesthesia services to patients of physicians who did not enter into primary source agreements.

When confronted with these actions, the Hospital had no choice but to develop a complete anesthesia service capable of serving patients twenty-four hours a day, three hundred sixty-five days a year. This service was highly likely to operate at a financial loss in view of the Clinic's control of the market. Therefore, I find a causal connection between the claimed violation (*i.e.*, the Clinic's refusal to deal), and the harm (*i.e.*, financial losses suffered by the Hospital's comprehensive anesthesia program instituted in response to the Clinic's refusal to deal).

Plaintiffs have presented evidence that the Clinic knew of the probable effects of its actions and therefore intended to cause harm to the plaintiffs. Although defendants have given business justifications for their actions, I find sufficient evidence for a jury to conclude that defendants possessed illicit intent.

I also find that plaintiffs have satisfied the second *Southhaven* factor-- antitrust injury. The Supreme Court first explained this requirement in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977):

[F]or plaintiffs to recover treble damages on account of [antitrust] violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."
**\*5** (quoting *Zenith Radio Corp. v. Hazeltine*

*Research,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)).

This case presents a unique situation because the Hospital is both a consumer and competitor of anesthesia services. Although anesthesia services are ancillary to surgical procedures, and patients are the ultimate consumers of surgical and anesthesia services, the Hospital must secure the necessary anesthesia services and make them available to its patients. Thus, under the circumstances of this case, the Hospital is a consumer of anesthesia services.

When the Hospital hired Dr. Gardner, an anesthesiologist, the Hospital became a competitor providing anesthesia services to the public. Defendants responded to Dr. Gardner's hiring by demanding that independent physicians in the Defiance area enter into primary source agreements, declining to work with or share rotations with Dr. Gardner, and refusing to provide anesthesia services to patients of physicians who did not enter into primary source agreements.

The defendants' absolute refusal to deal, combined with the Hospital's obligation to the public to provide medical services, forced the Hospital to implement a comprehensive anesthesia program, capable of providing anesthesia services twenty-four hours a day, seven days a week. This program, moreover, would consistently operate at a financial loss in light of defendants' overwhelming market share.

Defendants' conduct unfairly tended to destroy competition and is not in the public interest. As both a consumer and a forced competitor, the losses suffered by plaintiffs are the type of injury the antitrust laws were intended to prevent.

Plaintiffs satisfy the third *Southhaven* factor--the injury is direct, and the damages are not speculative. Plaintiffs suffered actual losses in operating an anesthesia service that has been unable to secure sufficient market share to operate profitably.

[4] Plaintiffs' damages are not so speculative that they cannot be calculated. Even if an antitrust claimant's injuries are somewhat speculative, as "is often the case in complex antitrust litigation," this

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

factor should not in itself foreclose antitrust standing. *See Potters Med. Ctr. v. City Hosp. Assn.,* 800 F.2d 568, 576 (6th Cir.1986).

The fourth and fifth factors also weigh in favor of plaintiffs. Working together as a competitor of the Clinic, the Hospital and ProMedica West are direct victims of defendants' anticompetitive conduct. The potential for duplicative recovery does not exist under these facts, nor does a potential recovery by plaintiffs require a complex apportionment of damages: the entities, the Hospital and ProMedica West, are both owned by ProMedica Health Systems.

Although patients of the Hospital may have also brought suit had patients been unable to obtain anesthesia services, the Hospital did not wait for its patients to suffer a direct injury, nor should it be required to do so. [FN5] The Hospital took actions to ensure that anesthesia services would be available to its patients at all times. Moreover, the Sixth Circuit has noted that where the plaintiff is a direct victim of the alleged antitrust violation, as the plaintiffs are in this case, the risk of duplicative recovery which may occur when more indirect parties sue is diminished. *See Potters,* 800 F.2d at 576.

**\*6** I find, accordingly, that plaintiffs have standing to bring suit under § 2 of the Sherman Act.

### 2. Monopolization

[5] A monopoly under § 2 of the Sherman Act consists of two elements: "1) possession of monopoly power in the relevant market; and 2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *United States v. Grinnell Corp.,* 384 U.S. 563, 570-571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

#### a. Monopoly Power in the Relevant Market

[6] To determine if defendants possessed monopoly power, I must first determine the relevant market. The relevant market consists of two

components: product or service market and geographic market. *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

[7] Courts use the "reasonable interchangeability" standard to ascertain the relevant product market. This test involves identifying those products or services that are either "identical to" or "available substitutes for the defendant's product or service." *White & White, Inc. v. American Hosp. Supply Corp.,* 723 F.2d 495, 500-01 (6th Cir.1983) (citing *United States v. du Pont de Nemours & Co.,* 351 U.S. 377, 394-95, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (*Cellophane* )). Reasonable interchangeability may be determined by considering product uses, (*i.e.,* whether substitute products or services can perform the same function) or cross-elasticity of demand (*i.e.,* consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service). *Id.*

[8] A geographic market is "an area of effective competition." *Re/Max Int'l, Inc. v. Realty One, Inc.,* 173 F.3d 995, 1016 (6th Cir.1999). The area is not defined by "metes and bounds," but "is the locale in which consumers of a product or service can turn for alternative sources of supply." *Id.; see also White,* 723 F.2d at 501 ("The area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.") (quoting *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)).

### I. Product or Service Market

[9] Plaintiffs define the relevant product market as the market for inpatient and outpatient anesthesia services. Defendants argue that plaintiffs' product market definition is too narrow; they define the relevant product market as the market for physician services. Plaintiffs' argument is more persuasive.

Plaintiffs have alleged and set forth evidence that defendants have monopolized and attempted to monopolize the market for anesthesia services. Plaintiffs have not alleged, much less presented any

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
(Cite as: 2004 WL 2601794 (N.D.Ohio))

Page 11

evidence of, monopolization or attempted monopolization of general physician services.

Not all physician services are identical. Only anesthesiologists and CRNAs provide anesthesia services. Some physicians are anesthesiologists, but not all physicians are anesthesiologists: therefore, physicians' services are not reasonably interchangeable with those of anesthesiologists.

**\*7** Defendants' definition of the product market fails, moreover, to account for the anesthesia services provided by CRNAs, who are registered nurses with special education and training in administering anesthesia, and who administer anesthesia under the supervision of a physician, dentist, or podiatrist. Though not physicians, CRNAs compete with anesthesiologists in providing anesthesia services.

Finally, defendants have produced no evidence of any other service that is a reasonable substitute for anesthesia services in terms of use and cross-elasticity of demand.

I thus find the relevant product market to be the market for anesthesia services.

### ii. Geographic Market

[10] Plaintiffs contend that the relevant geographic market in which a consumer of anesthesia services may practicably turn for those services is limited to the City of Defiance and its immediate environs ("Defiance Market"). The outer boundary of the Defiance Market, plaintiffs assert, is defined by the time needed for an anesthesia provider to travel to the Hospital after receiving a page informing the provider that a patient needs such services. This travel time, in turn, is twenty minutes pursuant to the Hospital's on-call policy, which requires those on call to be able to reach the Hospital within twenty minutes after receiving the page.

Defendants define the relevant geographic market much more broadly. They claim the market encompasses a six-county area: namely Defiance, Henry, Paulding, Putnam, Williams, and Fulton counties. According to defendants, this six-county area includes more than thirteen hospitals with which Defiance Hospital competes and has at least

173 physicians, of whom only thirty-two are affiliated with the Clinic.

Defendants argue that this six-county area is the relevant geographic market because: 1) Defiance Hospital competes with each of these hospitals for patients; and 2) there is no independent demand for inpatient anesthesiology services. Because a demand exists for inpatient services involving anesthesiology, defendants' expert concludes that the relevant geographic market for inpatient services provides a good estimate of the suppliers consumers turn to for inpatient services requiring anesthesia.

Plaintiffs' market definition, in contrast to the defendants' definition, accurately treats the Hospital as the consumer of services. Plaintiffs' definition also takes into account the economic realities of a hospital located in a rural area. I find plaintiffs' geographic market definition to be appropriate.

Defendants correctly note that patients undergoing inpatient or outpatient surgical procedures receive, and thus "consume" anesthesia services. Nonetheless, for purpose of ascertaining the consumer of those services from an antitrust perspective, I conclude that the Hospital is the consumer of anesthesia services.

Ohio Administrative Code §§ 3701-84-46(C)(1) and (D) require Defiance Hospital, in its capacity as a Level I obstetrical unit, to have a surgical team, including an anesthesia provider, available on a twenty-four hour basis for the purpose of ensuring that Cesarean Sections may proceed within thirty minutes of a decision to perform the procedure. Defiance Hospital satisfies this requirement by requiring an anesthesia provider to be at the hospital or on-call and able to arrive at the Hospital within twenty minutes of being paged.

**\*8** As a result of the necessarily short response time, the locale in which Defiance Hospital can turn for alternative sources of anesthesia providers is limited to anesthesiologists and CRNAs able to arrive at the hospital within twenty minutes of being paged. Plaintiffs present uncontroverted evidence that anesthesia providers in neighboring communities, such as Bryan, Hicksville, Paulding, and Napoleon, are unable to reach the Hospital

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
(Cite as: 2004 WL 2601794 (N.D.Ohio))

reliably within twenty minutes of receiving a page due to the vagaries of traffic and road and weather conditions. Moreover, patients needing emergency surgery cannot wait for anesthesia providers to travel to the Hospital from more distant communities.

The manner in which the Clinic's CRNAs practiced further evidences the limited scope of the geographic market. Each Clinic CRNA limited his or her practice to one hospital, with three CRNAs practicing only at Defiance Hospital. [FN6] Prior to its exclusive arrangement with ProMedica, CRNAs based in other communities did not seek admission to the medical staff or privileges to administer anesthesia at the Hospital.

Defendants cite *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869 (3d Cir.1995), for the proposition that limiting the relevant market to a single hospital is generally too narrow a definition. In *Brader,* the Third Circuit, listing several cases in which courts refused to define the geographic market narrowly, stated: "[E]very court that has addressed this issue has held or suggested that, absent an allegation that the hospital is the only one serving a particular area or offers a unique set of services, a physician may not limit the relevant geographic market to a single hospital." *Id.* at 878. [FN7]

None of the cases referenced in *Brader* involved a hospital as the consumer of services. The cases cited in *Brader* involved, rather, physicians' suits against hospitals either arising from denial or revocation of staff privileges or challenging exclusive dealing contracts between the hospitals and physicians. [FN8]

Defendants also claim that *Re/Max, supra,* requires rejection of plaintiffs' proposed geographic market:
> Obviously, at the outer edges of a *bona fide* geographic market, buyers may be able to cross into other territory for their supply of a product or service; however, this fact alone does not require a rejection of the claimed market. *See United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 359-60, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). On the other hand, when the evidence indicates that a large proportion of consumers within the proposed area in fact turn to alternative sources of supply outside the proposed area, the market

boundaries posited by the plaintiff must be rejected. *See Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 346 (8th Cir.1995).
173 F.3d at 1016-17.

Defendants again failed to treat the Hospital as the consumer of anesthesia services. While the Hospital draws patients from several surrounding counties, that fact is irrelevant. As a consumer of anesthesia services, the Hospital is limited, due to its on-call paging system, to securing anesthesia services from providers within a twenty-minute radius of the Hospital. [FN9]

*9 [11] A market definition must take into account the realities of competition. *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.,* 118 F.3d 178, 183 (3d Cir.1997); *Weiss v. York Hosp.* 745 F.2d 786, 826 (3d Cir.1984) (citing *Grinnell,* 384 U.S. at 572-73; *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 356-57, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963)). The realities of operating a hospital in rural Ohio are that a hospital cannot afford to maintain a full staff at the hospital twenty-four hours a day, seven days a week. The economic realities require the hospital to implement an on-call system, a system which, under Ohio law, must provide a prompt response to on-call pages. Thus, for a consumer of anesthesia services like Defiance Hospital, the realities of the market limit the Hospital to obtaining services within a twenty-minute vicinity.

In the absence of a genuine issue of material fact on this issue, I find the relevant geographic market to be the twenty-minute vicinity around Defiance Hospital.

### iii. Monopoly Power

[12][13] In *Cellophane,* 351 U.S. at 391, the Supreme Court defined monopoly power as "the power to control prices or exclude competition." A plaintiff may establish that a defendant holds monopoly power by presenting either 1) direct evidence of actual control over prices or actual exclusion of competitors or 2) circumstantial evidence showing a high market share within a defined market. *Re/Max, supra,* 173 F.3d at 1016 (citations omitted).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

In the relevant market of anesthesia services within a twenty-minute radius of Defiance Hospital, the defendants possessed monopoly power.

Plaintiffs have presented no evidence showing that defendants had actual control over prices or actually excluded competitors from the relevant market. [FN10] Therefore, I must look to defendants' market share to determine whether defendants possessed monopoly power.

[14] The Supreme Court has not prescribed a "magical percentage of market power" that triggers monopoly power for purposes of § 2. Generally, however, monopoly power requires proof of more than sixty percent market power. *See Grinnell,* 384 U.S. at 571 (eighty-seven percent market power constitutes a monopoly); *American Tobacco Co. v. United States,* 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (over two-thirds of market constitutes a monopoly); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 917 F.2d 1413, 1443 (6th Cir.1990) ("There is substantial merit in a presumption that market shares below 50 or 60 percent do not constitute monopoly power.") (citing Areeda & Hovenkamp, Antitrust Law, § 518.3 (1988 Supp.)).

In 1991, the Clinic's last competitor providing anesthesia services in the Defiance Market left the area. At that point, the Clinic obtained a monopoly for anesthesia services in the Defiance Market, albeit by historical accident. Nonetheless, from early 1991 until July 2000 when Dr. Gardner joined the Hospital, defendants provided the only anesthesia services in the market and administered all anesthesia to the Hospital's patients. During this period, the Clinic enjoyed a 100% market share.

*10 The plaintiffs have presented evidence that in 1999, the Clinic controlled ninety-six percent of the demand for anesthesia services. Plaintiffs base this percentage on the fact that Clinic surgeons performed 1,828 surgical procedures or sixty-five percent of all surgeries at the Hospital that year. By adding the number of surgeries performed by independent physicians under primary source agreements using the Clinic CRNAs, the Clinic controlled over ninety-six percent of all surgical procedures requiring anesthesia at the Hospital.

After Dr. Gardner entered the market, the Clinic physicians continued to use Clinic CRNAs for anesthesia services. At the time, the Clinic also attempted to enter into new primary source agreements with the independent physicians in the community. These agreements required the physician to use Clinic CRNAs to perform ninety percent of all anesthesia services needed by the physician's patients in any thirty-day period.

None of the independent physicians signed the agreements in 2000. The Clinic, in response, refused to serve patients of non-signing physicians, and thereby effectively ceded thirty-five percent of anesthesia services to Dr. Gardner and ProMedica West.

In 2000 and 2001, the Clinic's market share dropped. In 2000, the Clinic CRNAs performed sixty-four percent of all surgical procedures requiring anesthesia services at the Hospital. In 2001, Clinic CRNAs performed fifty-one percent of all surgical procedures requiring anesthesia services at the Hospital.

The 2001 figure, however, is somewhat misleading. In 2001, the Clinic opened a ambulatory surgery center for outpatient surgical procedures previously performed at the Hospital. By adding the surgical procedures conducted at this facility to the total procedures performed at the Hospital, the Clinic's percentage of procedures was sixty-three percent.

Since Dr. Gardner's entry into the market, the Hospital, Dr. Gardner, and ProMedica West have been able to conduct slightly more than one-third of the surgical procedures requiring anesthesia. While defendants' over sixty percent market share is strong evidence of monopoly power, other market factors are also relevant to this determination.

[15] "Market share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share." *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,* 185 F.3d 606, 623 (6th Cir.1999) (citing *Byars v. Bluff City News Co.,* 609 F.2d 843, 850-51 (6th Cir.1979)). "Factors such as competitiveness of the market, number and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

strength of competitors, market trends and the presence or absence of significant barriers to entering the market also are useful in determining whether a defendant has monopolized a market." *Re/ Max Int'l v. Realty One,* 924 F.Supp. 1474, 1489 (N.D.Ohio 1996), *rev'd in part on other grounds,* 173 F.3d 995 (6th Cir.1999) (citing *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 894 (10th Cir.1991)).

*11 Combining defendants' market share with these market factors compels a finding that defendants possessed monopoly power.

Prior to plaintiffs' entry into the market, defendants faced no competition and had erected a significant barrier to entry--control over customer access. Plaintiffs admit that the thirty-five to thirty-seven percent of the market they have been able to obtain from independent physicians would have been sufficient to support Dr. Gardner's entry into the market, but argue the same market share is insufficient to support the comprehensive service defendants forced plaintiffs to implement.

Defendants refused to share on-call time with Dr. Gardner and refused to provide services to patients of non-signing independent physicians. Without the services the Clinic's CRNAs, plaintiffs had to provide anesthesia services twenty-four hours a day, seven days a week. This necessitated developing a complete anesthesia service.

The portion of the market not controlled by the defendants is, however, insufficient to support the plaintiffs' service financially. Plaintiffs simply do not have access to enough patients requiring surgical procedures to sustain a comprehensive anesthesia service.

Thus, I find that plaintiffs have proven defendants possessed monopoly power over anesthesia services within a twenty-minute radius of Defiance Hospital.

### b. Willful Acquisition or Maintenance of Monopoly Power

[16] For plaintiffs to prevail, they must prove willful acquisition or maintenance of monopoly power. *Eastman Kodak,* 504 U.S. at 481. This element requires a showing that monopoly power

was used "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* at 482-83 (citing *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948)).

[17] Under this element, plaintiffs must also prove "a general intent on the part of the monopolist to exclude." *Conwood Co. v. United States Tobacco Co.,* 290 F.3d 768, 782 (6th Cir.2002). Proof of specific intent is not required as "no monopolist monopolizes unconscious of what he is doing.... Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 602, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

[18] Courts frequently examine the business justifications for conduct to determine if the conduct has a rational business purpose other than adverse effects on competition. A defendant may escape liability if its actions can be explained by legitimate business justifications. *Technical Res. Servs., Inc. v. Darnier Med. Sys., Inc.* 134 F.3d 1458, 1466 (11th Cir.1998).

As previously stated, defendants obtained monopoly power in the relevant market by historical accident when the last competitor left the market in 1991. Despite having obtained a monopoly lawfully, defendants may have committed a § 2 offense by unlawfully maintaining that monopoly by refusing to deal with its competitor, the Hospital.

*12 [19] I find that a question of fact exists as to this element of plaintiffs' monopolization claim.

Plaintiffs have set forth sufficient facts for a jury to could conclude that defendants intended to exclude competition by refusing to work with Dr. Gardner, seeking primary source agreements with independent physicians, and not providing services for physicians who did not enter the primary source arrangements.

Plaintiffs argue defendants knew that their failure to supply anesthesia services to independent physicians who did not enter primary source agreements would force the Hospital into establishing a comprehensive anesthesia service able to provide service twenty-four hours a day,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

seven days a week. Further, plaintiffs argue that, based on defendants' experience as an anesthesia services provider, defendants knew that a comprehensive service would require a minimum of three anesthesia providers, and that the number of surgical procedures performed by independent physicians was insufficient to support such a program.

Defendants, however, have set forth business justifications for their alleged anticompetitive actions.

Defendants claim that these primary source agreements with independent physicians ensured that independent physicians supervised the Clinic CRNAs and maintained adequate medical malpractice insurance coverage when using those CRNAs. Defendants also argue that these agreements were not "particularly troublesome impediment[s]" to competing anesthesia providers because the agreements permitted independent physicians to use other anesthesia services, with the limitation that each physician use Clinic CRNAs simply as his or her primary source. The agreements, moreover, could be terminated by either party on ninety days written notice. (Doc. 124, at 13-14.)

As to defendants' refusal to work with Dr. Gardner, defendants explain they "were uncomfortable" with a physician who supervised its employees, but had no relationship with the Clinic. (Doc. 62, at 5.) Further, the defendants claim they were concerned that its CRNAs would have little or no control over the on-call schedule established by Dr. Gardner, and thus feared its CRNAs faced a disproportionate share of the more difficult emergency cases while Dr. Gardner handled the majority of the less stressful scheduled cases. For these reasons, the defendants assert, the Clinic decided to provide anesthesia services only for its own physicians and independent physicians who signed primary source agreements.

These contentions give rise to a question of fact as to whether defendants possessed the general intent to exclude competition. Thus, both parties' motions for summary judgment shall be denied as to this issue.

Plaintiffs' motion for summary judgment on their monopolization claim shall be granted, in part, as to the issue of defendants' possession of monopoly power in the relevant market. Defendants' motion for summary judgment on this claim shall be denied.

### 3. Attempted Monopolization

**\*13** [20] When the allegation under § 2 of the Sherman Act is that a party has attempted to monopolize, a plaintiff must prove: 1) the defendant has engaged in predatory or anticompetitive conduct; 2) with a specific intent to monopolize; 3) thereby creating a dangerous probability of achieving monopoly power. *Spectrum Sports*, 506 U.S. at 456.

#### a. Predatory or Anticompetitive Conduct

[21][22] Predatory or anticompetitive conduct is "conduct designed to destroy competition, not just to eliminate a competitor." *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 823 (6th Cir.1982); *see also Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir.1986) ("Predatory conduct may be broadly defined as conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition.").

[23][24] Conduct amounting to a refusal to deal has been held to be anticompetitive. *See Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) (finding anticompetitive conduct where newspaper refused to accept local advertisements from those who advertised over competing radio station, with purpose to destroy that station). [FN11]

Plaintiffs and defendants agree as to the material facts impacting this issue: 1) defendants refused to work with Dr. Gardner; 2) defendants sought new primary source agreements with independent physicians shortly after Dr. Gardner's arrival; and 3) defendants refused to provide services for those independent physicians who did not agree to the primary source arrangements, thereby forcing plaintiffs to implement a comprehensive anesthesia service capable of providing services twenty-four hours a day, seven days a week.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794                                                                                          Page 16
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

These undisputed facts compel the conclusion that defendants refused to deal with a competitor, and support a finding of anticompetitive conduct.

### b. Intent to Monopolize

[25][26] Specific intent to monopolize may be inferred from anticompetitive conduct, but not from legitimate business practices aimed at succeeding in competition. *White, supra,* 723 F.2d at 506.

As with the intent element of plaintiffs' monopolization claim, I find that a question of fact exists as to whether defendants had the specific intent to monopolize with regard to plaintiffs' attempted monopolization claim. Plaintiffs and defendants have set forth sufficient facts from which a reasonable juror could infer that defendants possessed ill intent or that defendants had legitimate business justifications for the Clinic's actions.

Because a question of fact exists as to whether defendants possessed the specific intent to monopolize, both parties' motions for summary judgment shall be denied on this issue of plaintiffs' attempted monopolization claim.

### c. Dangerous Probability of Achieving Monopoly Power

[27][28] The final element of an attempted monopolization claim requires proof that the defendant possessed a dangerous probability of achieving monopoly power. To determine whether there is a dangerous probability of achieving monopoly power, courts consider the relevant market and the defendant's ability to lessen or control competition in that market. *Spectrum Sports,* 506 U.S. at 456. "The greater a firm's market power the greater the probability of successful monopolization." *Richter Concrete,* 691 F.2d at 826.

**\*14** [29][30] To have a dangerous probability of success, a firm must possess "market strength that approaches monopoly power--the ability to control prices and exclude competition." *Id.* A plaintiff cannot succeed in an attempted monopolization claim unless the defendant possess market power. *Spectrum Sports,* 506 U.S. at 457.

[31] In considering the likelihood of achieving

monopoly power, courts employ the same concept of market power as used in monopolization claims: namely, the defendant's relevant market share in light of other market characteristics, including barriers to entry. *Tops Markets, Inc. v. Quality Markets, Inc.* 142 F.3d 90, 100 (2d Cir.1998) (citing *Int'l Distribution Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 791 (2d Cir.1987)).

[32] A lesser degree of market power may be sufficient to establish an attempted monopolization claim than that needed to establish a completed monopolization claim. *Id.; see also Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1438 (9th Cir.1995) ("[T]he minimum showing of market share required in an attempt case is a lower quantum than the minimum showing required in an actual monopolization case."); *McGahee v. N. Propane Gas Co.,* 858 F.2d 1487, 1505 (11th Cir.1988).

Under this lesser standard, courts will generally find a dangerous probability of success where the defendant has a market share of fifty percent or more. *See Langenderfer,* 917 F.2d at 1443 (finding fifty-eight percent market share sufficient for a jury to find attempted monopoly); *McGahee,* 858 F.2d at 1506 (finding that "a sixty or sixty-five percent market share is a sufficiently large platform ... to create a genuine issue of material fact as to whether ... [defendant] would succeed in achieving a monopoly").

[33][34] On the other end of the spectrum, a market share of thirty percent is presumptively insufficient to establish a dangerous probability of success. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 26, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) . Those with market shares between thirty and fifty percent may be found to have a dangerous probability of success if other factors are present. *Domed Stadium Hotel Inc. v. Holiday Inns,* 732 F.2d 480, 490 (5th Cir.1984) (stating that a market share of less than the fifty percent "may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present").

Under plaintiffs' monopolization claim, I found

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

defendants to have over sixty percent of the market share for anesthesia services. When combined with other market factors, namely the lack of competition and the defendants' unique access to customers and resultant barrier to entry, I found that defendants possessed monopoly power.

Because a lesser degree of market power is sufficient to establish an attempted monopolization claim, I must find that defendants possessed a dangerous probability of achieving monopoly power.

**\*15** Plaintiffs' motion for summary judgment on their attempted monopolization claim shall be granted, in part, as to the issues of defendants' predatory or anticompetitive conduct and dangerous probability of achieving monopoly power. Defendants' motion for summary judgment on these issues shall be denied. Both parties' motions shall be denied on the issue of specific intent to monopolize.

### B. O.R.C. § 1331.01-Monopolization and Attempted Monopolization

[35] Count Two of plaintiffs' complaint asserts a state law claim identical to the claim asserted in Count One--monopolization and attempted monopolization of the market for anesthesia services in violation of O.R.C. § 1331.01, et seq.

The Ohio Supreme Court has stated that the Ohio Valentine Act (i.e., O.R.C. § 1331.01, et seq.) was patterned after the Sherman Act and therefore is to be interpreted consistently with federal antitrust law. *Johnson v. Microsoft Corp.* 156 Ohio App.3d 249, 251, 805 N.E.2d 179 (Ohio Ct.App.2004) (citing *C.K. & J.K., Inc. v. Fairview Shopping Ctr.,* 63 Ohio St.2d 201, 204, 407 N.E.2d 507 (1980)).

In interpreting plaintiffs' claims in Count Two consistently with the federal antitrust laws, I find plaintiff's claims to be identical to those asserted in Count One. Reaching the same result, the parties' cross-motions for summary judgment shall be denied to all parties as to defendants' intent.

### C. Wrongful Acts and Unfair Competition

Count Three of plaintiffs' complaint asserts a

separate claim for wrongful acts and unfair competition in pursuit of "preserving and continuing their monopoly over anesthesia services in the Defiance market."

Although plaintiffs have styled Count Three as a separate claim, plaintiffs do not point to any particular cause of action and cite no cases in support of their contention that this claim should survive summary judgment. I find the wrongful acts and anticompetitive behavior alleged in this count to be evidence in support of their antitrust claims, rather than proof of an independent actionable tort.

Because plaintiffs have failed to set forth a valid cause of action in Count Three of their complaint, defendants' motion for summary judgment on plaintiffs' wrongful acts and unfair competition claim shall be granted.

### D. Interference with Recruiting Efforts and Unreasonable Non-Compete Agreements

[36] Count Four of plaintiffs' complaint seeks equitable relief and compensatory damages for the defendants' alleged interference with ProMedica West's physician recruiting efforts. Plaintiffs also seek a declaratory judgment that the "non-competition agreements extracted by [the Clinic] from its employees are unreasonable and unenforceable, and that [ProMedica West] would not be liable to defendants in any way should it hire former employees of [the Clinic] who have entered into such agreements."

[37] Plaintiffs couch this entire claim on the Clinic's use of "unreasonable non-competition provisions in its employment contracts." (Doc. 113, 115, at 72.) Plaintiffs have failed to assert a valid cause of action under contract. [FN12]

**\*16** [38] It is a well-settled principle of contract law that only a party to a contract or an intended third-party beneficiary may bring an action on a contract. *Thorton v. Windsor House, Inc.,* 57 Ohio St.3d 158, 161, 566 N.E.2d 1220 (1991). Plaintiffs are neither parties to the employment contracts between the Clinic employees and the Clinic, nor are they third-party beneficiaries. Because plaintiffs lack standing to sue to enforce or void the employment contracts, Count Four of plaintiffs'

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
(Cite as: 2004 WL 2601794 (N.D.Ohio))

Page 18

complaint must fail as a matter of law.

Moreover, even if plaintiffs had standing to sue, the non-compete agreements would be upheld as reasonable.

[39][40] The Ohio Supreme Court has long recognized the validity of non-compete agreements between an employer and an ex-employee "if they contain reasonable geographical and temporal restrictions." *Lake Land Emp. Group of Akron, LLC v. Columber,* 101 Ohio St.3d 242, 245, 804 N.E.2d 27 (2004) (citing *Briggs v. Butler,* 140 Ohio St. 499, 507, 45 N.E.2d 757 (1942)). Such an agreement does not violate public policy if it is "reasonably necessary for the protection of the employer's business, and not unreasonably restrictive upon the rights of the employee." *Id.* at 508, 45 N.E.2d 757.

The non-compete agreements at issue are very limited in scope. The agreements prevent employees from competing with the Clinic for one year following termination of employment within a radius of twenty-five miles of the Clinic office. The agreements also include a buyout provision whereby an employee can buy his or her way out of the agreement by paying the Clinic $50,000. Thus, I find the agreements to contain reasonable geographical and temporal restrictions.

For these reasons, defendants' motion for summary judgment on plaintiffs' claim for interference with recruiting efforts and unreasonable non-competition agreements shall be granted.

### E. Deceptive Trade Practices Under O.R.C. § 4165.01 et seq.

[41] Count Five of plaintiffs' complaint alleges that defendants engaged in deceptive trade practices in violation of O.R.C. § 4165.01 et seq. by disparaging services provided by the Hospital, ProMedica West, and Dr. Gardner. Plaintiffs contend that defendants made false representations of fact, misrepresented the quality of the services provided by the Hospital, ProMedica West, and Dr. Gardner, and falsely stated that defendants were unable to provide services to their patients at the Hospital.

Defendants' motion for summary judgment

characterizes plaintiffs' claim as one for defamation and argues that plaintiffs have failed to present any evidence that any disparaging statements were made, and that even if such statements were made, these statements are subject to a qualified privilege.

[42] Plaintiffs respond to this argument by renewing their request for an order requiring defendants to identify those patients whose surgical procedures were shifted by Dr. Pruitt and Dr. Shaw to hospitals other than Defiance Hospital. In denying plaintiffs' earlier request, I asked plaintiffs to obtain more support (aside from the hearsay evidence on which plaintiffs rely) that such statements were in fact made. (Doc. 93.)

*17 Plaintiffs, however, have been unable to obtain any such evidence, and I will not permit plaintiffs to engage in a fishing expedition without more reliable proof that disparaging statements were in fact made. Plaintiffs' request for an order requiring defendants to identify patients whose surgical procedures were shifted to hospitals other than Defiance Hospital is denied.

Aside from renewing their discovery request, Plaintiffs have failed in all material respects to respond to defendants' motion for summary judgment. Because plaintiffs have failed to set forth specific facts showing that there is a genuine issue for trial, defendants' motion for summary judgment as to plaintiffs' deceptive trade practices claim shall be granted.

### F. Defamation

[43][44] Count Six of plaintiffs' complaint reiterates the allegations set forth in Count Five. Under Ohio law, a claim for defamation requires proof of:
  1) a false and defamatory statement concerning another; 2) an unprivileged publication to a third party; 3) fault amounting at least to negligence on the part of the publisher; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.
*Fitzgerald v. Roadway Express, Inc.,* 262 F.Supp.2d 849, 855 (D.Ohio 2003) (citing *Akron-Canton Waste Oil, Inc., v. Safety-Kleen Oil Servs., Inc.,* 81 Ohio App.3d 591, 601, 611 N.E.2d

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2601794
--- F.Supp.2d ---
**(Cite as: 2004 WL 2601794 (N.D.Ohio))**

955 (Ohio Ct.App.1992)).

For the reasons stated in granting defendants' motion for summary judgment on plaintiffs' deceptive trade practices claim, and because plaintiffs have failed to set forth sufficient evidence in support of their defamation claim, defendants' motion for summary judgment as to plaintiffs' defamation claim shall be granted.

Conclusion

In light of the foregoing, it is

ORDERED THAT

1. Defendants' motion for summary judgment as to Counts One and Two of plaintiffs' first amended complaint be, and the same hereby is denied;

2. Plaintiffs' motion for summary judgment as to Counts One and Two of plaintiffs' first amended complaint be, and the same hereby is granted on the issues of monopoly power in the relevant market, predatory or anticompetitive conduct, and dangerous probability of achieving monopoly power;

3. Plaintiffs' motion for summary judgment as to Counts One and Two of plaintiffs' first amended complaint be, and the same hereby is denied on the issues of general intent to exclude and specific intent to monopolize;

6. Defendants' motion for summary judgment as to Counts Three, Four, Five, and Six of plaintiffs' first amended complaint be, and the same hereby is, granted;

7. Plaintiffs' motion for summary judgment as to Counts Three, Four, Five, and Six of plaintiffs' first amended complaint be, and the same hereby is, denied;

8. Plaintiffs' request for an order requiring defendants to identify those patients whose surgical procedures were shifted by Dr. Pruitt and Dr. Shaw to hospitals other than Defiance Hospital be, and the same hereby is denied.

**\*18** So ordered.

FN1. At the time of the complaint's filing, Alan Gardner, M.D. (Dr. Gardner), a board certified anesthesiologist employed by ProMedica West, was included as a plaintiff in the action. Dr. Gardner

dismissed his claims on July 20, 2004. (Doc. 99.)

FN2. Specifically, the complaint named four physicians, John J. Racciato, M.D., William H. Richter, M.D., John W. Shaw, M.D., and Jeffrey A. Pruitt, M.D., and four nurse anesthetists, Terry Howarth, CRNA, Douglas Lee, CRNA, John Yeoman, CRNA, and Kathryn Schwindl Watson, CRNA.

FN3. Plaintiffs also seek a declaratory judgment that the exclusive anesthesia contract between Defiance Hospital and ProMedica West is "reasonable and appropriate in light of the circumstances confronting plaintiffs, that it does not violate any legal rights of defendants, and that plaintiffs are not liable to defendants in any way for or in relation to their implementation of said contract." (Doc. 35, at 16.) Neither party has sought summary judgment on this claim, and therefore, I will not address the merits of Count Seven of plaintiffs' complaint.

FN4. Chad Peter subsequently informed the Hospital that the Clinic CRNAs would no longer provide anesthesia services to Dr. Shehata's patients and stated: "If an emergency should arise with a physician not contracted with Clinic, we would not allow our CRNAs to perform services unless the surgery is performed by a physician who has a contract with us or a Clinic surgeon." (Doc. 113, 115, at 7.)

FN5. I decline to require the Hospital to expose its patients to the threat of physical harm for the mere purpose of giving patients standing to bring this litigation.

FN6. Another CRNA practiced only at Community Memorial Hospital in Hicksville.

FN7. In *Brader,* the court listed the following cases as illustrative: *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 480 n. 5 (7th Cir.)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

(physician was "slicing the geographic market much too thin" in limiting market to one hospital), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *Seidenstein v. National Medical Enterprises, Inc.,* 769 F.2d 1100, 1106 (5th Cir.1985) (no evidence that the hospital "is recognized as a separate and distinct market, or that unique services or facilities existed there"); *Dos Santos v. Columbus-Cuneo-Cabrini Medical Ctr.,* 684 F.2d 1346, 1353 (7th Cir.1982) (noting that "we have reason to doubt whether the relevant market can be sliced so small as to embrace only a single hospital"); *Flegel v. Christian Hosp. Northeast-Northwest,* 804 F.Supp. 1165, 1174 (E.D.Mo.1992) (limiting the relevant geographic market to one hospital lacked any "reasonable legal or factual basis"), *aff'd,* 4 F.3d 682 (8th Cir.1993); *Drs. Steuer & Latham P.A. v. National Medical Enterprises, Inc.,* 672 F.Supp. 1489, 1514 (D.S.C.1987), *aff'd,* 846 F.2d 70 (4th Cir.1988); *Friedman v. Delaware County Memorial Hosp.,* 672 F.Supp. 171, 195 (E.D.Pa.1987), *aff'd,* 849 F.2d 600 (3d Cir.1988). 64 F.3d at 878.

FN8. *See e.g. Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 474 (7th Cir.1988) (antitrust suit by pathologist against a hospital and a physicians' group providing pathology services to the hospital challenging an exclusive arrangement for the provision of such services); *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *Seidenstein v. National Med. Enters., Inc.,* 769 F.2d 1100, 1101 (5th Cir.1985) (antitrust claim by physician against hospital and other physicians arising from the suspension of the physician's medical staff privileges at the hospital); *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.,* 684 F.2d 1346, 1347 (7th Cir.1982) (antitrust suit by an anesthesiologist challenging an exclusive dealing contract for the provision of anesthesia services at a hospital); *Flegel v. Christian Hosp. Northeast-Northwest,* 804 F.Supp. 1165,

1167 (E.D.Mo.1992) (antitrust suit against a hospital by osteopathic physicians who applied for and were denied staff privileges at the hospital), *aff'd,* 4 F.3d 682 (8th Cir.1993); *Drs. Steuer & Latham P.A. v. Nat'l Med. Enters., Inc.,* 672 F.Supp. 1489, 1492 (D.S.C.1987) (antitrust suit by pathologists against hospital challenging an exclusive dealing contract for the provision of pathology services at the hospital), *aff'd,* 846 F.2d 70 (4th Cir.1988) ; *Friedman v. Delaware County Mem'l Hosp.,* 672 F.Supp. 171, 173 (E.D.Pa.1987) (antitrust suit by physician against hospital arising out of the revocation of the physician's staff privileges), *aff'd,* 849 F.2d 600 (3d Cir.1988).

FN9. The fact that the Hospital can recruit anesthesia service providers from all across the nation, or for that matter, from all over the world, is also irrelevant. Once that recruit arrives and takes residence within a twenty-minute radius of the Hospital, the rural nature of the area limits that physician to administering anesthesia only at the Hospital, and thereby competing with defendants for the limited number of independent physicians' patients who require anesthesia services.

FN10. No competitors successfully entered the market from 1991 to 2000, until Dr. Gardner did so in 2000. Although no competitors entered the market, plaintiffs have failed to present any evidence of any attempted entry into the market. Plaintiffs have no evidence showing that any person or entity attempted to enter the market to establish an anesthesia practice, but were unable to do so as a result of defendants' exclusionary behavior.

FN11. As a general rule, "there exists no duty to deal, so long as the determination is made unilaterally," but where a business possesses monopoly power, the business may be held to a different standard. *Cleveland v. Cleveland Electric*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Illuminating Co.,* 538 F.Supp. 1306, 1316 (N.D.Ohio 1980) (quoting *Byars,* 609 F.2d at 854-550). "[A] business possessing monopoly power ordinarily cannot wilfully refuse to deal with a competitor if the refusal is designed and calculated to foreclose competition or to remove or exclude a competitor by unfair, unreasonable or predatory practices or conduct ." *Id.* (citing *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Lorain Journal,* 342 U.S. at 143; *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) ).

FN12. Even if plaintiffs are asserting a tortious interference with business relationships or contract rights claim, plaintiffs have failed to present evidence of the elements of such a claim. A claim of tortious interference requires proof of: 1) a business relationship or contract; 2) knowledge of the relationship or contract by the wrongdoer 3) intentional or improper action taken by the wrongdoer to prevent a contract formation, procure a contractual breach, or terminate a business relationship; 4) a lack of a privilege or justification; and, 5) resulting damages. *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 418-19, 650 N.E.2d 863 (1995).

2004 WL 2601794 (N.D.Ohio)

Motions, Pleadings and Filings (Back to top)

- 3:0107578  (Docket)
                   (Nov. 07, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.