

2004 WL 2809797                                                                                                Page 1
--- F.3d ---
**(Cite as: 2004 WL 2809797 (3rd Cir.(Del.)))**

Only the Westlaw citation is currently available.

United States Court of Appeals, Third Circuit.

In re: WARFARIN SODIUM ANTITRUST LITIGATION
Seymour EAGEL, Appellant
Willie HUTCHINSON, Jr.; Vincent Palazzola; Alex Galperin; Shirley Bruce;
Madison W. O'Kelly, Jr.; Garey L. McCarty, Appellants
Alan SHAPIRO, Appellant
Mary CLEUSMAN, Appellant.

**No. 02-3603, 02-3755, 02-3757, 02-3758.**

Argued Oct. 29, 2003.
Dec. 8, 2004.

On Appeal from the United States District Court for the District of Delaware, (D.C. No. 98-md-1232), District Judge: The Honorable Sue L. Robinson.

Paul D. Wexler (Argued), Bragar Wexler Eagel & Morgenstern, LLP, New York, for Appellant Seymour Eagel.

Jeffrey S. Friedman, Silverman & McDonald, Wilmington, Edward Cochran (Argued), Shaker Heights, Hilton F. Tomlinson, Pritchard, McCall & Jones, LLC, Birmingham, Paul Rothstein, Gainesville, N. Albert Bacharach, Jr., Gainesville, Robert W. Bishop, Bishop & Associates, Louisville, for Appellants Willie Hutchinson, Jr., Vincent Palazzola; Alex Galperin; Shirley Bruce; Madison W. O'Kelly, Jr.; Garey L. McCarty.

John J. Pentz (Argued), Maynard, for Appellant Alan Shapiro.

J. Arnold Fitzgerald, Andrew F. Tucker (Argued), Dayton, Sidney Balick, Balick & Balick, Wilmington, for Appellant Mary Cleusman.

Bernard Persky (Argued), Barbara J. Hart, Vaishali Shetty, Goodkind Labaton Rudoff & Sucharow LLP, New York, for Appellees John Kusnerick, et al.; Sara Altman; Samuel Gordon Tischler; Marie A. Steckel; Robert Bareiss; John Civatte, Jr.; Mary Banten; Arkansas Carpteners' Health & Welfare Fund; Operating Engineers Local 312 Health & Welfare Fund; United Food and Commercial Union and Employers Midwest Health Benefits Fund; United Wisconsin Services, Inc., now known as Cobalt Corporation; Louisiana Health Service and Indemnity Corporation doing business as Blue Cross and Blue Shield of Louisiana.

William R. Kane, Miller, Faucher and Cafferty, Philadelphia, Alan H. Rolnick, Hanzman & Criden, Coral Gables, Marvin A. Miller, Miller, Faucher and Cafferty, Chicago, for Appellees John Kusnerick, et al.; Sara Altman; Samuel Gordon Tischler; Marie A. Steckel; Arkansas Carpteners' Health & Welfare Fund; Operating Engineers Local 312 Health & Welfare Fund; United Food and Commercial Union and Employers Midwest Health Benefits Fund; United Wisconsin Services, Inc., now known as Cobalt Corporation; Louisiana Health Service and Indemnity Corporation doing business as Blue Cross and Blue Shield of Louisiana.

Pamela S. Tikellis, Chimicles & Tikellis, Wilmington, for Appellees John Kusnerick, et al.; Sara Altman; Samuel Gordon Tischler; Marie A. Steckel; Robert Bareiss; John Civatte, Jr. Mary Banten.

Richard W. Cohen (Argued), Lowey, Dannenberg, Bemporad & Selinger, White Plains, for Appellee United Wisconsin Services, Inc., now known as Cobalt Corporation.

Donald J. Wolfe, Jr., Potter, Anderson & Corroon, Wilmington, George D. Ruttinger (Argued), Crowell & Moring, Washington, for Appellee Dupont Pharmaceutical Company.

Before SCIRICA, Chief Judge, FUENTES, and SMITH, Circuit Judges.

OPINION OF THE COURT

FUENTES, Circuit Judge.

**\*1** This matter arises out of a consolidated class action suit seeking injunctive and monetary relief in connection with the sale of Coumadin, the brand name for the prescription drug warfarin sodium manufactured and marketed by the DuPont Pharmaceuticals Company ("DuPont"). [FN1] Plaintiffs allege that DuPont's anticompetitive

behavior and dissemination of false and misleading information about a lower-priced, readily available generic competitor caused them to purchase the higher-priced Coumadin instead of the generic product. At issue in this appeal is whether the District Court abused its discretion in approving a $44.5 million nationwide settlement agreement between DuPont and the fixed co-pay consumers and out-of-pocket consumers (collectively, the "consumers") and Third Party Payors ("TPPs") of Coumadin, and awarding $10 million in fees to class counsel. [FN2] Several individual consumers and TPPs challenge the District Court's certification of the class and approval of the settlement. For the reasons discussed below, we conclude that the District Court did not abuse its discretion in certifying the class or in approving the settlement, and accordingly we will affirm the judgment of the District Court.

> FN1. Formerly known as DuPont Merck Pharmaceutical Company (a partnership between E.I. duPont de Nemours & Company and Merck & Company).

> FN2. Fixed co-pay consumers refer to those insured consumers who paid the same price for prescription drugs regardless of whether the drugs were name-brand or generic. Out-of-pocket consumers refers to individuals who paid different prices for prescription drugs depending on whether they were name-brand or generic. Third Party Payors refer to those entities providing prescription drug coverage and/or paying or reimbursing part or all of the costs of prescription drugs.

I. BACKGROUND

A. Factual History

Warfarin sodium is a prescription oral anticoagulant medication sold in tablet form that is taken by more than 2 million Americans to treat blood-clotting disorders. DuPont has been the dominant manufacturer and supplier of warfarin sodium under the brand name Coumadin, recording sales of approximately $550 million and $464 million, respectively, in 1998 and 1999. Although DuPont's Coumadin patent expired in 1962, Coumadin remained the only warfarin sodium product available until July 1997, when a generic version of warfarin sodium was released onto the market following approval by the U.S. Food and Drug Administration ("FDA"). Class action plaintiffs have alleged that DuPont, in response to the competition from lower-priced generic warfarin sodium, disseminated false and misleading information to consumers, TPPs, and others about the safety and equivalence of generic warfarin sodium. As a result, plaintiffs allege that DuPont's campaign of misrepresentations and omissions caused consumers and TPPs to buy higher-priced, brand name Coumadin instead of the lower-priced generic warfarin sodium.

DuPont's alleged violations are said to have begun when Barr Laboratories, Inc. ("Barr") filed a petition with the FDA in May 1995 seeking approval to manufacture and distribute a generic warfarin sodium product. In response to Barr's petition, DuPont filed a petition for stay with the FDA in October 1996 requesting that the FDA adopt stricter bioequivalence standards and postpone approval for all generic warfarin sodium products. The FDA denied DuPont's petition, however, on the grounds that the methods in place for determining bioequivalence were sufficient. At the same time, DuPont filed a petition with the U.S. Pharmacopeial Convention, Inc. ("USP") requesting the adoption of Coumadin's content uniformity specifications as the industry standard for warfarin sodium drugs. The USP rejected this petition.

**\*2** In March 1997, the FDA approved a generic warfarin sodium, finding that it was the bioequivalent and therapeutic equivalent to Coumadin. [FN3] The generic product was released to the market on July 26, 1997 at prices substantially lower than Coumadin. Plaintiffs allege that DuPont, in the period before and after Barr's introduction of generic warfarin sodium, published false and misleading statements concerning the bioequivalence, therapeutic safety, and efficacy of generic warfarin sodium. For instance, DuPont allegedly issued a variety of false and misleading communications to convince health care professionals, government agencies, and the public that Coumadin was safer and more effective than Barr's generic warfarin sodium product. In addition, DuPont allegedly revised its promotional computer software system designed for health care practitioners monitoring patients using Coumadin to include warnings about switching to generic substitutes, and created a slide presentation for health care professionals claiming that the generic drug may not be the equivalent to Coumadin.

> FN3. When seeking approval from the FDA to market generic drugs, drug manufacturers typically submit detailed information regarding the equivalence of the generic version and the previously approved brand name version. Bioequivalence is established

by showing that the generic drug delivers to the body the same amount of active ingredient at the same rate and extent as its brand name counterpart. Once bioequivalence is established, and after the FDA approves the manufacturing controls and labeling of the generic substitute, the FDA grants approval for release of the generic drug to the market.

DuPont also allegedly ran a publicity campaign claiming that Coumadin had tighter than USP content uniformity standards. DuPont issued a press release, which stated that patients should receive additional blood tests if switched to generic warfarin sodium and accused Barr of focusing on producing a cheaper product to save money while DuPont focused on patient safety and education. Furthermore, DuPont allegedly created an organization named the Health Alliance for NTI Patient Safety for the purpose of lobbying state legislatures, formularies, and pharmacy boards to exclude NTI drugs from state generic substitution laws. [FN4]

> FN4. "NTI drugs," or Narrow Therapeutic Index drugs, are used for treating severe, life-threatening diseases where a patient's tolerance to the drugs are so narrow that too small a dose can be useless and too large a dose can be dangerous to the patient's health. Warfarin sodium is designated by the FDA as an NTI drug.

Plaintiffs assert that the misrepresentations led consumers, TPPs, and others to believe that Coumadin was superior to the generic equivalents, caused millions of prescriptions to be filled with Coumadin that could have been filled with less expensive generic drugs, and allowed DuPont to maintain supracompetetive prices for Coumadin. As evidence that DuPont's misrepresentations and conduct had an anticompetitive effect, plaintiffs cited evidence of the weak market penetration of generic warfarin sodium as compared to Coumadin. Generally, about 40-70% of prescriptions for drugs available from multiple sources are filled with less expensive generic products within one year of generic availability. However, more than 75% of prescriptions for sodium warfarin were still filled with Coumadin a year after Barr introduced its generic version, and DuPont continued to maintain a 67% market share up until the date the complaints in this matter were filed.

B. Procedural History

Beginning in 1997, class action complaints were filed in several federal district courts and were consolidated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation ("MDL panel") before the U.S. District Court for the District of Delaware. The class actions sought treble damages and injunctive relief under federal antitrust laws on behalf of a nationwide class of consumer and TPP purchasers of Coumadin who paid all or part of the purchase price. In an order dated December 7, 1998, the District Court dismissed the claims on the grounds that consumer plaintiffs, as indirect purchasers of Coumadin, lacked standing to seek injunctive relief and treble damages under the Sherman Act. *See In re: Warfarin Sodium Antitrust Litig.,* C.A. No. MDL 98-1232-SLR, 1998 WL 883469 (D. Del. Dec 7, 1998). This Court reversed the District Court's decision with respect to injunctive relief, finding that consumer plaintiffs did have standing under federal antitrust laws. *See In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395 (3d Cir.2000).

**\*3** Following our decision, several additional class actions were filed in Delaware District Court as well as other federal courts by TPP plaintiffs and a state medicaid agency and were transferred to the Delaware District Court as tag-along actions pursuant to the order of the MDL panel. After discussions among counsel, the parties negotiated and drafted a pretrial case management order ("CMO"), which the District Court entered on February 22, 2001. The CMO established a plaintiffs' Executive Committee, established procedures for conducting settlement discussions, and specified when and how to file a consolidated class action complaint.

A consolidated class action complaint was filed in the District Court on March 30, 2001 by consumers and TPPs on behalf of all similarly situated U.S. consumers who purchased Coumadin at supracompetitive prices and all similarly situated U.S. TPPs who paid for the fulfillment of Coumadin prescriptions for their members or their insureds at supracompetitive prices beginning in July 1997. Plaintiffs sought an injunction and other equitable relief under § 16 of the Clayton Act, 15 U.S.C. § 26, [FN5] to remedy DuPont's violation of the federal antitrust laws, particularly § 2 of the Sherman Act, 15 U.S.C. § 2. [FN6] On behalf of all TPPs, plaintiffs sought treble damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15. [FN7] Plaintiffs also alleged violations of the Delaware Consumer Fraud Act, 6 Del.C. § 2513; the consumer fraud and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

deceptive acts and practices statutes of all fifty states and the District of Columbia; and the antitrust statutes [FN8] of the "indirect purchaser" states. Finally, plaintiffs alleged tortious interference with TPPs' contracts with health benefit plan members and pharmacies relating to the substitution of generic warfarin sodium and alleged unjust enrichment under the laws of all fifty states and the District of Columbia. The state actions that are still pending are included in the proposed settlement.

> FN5. 15 U.S.C. § 26 states in pertinent part: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue...."

> FN6. 15 U.S.C. § 2 states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."

> FN7. 15 U.S.C. § 15 states in pertinent part: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee...."

> FN8. Ariz.Rev.Stat. § 44-1401, *et seq.;* Cal. Bus. & Prof.Code § 17200 *et seq.;* D.C.Code Ann. § 28-4502, *et seq.;* Fla. Stat. ch. 401; Kan. Stat. Ann. § 50-101, *et seq.;* Ky.Rev.Stat. Ann. § 367.110-310, *et seq.;* La.Rev.Stat. Ann. § 51:137, *et seq.;* Me.Rev.Stat. Ann. tit. 10, § 1101, *et seq.;* Mass. Ann. Laws, ch. 93A, *et seq.;* Mich. Comp. Laws § 445.771, *et seq.;* Minn.Stat. § 325D.49, *et seq.;* N.J. Stat. Ann. § 56:9-1, *et seq.;* N.M. Stat. Ann. § 57-1-1, *et seq.;* N.Y. Gen. Bus. Law § 340, *et seq.;* N.C. Gen.Stat. § 75-1, *et seq.;* N.D. Cent.Code § 51-08.1-0, *et seq.;* S.D. Codified Laws § 37-1, *et seq.;* Tenn.Code Ann. § 47-25-101, *et seq.;* W. Va.Code § 47-18-1, *et seq.;* Wis. Stat. § 133.01, *et seq.*

C. Settlement Negotiations and Agreement

Pursuant to the CMO, co-chairs of the Executive Committee had primary responsibility for submitting motions to the District Court, engaging in discovery, conducting negotiations with DuPont, and acting as the spokesperson for the plaintiffs at pretrial conferences. Any settlement discussions had to be attended by at least one of the co-chairs, one consumer representative, and one TPP representative, and no settlement offer could be made or accepted without the prior consent of all consumer and TPP representatives on the committee.

Settlement negotiations in the federal actions began in March 2000 and continued through the next year. The parties reached an oral agreement on the basic terms of the proposed settlement on April 19, 2001, executed a memorandum of understanding on May 14, 2001, and entered into a Stipulation of Settlement and Compromise on July 26, 2001.

Under the proposed settlement, DuPont would pay, for settlement purposes only, $44.5 million to settle the claims of the following proposed class:

**\*4** All consumers or Third Party Payors in the United States who purchased and/or paid all or part of the purchase price of Coumadin dispensed pursuant to prescriptions in the United States during the period March 1, 1997 through and including August 1, 2001 ("Class Period"). Excluded from the Class are Defendant and any of its officers and directors and any governmental entity. "Third Party Payor" shall mean any non-governmental entity that is (i) a party to a contract, issuer of a policy, or sponsor of a plan, which

contract, policy or plan provides prescription drug coverage to natural persons, and is also (ii) at risk, pursuant to such contract, policy or plan, to provide prescription drug benefits or to pay or reimburse all or part of the cost of prescription drugs dispensed to natural persons covered by such contract policy or plan.

Upon final approval of the settlement, all pending actions against DuPont arising from its alleged unlawful marketing and sale of Coumadin, *i.e.,* both federal MDL proceedings and related state actions, would be dismissed. DuPont has already paid the $44.5 million into an escrow account which is earning interest for the benefit of the class.

Under the allocation and distribution plan, the Net Settlement Fund ("NSF") is to be distributed to class members who filed a proof of claim on or before April 30, 2002. [FN9] The recognized loss for each class member will be total payments made for Coumadin (less the amounts received for reimbursements, discounts, or rebates) multiplied by 15%. Eighteen percent of the NSF is to be set aside for a "Preferential Fund" out of which the recognized losses of consumers will be paid first. If the recognized losses of consumer claimants are fully satisfied from the Preferential Fund, the unexpended portion will be added to the NSF for payment of the recognized losses of the TPPs. If instead consumer losses are not fully satisfied, the unsatisfied amounts will be paid out of the remainder of the NSF on a pro-rata basis with TPP claimants.

> FN9. The NSF is to be calculated as follows: $44.5 million plus accrued interest, less court-awarded attorneys' fees, costs and expenses, less costs of notice to class members, less costs of administering the fund, and less taxes.

On August 1, 2001, the District Court granted preliminary approval of the settlement and conditionally certified the settlement class. The order approved the plan for providing notice to class members about the settlement terms. In addition, the District Court required any class member who wanted to opt-out of the class, or who wished to object to the proposed settlement but not opt-out of the class, to do so by December 17, 2001.

D. Notice to Class Members and Response to Proposed Settlement

Plaintiffs contracted with Complete Claim Solutions, Inc. ("CCS"), a nationally recognized settlement administrator, to prepare and implement a notice program. CCS published notices targeted at both TPP and consumer class-members; set up a call-center to receive telephone inquiries; prepared, printed, and distributed notice packets for consumers and TPPs who responded to the notice; and designed and developed a website for class members to review and access information about the settlement. Summary notice of the proposed settlement was published over a period of three months beginning in August 2001 in selected publications across the country including *USA Today, USA Weekend,* and *Parade Magazine,* as well as *Modern Maturity* and *Readers Digest,* in an effort to reach users of Coumadin who are generally over the age of 50. The publications had a combined circulation of approximately 115 million people. The notice was also published in *National Underwriter and Benefits* and *Compensation Solutions.*

**\*5** The summary notice informed class members that a settlement on behalf of the class had been proposed. To make a claim, consumers were required to submit a form, available on the website set up by CCS, containing certain identifying information and proof concerning their use of Coumadin. By January 2002, there had been over 89,000 telephone inquiries made, over 41,803 visits to the websites and 15,127 forms viewed and/or downloaded. An additional 7,273 requests for printed notice packets were received via email. Through June 3, 2002, the administrator had mailed claim forms to 90,926 potential consumer class members and received and processed 48,305 consumer claims and 1,055 TPP claims.

The claims submitted by consumer class members who filed proof of claim on or before the April 30, 2002 deadline totaled $4.3 million (well within the 18% set aside for them in the Preferential Fund). Attorneys' fees and expenses were awarded to counsel for the consumers and the TPPs in the aggregate amount of $10.8 million. Approximately $2.2 was spent on notice and administration. This left $27.2 million in the fund for compensation of TPPs. In addition, by the December 17, 2001 opt-out and objection deadline, a total of 136 consumers and 10 TPPs had opted out of the proposed settlement while 11 individual consumers and consumer groups and two TPPs had filed objections.

Oral arguments by plaintiffs' and objectors' counsel were presented at a fairness hearing held on January 23, 2002. On August 30, 2002, the District Court issued an extensive and detailed Memorandum Opinion and Order ("Final Approval Order") certifying the settlement class, approving the

settlement, and dismissing the contentions made by the objectors. Nine of the consumer objectors now appeal the Final Approval Order. Cleusman, Shapiro, and Eagel filed individual appeals, while Hutchinson, Palazzola, Galperin, Bruce, O'Kelley, and McCarthy (collectively, "Hutchinson") filed a joint appeal.

## II. DISCUSSION

We review the decision of the District Court to certify the class and approve the settlement under an abuse of discretion standard. *See In re Cendant Corp. Litig.,* 264 F.3d 201, 231 (3d Cir.2001) (*"Cendant"* ); *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 299 (3d Cir.1998) (*"Prudential"* ). An abuse of discretion may be found where the "district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tanks Prod. Liab. Litig.* 55 F.3d 768, 783 (3d Cir.1995) (*"General Motors"* ). We have jurisdiction over this appeal under 28 U.S.C. § 1291.

### A. Class Certification

To be certified, a class must satisfy the four threshold requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class"). *See also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613 (1997). In addition to the threshold requirements of Rule 23(a), parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). Rule 23(b)(3), the provision at issue in this case, provides for so-called "opt-out" class actions suits. *See Amchem,* 521 U.S. at 615. Under Rule 23(b)(3), two additional requirements must be met in order for a class to be certified: (1) common questions must "predominate over any questions affecting only individual members" (the "predominance requirement"), and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy" (the "superiority requirement").

**\*6** Appellants allege several errors in the District Court's certification decision. First, Appellants argue that the Rule 23(a) commonality and Rule 23(b)(3) predominance requirements were not satisfied in this case because of variations in the claims and injuries of the plaintiffs, specifically between and among the consumers and TPPs, as well as differences in the laws of the 50 states which form the basis of several of the class' claims. Appellants also argue that the certified class does not satisfy the Rule 23(a) requirement of adequacy of representation because of the existence of intra-class conflicts of interest, which rendered class counsel unable to represent the interests of a single class. After reviewing Appellants' arguments, and for the reasons discussed below, we find that the District Court did not abuse its discretion in certifying a single nationwide class of consumers and TPPs. [FN10]

> FN10. We do not understand Appellants as challenging the District Court's findings that the class satisfied Rule 23(a)'s numerosity requirement.

1. *Commonality and Predominance*

Rule 23(a)(2)'s commonality element requires that the proposed class members share at least one question of fact or law in common with each other. *See Baby Neal ex. rel. Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). Rule 23(b)(3)'s predominance element in turn requires that common issues predominate over issues affecting only individual class members. *See* Fed.R.Civ.P. 23(b)(3). We have previously noted that the Rule 23(b)(3) predominance requirement, which is far more demanding, incorporates the Rule 23(a) commonality requirement. *See In re LifeUSA Holding, Inc.,* 242 F.3d 136, 144 (3d Cir.2001); *see also Amchem,* 521 U.S. at 623-24. Accordingly, we analyze the two factors together, with particular focus on the predominance requirement. *See In re LifeUSA Holding, Inc.,* 242 F.3d at 144. The District Court found that common questions of law and fact arose from plaintiffs' complaint, and that such common questions predominated over any issues affecting only individual class members. We agree.

As the Supreme Court noted in *Amchem,* "[p]redominance is a test readily met in certain cases alleging consumer [ ] fraud or violations of the antitrust laws." *Amchem,* 521 U.S. at 625. This case falls squarely into that category: plaintiffs have alleged that DuPont engaged in a broad-based campaign, in violation of federal and state consumer fraud and antitrust laws, to deceive consumers, TPPs, health care professionals, and regulatory bodies into believing that generic warfarin sodium was not an equivalent alternative to Coumadin. These allegations

naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members, including the unlawfulness of DuPont's conduct under federal antitrust laws as well as state law, the causal linkage between DuPont's conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled.

Moreover, proof of liability for DuPont's conduct under § 2 of the Sherman Act and the Delaware Consumer Fraud statute depends on evidence which is common to the class members, such as evidence that DuPont made misrepresentations about Coumadin and generic warfarin sodium permitting DuPont to monopolize the market for warfarin sodium and charge supracompetitive prices for Coumadin, while discouraging class members to purchase the lower-priced generic competitor. [FN11] In other words, while liability depends on the conduct of DuPont, and whether it conducted a nationwide campaign of misrepresentation and deception, it does not depend on the conduct of individual class members. See *In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 483-84 (W.D.Pa.1999) (noting that the predominance test is met in an antitrust case because "consideration of the conspiracy is sue would, of necessity, focus on defendants' conduct, not the individual conduct of the putative class members"). Similarly, proof of liability does not depend on evidence that DuPont made deceptive communications to individual class members or of class members' reliance on those communications; to the contrary, DuPont's alleged deceptive conduct arose from a broad-based, national campaign conducted by and directed from corporate headquarters, and individual reliance on the misrepresentations was irrelevant to liability. See *In re LifeUSA Holding, Inc.,* 242 F.3d at 144-46 (vacating class certification in part because plaintiffs' claims of deceptive insurance sales practices arose from individual and nonstandardized presentations by numerous independent agents). Finally, the fact that plaintiffs allege purely an economic injury as a result of DuPont's conduct (*i.e.,* overpayment for warfarin sodium), and not any physical injury, further supports a finding of commonality and predominance because there are little or no individual proof problems in this case otherwise commonly associated with physical injury claims. See *Prudential,* 148 F.3d at 315 (noting that "the complexity of a case alleging physical injury as a result of asbestos exposure differs greatly from a case alleging economic injury as a result of deceptive sales practices").

FN11. As the District Court noted, in order to prove a violation of § 2 of the Sherman Act, plaintiffs must establish that DuPont possessed monopoly power in the warfarin sodium market and that it willfully acquired or maintained that power as distinguished from achieving growth or development as a consequence of a superior product, business acumen, or historic accident. See *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966). To prove a violation of the Delaware Consumer Fraud statute, plaintiffs must show that DuPont committed fraud or misrepresentation in connection with the sale of Coumadin; no proof of individual reliance on the fraud or misrepresentation is required. See Delaware Consumer Fraud Statute, 6 Del. C. § 2513; see also *S & R Assoc., LP v. Shell Oil Co.,* 725 A.2d 431, 440 (Del.Super.Ct.1998).

**\*7** Appellants raise several objections to the District Court's finding that the certified class satisfies the commonality and predominance requirements. We consider each in turn.

First, several Appellants argue that the District Court erred when it certified a single nationwide class of plaintiffs because variations in and inconsistencies between the state consumer fraud and antitrust laws of the fifty states defeat the commonality and predominance requirements of Rule 23. Appellants rely principally on the Seventh Circuit's decision in *In re Bridgestone/Firestone Inc.,* 288 F.3d 1012 (7th Cir.2002) (*"Bridgestone"* ), a case involving the certification of a nationwide class alleging tort claims arising under the laws of all fifty states. However, *Bridgestone* is distinguishable from the instant matter because that case concerned certification of a class for purposes of litigation, not a class solely for purposes of settlement, which is at issue in this case. 288 F.3d at 1018.

The difference is key. In certification of litigation classes for claims arising under the laws of the fifty states, we have previously noted that the district court must determine whether variations in state laws present the types of insuperable obstacles which render class action litigation unmanageable. See *Prudential,* 148 F.3d at 315; see also *In re Sch. Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986). Thus, for instance, we have stated that a district court should examine whether varying state laws can be grouped by shared elements and applied as a unit in such a way that the litigation class is manageable.

*Prudential,* 148 F.3d at 315; *In re Sch. Asbestos Litig.,* 789 F.2d at 1010. However, when dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class. *See Amchem,* 521 U.S. at 620 (in a settlement-only class certification, "a district court need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial").

Nonetheless, we recognize that problems beyond those of just manageability may exist when a district court is asked to certify a single nationwide class action suit, even for settlement purposes, when claims arise under the substantive laws of the fifty states. Although there may be situations where variations in state laws are so significant so as to defeat commonality and predominance even in a settlement class certification, this is not such a case. We agree with the District Court that the fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states in this matter does not defeat commonality and predominance. In *Prudential,* we noted that a "finding of commonality does not require that all class members share identical claims," 148 F.3d at 310, and we rejected an objector's contention that predominance was defeated because claims were subject to the laws of fifty states, *id.* at 315. Moreover, recent decisions elsewhere have certified nationwide or multistate classes under state laws in actions alleging overpayment for brand-name prescription drugs. *See In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369 (D.D.C.2002); *In re Synthroid Mktg. Litig.,* 188 F.R.D. 295 (N.D.Ill.1999). In certifying a nationwide settlement class, the District Court was well within its discretion in determining that variations between the laws of different states were insufficient to defeat the requirements of Rule 23.

**\*8** Turning to the next argument, several Appellants object to the certification of a single, nationwide class because certain class members may be eligible for treble damages or punitive damages under their state antitrust laws, while other class members, such as those from Tennessee, may be eligible for "full consideration" damages. Under a "full consideration" statute, a consumer can recover the full purchase price paid, as opposed to receiving reimbursement of only the overcharges. As we explained above, however, we cannot say that the District Court abused its discretion in finding that such variations in state law rights and remedies were insufficient to defeat commonality and predominance. [FN12] In any event, we agree with the District Court that any material variations could be considered in the context of calculating damages as well as in assessing the fairness of the settlement.

> FN12. We also note that it appears to be an unsettled question of law as to whether Tennessee's antitrust statutes, the Tennessee Consumer Protection Act ("TCPA") and the Trade Practices Act ("TPA"), cover only violations occurring in intrastate commerce or extend to cover violations occurring in interstate commerce as well. *See FTC v. Mylan Labs., Inc.,* 62 F.Supp.2d 25, 51 (D.D.C.1999) ("When the challenged conduct occurs before the products arrive in Tennessee, the conduct is considered interstate in nature and the TPA and TCPA should not apply."); *see also Richardson v. Aventis,* Civil Action No. 02-4586 (Tenn. Ch. Ct, Rutherford Co., May 20, 2003) (holding that the TPA was intended to apply to predominantly intrastate commerce within Tennessee and is thus "not applicable to ... an interstate ... price-fixing conspiracy").

Appellant Hutchinson argues that the District Court erred in when it certified a single class including both fixed co-pay consumers and out-of-pocket consumers. According to Hutchinson, because fixed co-pay consumers suffered no injury or did not suffer the same injury as out-of-pocket consumers whose economic loss varied with the conduct of DuPont, the District Court should either have excluded fixed co-pay consumers from the class or otherwise created a separate sub-class for them. We disagree. As the District Court noted, fixed co-pay consumers did possess viable equitable and common law claims for unjust enrichment as well as claims for injunctive relief against DuPont. Fixed co-pay consumers therefore suffered a cognizable injury as a result of DuPont's allegedly unlawful conduct and posed the same risk to DuPont as did out-of-pocket consumers. Thus, the District Court did not err when it included fixed co-pay consumers with out-of-pocket consumers in the same class.

Finally, several Appellants object to the inclusion of TPPs in the certified class on the grounds that TPPs did not have standing to assert antitrust claims, or in the alternative that their claims were not as strong as those of the consumer plaintiffs. Despite Appellants' objections, we find no error in the inclusion of TPPs

in the certified class. Notably, TPPs, like individual consumers, suffered direct economic harm when, as a result of DuPont's alleged misrepresentations, they paid supracompetitive prices for Coumadin instead of purchasing lower-priced generic warfarin sodium. Thus, this case is distinguishable from other product liability class actions, such as *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912 (3d Cir.1999)* (*"Steamfitters"*), and a decision of the Southern District of New York in *In re Rezulin Products Liability Litigation, 171 F.Supp.2d 299 (S.D.N.Y.2001)* (*"Rezulin"*), which were cited by Appellants. *See also Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429 (3d Cir.2000).*

These cases, as with other similar product liability cases, involved class action claims by consumers who had suffered physical injuries from defective products, which in turn resulted in increased medical costs of covered insureds and increased payments by TPPs. The injuries suffered by TPPs in those cases, unlike the direct and independent harm suffered by TPPs in this matter, were derivative of and dependent on the harm suffered by consumers. Moreover, we note that the Second Circuit, in reversing the district court's decision in *Rezulin,* recently held that when insurance companies "allege an injury directly to themselves" and "the damages-the excess money plaintiffs paid defendants for the Rezulin that they claim they would not have purchased but for Defendant's fraud-were in no way derivative of damages to a third-party," the insurance companies have standing to directly sue defendants. *See Desiano v. Warner-Lambert Co., 326 F.3d 339, 349 (2d Cir.2003)* (recognizing the right of health benefit providers to recover from drug companies the amounts that were overpaid due to illegal or deceptive marketing practices). Therefore, Appellants' suggestion that TPPs should have been excluded from the class or categorized in a separate subclass is without merit, as it well recognized that a purchaser in a market where competition has been wrongfully restrained has suffered an antitrust injury, and in this case, TPPs are such purchasers. Moreover, it should be noted that because TPPs have litigable claims against DuPont as injured purchasers, their inclusion was a necessary condition for DuPont to enter into a settlement. Accordingly, the inclusion of TPPs in the settlement created a much larger settlement fund available to satisfy the claims of consumer class members. If TPPs had not been included in the settlement with DuPont, they could have held back and sued consumers in subrogation, thereby doubling the detriment to consumers resulting from the exclusion of TPPs. *See In re Synthroid Mktg. Litig., 264 F.3d 712, 717 (7th Cir.2001).*

2. *Typicality*

**\*9** The District Court found that the proposed class satisfied the requirements of *Rule 23(a)(3)*, which requires that the claims of the named class representatives be "typical of the claims ... of the class." *Fed.R.Civ.P. 23(a)(3)*. The typicality requirement "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Id.* However, typicality, as with commonality, does not require "that all putative class members share identical claims." *Id.*

We find no error in the District Court's determination. Notably, the claims of the representative plaintiffs arise from the same alleged wrongful conduct on the part of DuPont, specifically the alleged misrepresentation and deception regarding the equivalence of generic warfarin sodium and Coumadin. The claims also arise from the same general legal theories. As the District Court noted, the one obvious difference among the various class members is that some are consumers and some are TPPs. However, the named class representatives include members from each group. Accordingly, the District Court did not abuse its discretion in finding that *Rule 23*'s typicality requirement was satisfied.

3. *Adequacy of Representation*

*Rule 23* also requires that the representative class members "fairly and adequately protect the interests of the class." *See Fed.R.Civ.P. 23(a)(4)*. We have previously noted that the adequacy inquiry under *Rule 23* "has two components designed to ensure that absentees' interests are fully pursued." *See Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630 (3d Cir.1996),* aff'd, *Amchem, 521 U.S. at 591*. First, the adequacy inquiry "tests the qualifications of the counsel to represent the class." *Prudential, 148 F.3d at 313* (internal citations omitted). Second, it seeks "to uncover conflicts of interest between named parties and the class they seek to represent." *See id.* Several Appellants argue that the interests of TPPs, fixed co-pay consumers, and out-of-pocket consumers were in conflict, and accordingly class counsel was not in a position to adequately represent the class in settlement negotiations. Appellants therefore contend that the District Court should have, at a minimum, certified separate subclasses for

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

consumers and TPPs, or otherwise not certified the class.

Admittedly, as the District Court noted, class counsel could have more skillfully defined the class to recognize the differences between the various groups included within the class. However, we reject Appellants' contention that the interests of the class members were in conflict in such a way that the District Court abused its discretion in certifying a single class including several types of injured plaintiffs. As the District Court found, the named parties, who included consumers and TPPs, as well as consumers from the indirect purchaser states, all shared the same goal of establishing the liability of DuPont, suffered the same injury resulting from the overpayment for warfarin sodium, and sought essentially the same damages by way of compensation for overpayment. More importantly, contrary to Appellants' suggestion, the inclusion of fixed co-pay consumers and TPPs neither prejudiced out-of-pocket consumers nor reduced their settlement fund recovery. All class members had the opportunity to recover 100% of their "Recognized Loss," [FN13] and recovery did not change depending on the number of people in the class, thereby creating the problem of "splitting the settlement." Although some courts have created subclasses of class action plaintiffs where there are conflicts of interest among class members, *see, e.g., Davis v. Weir,* 497 F.2d 139, 147 (5th Cir.1974) (noting that subclasses are generally utilized to eliminate antagonistic interests within a class); *Am. Fin. Sys., Inc. v. Harlow,* 65 F.R.D. 94 (D.Md.1974) (encouraging combination of subclasses into one class where interests of class are not antagonistic), we do not believe that this was required in this case. Appellants have only asserted, rather than established, an inherent conflict among consumers and between consumers and TPPs. [FN14]

> FN13. Recognized Loss" refers to total payments made for Coumadin (less the amounts received for reimbursements, discounts, or rebates) multiplied by fifteen percent.

> FN14. Although we find that the District Court was not required to certify subclasses in this matter, we pause to note that subclasses might nonetheless have been usefully employed in this case, and may be so employed in future cases, even in the absence of conflicts, to forestall the particular kind of challenge to certification presented here. Of course, the decision whether to use subclasses is to be made on a case by case basis by the District Court, a determination which we review for an abuse of discretion.

*10 Moreover, we agree with the District Court that any potential for conflicts of interest between and among consumers and TPPs that may have arisen prior to and during the settlement negotiations were adequately represented by the presence of separate counsel for consumers and TPPs. The existence of separate counsel, as well as the operation of the Executive Committee, provided adequate "structural protections to assure that differently situated plaintiffs negotiate for their own unique interests." *Georgine,* 83 F.3d at 631 (finding inadequate representation of different groups of plaintiffs where no such structural protections existed); *see also Amchem,* 521 U.S. at 627-28. [FN15] Accordingly, we find that the District Court did not abuse its discretion in finding that the class satisfied the adequacy of representation requirement of Rule 23.

> FN15. Appellant Shapiro also contests the District Court's fee award on the grounds that it exacerbated the intraclass conflict between consumers and TPPs. The District Court set aside 22.5% of the total $44 million settlement fund to cover attorneys fees to be divided according to the discretion of the co-chairs of the Executive Committee. The District Court dismissed objections lodged against the award as unpersuasive, explaining that the distribution of an attorney fee award among counsel is and should be a "private matter" for the attorneys to resolve amongst themselves. *See Spicer v. Chi. Bd. Operations Exch.,* 844 F.Supp. 1226, 1256 (N.D.Ill.1993); Newberg, *Attorney Fee Awards* § 2.16 (1986). Shapiro renews his arguments here, essentially asserting that consumer counsel would have had an incentive to win a larger settlement for their clients if their share of the fees were directly linked to their clients' recovery. Because we find that the class was properly certified, and the Executive Committee structure adequately represented the interests of all class members in the settlement negotiations, we see no reason to treat TPP and consumer counsel as antagonistic constituencies within the settlement class and deviate from the accepted practice of allowing counsel to apportion fees amongst themselves. *See*

> *Prudential,* 148 F.3d at 329 n.96 ("[T]he court need not undertake the difficult task of assessing counsels' relative contributions."). Furthermore, as the District Court noted, not only is there no reason to presume that TPP and consumer counsel will collect fees in proportion to the amount of recovery for their respective clients, but the fund is not allocated between TPPs and consumers in such a way that would make such a division even possible.

4. *Superiority Requirement*

Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The Rule sets out several factors relevant to the superiority inquiry. [FN16] The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Prudential,* 148 F.3d at 316 (internal citations and quotations omitted). The District Court found that the class satisfied the superiority requirements of Rule 23(b)(3), and we find no error in this determination.

> FN16. Rule 23(b)(3) lists the following factors for consideration by the courts:
> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Notably, there are a potentially large number of class members in this matter, including some 2 million consumers and potentially thousands of TPPs. However, individual consumer class members have little interest in "individually controlling the prosecution or defense of separate actions," Fed.R.Civ.P. 23(b)(3)(A), because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit. Thus, from the consumers' standpoint, a class action facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement of the statutes. *See General Motors,* 55 F.3d at 784. As the District Court noted, this is less true for TPP members of the class, some of whom have significant individual claims. However, the TPPs had the option to opt-out of the proposed settlement if it was in their interest to bring their claims separately.

Moreover, there were a relatively small number of individual lawsuits pending against DuPont in this matter, which indicated to the District Court that there was a lack of interest in individual prosecution of claims. *See Prudential,* 148 F.3d at 316; *see also* Fed.R.Civ.P. 23(b)(3)(B). Finally, the District Court found that it was desirable to concentrate litigation in Delaware, where DuPont had its principal place of business and where several initial class action lawsuits had been filed. *See Prudential,* 148 F.3d at 316; *see also* Fed.R.Civ.P. 23(b)(3)(C).

B. Fairness of the Class Action Settlement

**\*11** A class action may not be settled under Rule 23(e) without a determination by the district court that the proposed settlement is "fair, reasonable and adequate." *General Motors,* 55 F.3d at 785 (citations and quotations omitted); *see also* Fed.R.Civ.P. 23(e)(1)(A). We have on several occasions stressed the importance of Rule 23(e), noting that "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *General Motors,* 55 F.3d at 785 (citations and quotations omitted); *see also Amchem,* 521 U.S. at 623 (noting that the Rule 23(e) inquiry "protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise") (citations omitted). However, in cases such as this, where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, we require district courts to be even "more scrupulous than usual" when examining the fairness of the proposed settlement. *See General Motors,* 55 F.3d at 805. This heightened standard is intended to ensure that class counsel has engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement negotiations, and has protected the interests of all class members. *See Prudential,* 148 F.3d at 317.

This Court has identified nine factors to be considered when determining whether a proposed class action settlement is fair, reasonable and adequate. *See Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975). These factors are:

(1) The complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh, 521 F.2d at 156-57. The "decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court," and we accord great deference to the district court's factual findings. *Girsh,* 521 F.2d at 156. Additionally, there is an overriding public interest in settling class action litigation, and it should therefore be encouraged. See General Motors, 55 F.3d at 784 ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); *In re Sch. Asbestos Litig.,* 921 F.2d at 1333 (noting that the court encourages settlement of complex litigation "that otherwise could linger for years").

 *12 Before turning to the District Court's application of the *Girsh* factors, we resolve a challenge raised by Appellants as to whether the proposed settlement is entitled to a presumption of fairness. We have previously directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." Cendant, 264 F.3d at 232 n.18. Based on the record before it, the District Court determined that the presumption of fairness properly attached because the settlement resulted from intense arms-length negotiations between experienced counsel, came after over three years of active litigation and discovery, and was objected to by only a small fraction of the purported class. Several Appellants argue that even if the four factors were met, the District Court was still not entitled to apply a presumption of fairness because the settlement negotiations preceded the actual certification of the class, and thus the District Court could not assure itself that the negotiations proceeded at arm's length or that class counsel vigorously protected the class' interests. We disagree. As discussed above, we have satisfied ourselves that the Rule 23(e) adequacy of representation requirement was met such that the consumer and TPP plaintiffs, their respective counsel, as well as the structure of the Executive Committee protected the class' interests during the settlement negotiations. Accordingly, we see no reason in this case to depart from the presumption of fairness that attached to the proposed settlement given that the District Court found that the four factors were met.

 We now turn to the *Girsh* factors, keeping in mind the heightened standard we use when reviewing the fairness of a settlement that results from negotiations that preceded formal class certification, as well as the initial presumption of fairness that the District Court found attached to the proposed settlement. For the reasons discussed below, we conclude that the District Court did not abuse its discretion in determining that the settlement was fair.

 1. *Complexity, Expense, and Likely Duration of Litigation*

 The first factor "captures the probable costs, in both time and money, of continued litigation." *Cendant,* 264 F.3d at 233 (citation omitted). We agree with the District Court's conclusion that this factor favors settlement because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial. Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class. In a class action of this magnitude, which seeks to provide recovery for Coumadin consumers and TPPs nationwide, the time and expense leading up to trial would have been significant. See *Prudential,* 148 F.3d at 318.

 2. *The Reaction of the Class to the Settlement*

 *13 The second *Girsh* factor "attempts to gauge whether members of the class support the settlement." *Prudential,* 148 F.3d at 318. We agree with the District Court that this factor also supports the proposed settlement. After preliminary approval of the settlement, individual notice was mailed to over 12,000 potential TPP class members, and summary notice was published in newspapers and magazines likely to be read by potential class members and which had a combined circulation of 115 million. Of the 1.8 million potential class members, 136 consumers and ten TPP claimants

opted out of the settlement, and 11 consumers or groups of consumers and two TPP claimants objected to the proposed settlement. As of June 3, 2002, 48,305 consumer and 1,055 TPP claims had been received and processed by the administrator. The District Court concluded that the insignificant number of objections filed weighed in favor of approving the settlement. Although we have previously noted that the district court should be "cautious about inferring support from a small number of objectors in a sophisticated settlement," General Motors, 55 F.3d at 812 (citations omitted), we agree with the District Court that the small number of TPP objectors is particularly telling as they are sophisticated businesses with very large potential claims.

In addressing this second *Girsh* factor, we consider a related argument raised by one of the Appellants. Hutchinson argues that the lack of consumer objectors resulted from inadequate notice to the consumers, as compared to the notice provided to TPPs. Rule 23(c)(2) specifies that all members of the class should receive "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The District Court determined that this requirement was satisfied by publishing summary notice in publications likely to be read by consumer claimants along with a call-center and a website with information and downloadable forms. Hutchinson, however, argues that notice to consumer plaintiffs was inadequate in this case as compared to other large class action suits where individual direct mailing was used. *See, e.g.,* In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 381 (D.D.C.2002); Cendant, 264 F.3d at 226; In re Synthroid Mktg. Litig., 264 F.3d at 716.

However, even in the absence of any individual notice via direct mail in this matter, we are satisfied that the District Court acted within its discretion in determining that "reasonable effort" was made here to provide "the best notice practicable under the circumstances." *See* Fed.R.Civ.P. 23(c)(2). In particular, we note that neither the plaintiffs nor DuPont had access to the names and addresses of the multitude of people nationwide who purchased Coumadin because the identity of pharmaceutical purchasers is confidential information that cannot be disclosed without patient consent. In addition, we note that consumers in this case who contacted the administrator or visited the website could request a copy of the notice by direct mail.

3. *Stage of Proceedings and Amount of Discovery Completed*

 **\*14** The third *Girsh* factor "captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." Cendant, 264 F.3d at 235 (quoting General Motors, 55 F.3d at 813). As the District Court found, this litigation had been pursued by class counsel on several fronts for over three years before negotiation of the settlement. Prior to consolidation by the order of the MDL panel, four separate federal actions had been filed by consumer plaintiffs, and consumers and TPPs pursued state actions in Illinois, California, Tennessee, New York, Alabama, and Wisconsin. The settlement agreement was reached after a year of negotiations which included consultations with experts. Contrary to Hutchinson's assertion that the District Court had virtually nothing to aid its evaluation of the settlement terms, three years of litigation and discovery resulted in hundreds of thousands of documents produced by defendant, numerous depositions, and consultations with experts with which the District Court was familiar. Based on the type and amount of discovery undertaken by the parties, the District Court concluded that class counsel adequately appreciated the merits of the case before negotiating, and we agree that this factor strongly favors approval of the settlement. *See* Prudential, 148 F.3d at 319.

4. & 5. *Risks of Establishing Liability and Damages*

These factors survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement. Cendant, 264 F.3d at 237-39; Prudential, 148 F.3d at 319. After evaluating several possible bars to plaintiffs' success at trial, the District Court concluded that on balance, the fourth and fifth *Girsh* factors favored settlement. We discern no error in that determination.

6. *Risks of Maintaining Class Action Status Through Trial*

Because "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action," General Motors, 55 F.3d at 817, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial. A district court retains the authority to decertify or

modify a class at any time during the litigation if it proves to be unmanageable. *Prudential,* 148 F.3d at 321. Although Appellants' concerns about the manageability of a multistate class of consumers and TPPs, as we discussed above, did not pose a problem for the certification of a settlement class, there is a significant risk that such a class would create intractable management problems if it were to become a litigation class, and therefore be decertified. *See In re LifeUSA Holding, Inc.,* 242 F.3d at 147; *Georgine,* 83 F.3d at 630. We agree with the District Court that the significant risk that the class would be decertified if litigation proceeded weighs in favor of settlement.

7. *Ability to Withstand Greater Judgment*

**\*15** The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *Cendant,* 264 F.3d at 240. The District Court found that this factor neither favored nor disfavored settlement because of a lack of evidence in the record about DuPont's ability to pay or whether such a consideration factored into the settlement negotiations. Appellants Cleusman and Hutchinson contend that the District Court should have inquired into DuPont's ability to pay a higher settlement amount in determining whether the settlement was adequate. Although the plaintiffs do not dispute that DuPont's total resources far exceed the settlement amount, the fact that DuPont could afford to pay more does not mean that it is obligated to pay any more than what the consumer and TPP class members are entitled to under the theories of liability that existed at the time the settlement was reached. Here, the District Court concluded that DuPont's ability to pay a higher amount was irrelevant to determining the fairness of the settlement. We see no error here.

8. & 9. *The Range of Reasonableness of Settlement in Light of Best Possible Recovery and All Attendant Risks of Litigation*

The last two *Girsh* factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial. *Prudential,* 148 F.3d at 322. In order to assess the reasonableness of a settlement in cases seeking primarily monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *Id.* (citing *General Motors,* 55 F.3d at 806).

Plaintiff's expert, Dr. French, estimated recoverable damages to be as low as $7.1 million and as high as $133.8 million. The District Court described the methodology utilized by Dr. French to arrive at those figures and concluded his estimate was reasonable. [FN17] Appellant Hutchinson now claims, without the support of expert evaluation, citation, or discovery, that maximum damages in this case should have been estimated at $400 million since DuPont made $1.6 billion in sales between 1997 and 1999, and there was a 25% difference in cost between generic warfarin sodium and Coumadin. The District Court, after reviewing the expert report and supporting materials, concluded that Dr. French's estimate of the range of possible damages was reasonable if the case were to go to trial.

> FN17. Dr. French's model assumed that, absent DuPont's alleged illegal acts, DuPont's share of the market would have fallen from 100% to 50% from July 1997 to September 1999, that generic warfarin sodium would have cost 25% less than Coumadin, and that DuPont would have charged 2.5% less for Coumadin due to competition from the generic product. Dr. French's floor of $7.1 million resulted from his estimation that DuPont would have vigorously challenged the basis for plaintiffs' damages at trial.

Based on the $400 million figure, Hutchinson argues that consumers only received 11% of total economic damages, well below the 30%-70% damages recovered in similar pharmaceutical industry class actions. According to Dr. French's figures, however, the $44.5 million settlement fund is approximately 33% of available damages and well within a reasonable settlement range when compared with recovery percentages in other class actions. *See Cendant,* 264 F.3d at 241 (approving settlement for 36%-37% recovery and noting that typical recoveries in securities class actions range from 1.6% to 14%). [FN18] We find no error in the District Court's analysis and hold that these two factors also favor settlement.

> FN18. Although it is not determinative here, it is also worth noting that while Hutchinson claims the settlement fund

amount is too small, every consumer who filed a claim on or before April 30, 2002, will receive 100% of their Recognized Loss.

*16 On balance, and in light of the presumption of fairness that attaches to the settlement, we find that the District Court adequately addressed the *Girsh* factors, properly discharged its fiduciary duty to absent class members, and did not abuse its discretion in finding the settlement to be fair and reasonable.

C. Plan of Allocation

Several Appellants object to the proposed allocation of settlement funds under the Plan of Allocation. These arguments overlap substantially with those made with respect to class certification, but to the extent that they were not addressed in our discussion above in Part A, we address them here. These additional arguments can be characterized into two groups, those objecting to the inclusion of TPPs in the Plan of Allocation and those objecting to the inclusion of fixed co-pay consumers in the Plan of Allocation.

With regards to the first contention, several Appellants argue, despite the fact that the District Court noted the priority being given to individual consumers in the structure of the settlement, that the settlement is unfairly skewed in favor of TPPs. Although TPPs are certainly receiving a larger percentage of the fund than are consumers, this does not translate into an unfair allocation. As the District Court noted, TPPs paid 67% of Coumadin costs, while consumers paid for 27%, so TPPs actually bear the greater share of damages. Moreover, the District Court stated that the settlement does not favor TPPs. Rather, it is structured to protect consumers and to create an incentive for them to submit claims. The settlement allows individual consumers preferential access to the first 18% of the Net Settlement Fund to satisfy consumer claims before TPP claimants can recover at all, and if consumer claims exceed that amount, the remainder of the 82% of the NSF is shared between TPPs and consumers on a pro rata basis. Because of this favorable allocation, based on the number of consumer claims the Settlement Administrator has received, all consumers who have filed claims can expect to receive 100% of their Recognized Loss, while TPP's will receive only approximately 35.6% of their Recognized Loss. Moreover, we note that had the TPPs or a subclass of consumers not been included in the settlement distribution, the settlement amount would have presumably been significantly smaller as DuPont would still have been vulnerable to claims from excluded purchasers. Consequently, we agree with the District Court that the inclusion of TPPs in the Plan of Allocation was not unfair to individual consumers.

As for the second contention, several Appellants object to the inclusion of fixed co-pay consumers as equal sharers in the proceeds of settlement. However, by participating in the settlement, all class members, including consumers with fixed co-pays, are releasing equitable and common-law claims for unjust enrichment seeking disgorgement of profits from wrongdoers, and claims for injunctive relief. Although fixed co-pay consumers have not suffered monetary damages, it is appropriate that they receive consideration for the release of the claims they have against DuPont. Because the Plan of Allocation was agreed to by consumer and TPP class representatives after extensive, arms-length negotiations, and because all consumers who filed claims are likely to receive 100% of their Recognized Losses, the District Court was persuaded that fixed co-pay consumers be allowed to share equally in the distribution of the settlement fund. We find no error in this determination.

III. CONCLUSION

*17 Because the class satisfies the requirements of Federal Rule of Civil Procedure 23 and the settlement is fair to the class, we will affirm the decision of the District Court.

2004 WL 2809797 (3rd Cir.(Del.))

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.