UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

_____
                                              )
MARJORIE FERRELL, et al.,                     )        Civil Action No. C-1-01-447
                                              )
                    Plaintiffs,               )        Judge Sandra S. Beckwith
                                              )        Magistrate Judge Timothy S. Hogan
          v.                                  )
                                              )
WYETH-AYERST LABORATORIES,                    )
INC., et al.,                                 )
                                              )
                    Defendants.               )
_____)

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT
AND APPROVAL OF NOTICE PROGRAM**

Plaintiffs United Food & Commercial Workers Midwest Health Benefits Fund, and Twin

Cities Bakery Workers Health & Welfare Fund, Marjorie Ferrell, Mary D. Duda and Mary

Seaworth (collectively "Plaintiffs"), by Plaintiffs' Counsel, submit this memorandum of law in

support of their Motion for Preliminary Approval of the Proposed Settlement and for Approval

of Notice Program.

**INTRODUCTION**

Following several months of hard fought negotiations, which included an all-day

mediation session with Hon. Edward A. Infante (Ret.), a nationally recognized mediator, and

numerous direct negotiations between counsel, Plaintiffs and Defendants Wyeth Pharmaceuticals

(formerly Wyeth-Ayerst Laboratories, Inc.) and Wyeth (formerly American Home Products

Corporation) (collectively "Defendants" or "Wyeth") have executed a Settlement Agreement,

dated December 29, 2006, which is intended to resolve this litigation.  Under the terms of the

Settlement Agreement, Defendants will pay $1,300,000 for the benefit of the Class certified by

the Court.[1]  The settlement, which contemplates a *cy pres* distribution, constitutes a good and fair

result, given the adverse circumstances facing Plaintiffs and the Class.  For the reasons set forth

herein, the Court should grant preliminary approval, approve of the proposed program of notice,

and schedule a Fairness Hearing to consider final approval of the proposed settlement.  *See* Fed.

R. Civ. P. 23(c)(2) & (e).

## THE SETTLEMENT

Following the Court's summary judgment ruling in the related direct purchaser class

action, *J.B.D.L. Corp., v. Wyeth-Ayerst Laboratories, Inc.*, No. 1:01-CV-704, 1:03-CV-781,

---

[1]    The Class is comprised of five subclasses certified by the Court that consists of the
following:

1.    A subclass of individual consumers in the states of Arizona, Iowa,
Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina,
North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin.

2.    A subclass of third-party payors in the states identified
immediately above, represented by Plaintiffs United Food & Commercial
Workers Midwest Health Benefits Fund ("UCFW"), and Twin Cities Bakery
Workers Health & Welfare Fund ("TCBW").

3.    A subclass of consumers in the states of Florida, Vermont and
Massachusetts, represented by Plaintiff Marjorie Ferrell.

4.    A subclass of third-party payors in the states of Florida, Vermont,
and Massachusetts.  UFCW alleges that it has members in Florida, and the Court
finds that UFCW is an adequate representative for this subclass.

[5].    A subclass of third-party payors in the state of Nevada.

Order of February 2, 2005 [Doc. No. 118] at 8.  "The Court excluded from all subclasses any
consumer who paid a fixed cost, or 'flat co-pay,' to purchase Premarin, as well as any consumer
who was fully insured or fully reimbursed for such purchases." *Id.* at 2.  Plaintiffs were unable
to identify a representative for the subclass of consumers in Nevada by the Court's deadline.

2005 WL 1396940 (S.D. Ohio, June 13, 2005) (*J.B.D.L.*), and the denial of Plaintiffs' motion to stay pending appeal of that judgment [Doc. No. 140, Oct. 21, 2005], the parties' differences concerning the risks associated with this litigation narrowed considerably.  Settlement negotiations began in late 2005 and continued through mediation on August 30, 2006, where the parties were able to reach an agreement in principle.  The parties thereafter negotiated the specific terms and conditions embodied in the Settlement Agreement.  The parties reached an impasse in negotiating these terms, which Judge Infante helped resolve during a teleconference on December 14, 2006.

       The Settlement Agreement provides that Defendants will pay $1,300,000 into an escrow account.  The Settlement Agreement also provides for a specific release of Class members' claims.  This release will forever terminate this litigation once the settlement becomes effective as defined in the Settlement Agreement.  The common fund will be used to pay the cost of a notice program approved by the Court.  *See Declaration of Patrick E. Cafferty in Support of Plaintiffs' Plan of Notice* ("Cafferty Decl."), Ex. A.  The Settlement Agreement further provides that Plaintiffs' Counsel may apply to the Court for an award of costs and expenses not to exceed $325,000, to be paid from the common fund.  Although Plaintiffs' Counsel have incurred an aggregate lodestar in excess of $3.7 million, they will not apply for an award of attorneys' fees.  Upon final approval, the remainder of the common fund will be equally divided and distributed to: (1) the National Women's Health Resource Center (www.healthywomen.org ); and (2) The Society for Women's Health Research (http://www.womenshealthresearch.org).  Judge Infante recommended to the parties that these organizations be designated as the *cy pres* recipients.

## ARGUMENT

## I.      THE COURT SHOULD PRELIMINARILY APPROVE THE PROPOSED SETTLEMENT.

### A.      The Standards For Approval.

Rule 23(e) of the Federal Rules of Civil Procedure requires court approval of any settlement of a class action. *Tennessee Ass'n of Health Maintenance Organizations, Inc. v. THA*, 262 F.3d 559, 565 (6th Cir. 2001). In *Williams v. Vukovich*, 720 F.2d 909, 920-21 (6th Cir. 1983), the United States Court of Appeals for the Sixth Circuit outlined the procedure to be followed by the Court for such approval:

> (1)      the court must preliminarily approve the proposed settlement; *i.e*., the court should determine whether the compromise embodied by the decree is illegal or tainted with collusion;
>
> (2)      the members of the class must be given notice of the proposed settlement by the best means practicable under the circumstances; and
>
> (3)      a hearing must be held to determine whether the settlement is fair to those affected, adequate and reasonable.

*Id.* This motion seeks preliminary approval of the settlement in order to give notice to the class members of its terms. *See* Manual for Complex Litigation, Fourth § 21.632-21.635 (2004); *Armstrong v. Bd. of School Directors of the City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980); *Bourlas v. Davis Law Assoc.*, 237 F.R.D. 345 (E.D.N.Y. 2006); *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99 (E.D.N.Y. 1997).

A court's role in evaluating a settlement "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Clark Equipment Co. v. Int'l Union, Allied Industrial*

*Workers of America, AFL-CIO*, 803 F.2d 878, 879 (6th Cir. 1986) (quoting *Officers For Justice*

*v. Civil Service Comm'n*, 688 F.2d 615 (9th Cir. 1982)).  The court does not substitute its

judgment for that of the litigants and their counsel.  *Armstrong*, 616 F.2d at 315.

> Thus, "[w]here the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representative or segments of the class and falls within the reasonable range of approval, preliminary approval is granted." [*In re NASDAQ Antitrust Litig*., 176 F.R.D. at 102] (citing Manual for Complex Litigation (Third) § 30.41 (1995)); *accord In re IPO Litig*., 226 F.R.D. [186] at 191 [(S.D.N.Y. 2005)].  Upon preliminary approval, the court "must direct the preparation of notice of the certification of the settlement class, the proposed settlement and the date of the final fairness hearing."  *In re IPO Litig*., 226 F.R.D. at 191.  At the fairness hearing, "[c]lass members (and non-settling defendants whose rights may be affected by the proposed settlement) then have an opportunity to present their views of the proposed settlement, and the parties may present arguments and evidence for and against the terms, before the court makes a final determination as to whether the proposed settlement is 'fair reasonable, and adequate.'"  *Id.* (citing Manual for Complex Litigation (Fourth) § 21.632-21.635 (2004)).

*Bourlas,* 237 F.R.D. at 355.

In determining whether to grant preliminary approval of a settlement, federal courts have

established a multi-faceted test in judging whether the settlement is within the range of possible

approval:

> (1)    whether the negotiations leading to the proposed settlement occurred at arm's length;
>
> (2)    whether there was sufficient discovery in the litigation for the plaintiffs to make an informed judgment on the merits of their claims; and
>
> (3)    whether the proponents of the settlement are experienced in similar litigation.

2 *Newberg on Class Actions* (1992 ed.) § 11.41 at 11-91.

**B.    The Proposed Settlement Satisfies the Requirements for Preliminary Approval.**

**1.    The Negotiations Leading To The Settlement Agreement Occurred At Arm's Length.**

The settlement was negotiated over a period of several months and was ultimately concluded with the meditation assistance of Judge Infante.  All in all, the settlement process spanned more than one-year and the dynamics shifted with each litigation event.  Because of the extensive bargaining process employed throughout the settlement process, there can be little doubt that the Settlement Agreement was the product of good-faith negotiations.

**2.    Plaintiffs' Counsel Engaged In Sufficient Discovery To Make An Informed Judgment Concerning The Merits of Their Claims.**

The stage of the proceedings and the amount of discovery completed at the time a settlement is reached is relevant to the parties' knowledge of the strengths and weaknesses of the various claims in the case, and consequently affects the determination of the settlement's fairness.  "Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) (citation omitted); *see also In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

Plaintiffs' Counsel here certainly had an appreciation of the merits before reaching the proposed settlement.  Plaintiffs' counsel reviewed in excess of 5.5 million pages of documents produced by Wyeth and third parties.  Plaintiffs' Counsel engaged Dr. Gary French, an expert economist of national reputation, to evaluate the economic theory of their claims, the potential damages based on sales data produced by defendants and plaintiffs and the pharmaceutical industry itself.  Discovery, which was coordinated with the *J.B.D.L.* action, has been completed and is closed.  Counsel for Plaintiffs participated in more than more than a dozen depositions,

including expert depositions, and reviewed the transcripts more than 50 depositions taken in the

*Duramed* and *J.B.D.L.* litigation.  More than any other factor, the risks Plaintiffs' face on the

merits are best demonstrated by the Court's analysis of the evidence in its summary judgment

ruling in *J.B.D.L.*  Thus, this factor favors preliminary approval of the proposed settlement.

> **3.    The Proponents of the Settlement Are Highly Experienced Antitrust Litigators**.

Plaintiffs' Counsel have considerable experience in handling complex class actions in

general, and antitrust class actions against pharmaceutical manufacturers in particular.  The

Court has previously determined that Plaintiffs' Counsel are adequate representatives of the

Class.  *See* Doc. No. 100 at 12 ("The record establishes that Plaintiffs' counsel is well qualified

to prosecute this complex antitrust action, and has experience in several other large antitrust

class actions.").  In fact, one or more of the firms designated as Co-Lead Counsel have been

involved at the leadership level in most pharmaceutical end-payor class action over the past

decade.[2]  Given this experience, Plaintiffs' Counsel have developed in-depth knowledge of the

applicable law.  While the settlements noted in footnote 2 resulted in larger financial recoveries,

---

[2]  *See, e.g., In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 85 (D. Mass. 2005) (settlement: $75,000,000; www.relafensettlement.com); *In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508 (E.D. Mich. 2003), *app. dismissed,* 391 F.3d 812 (6th Cir. 2004) (settlement: $80,000,000 ($7,000,000 state agencies; $40,150,000 third party payors; and $32,850,000 consumers); www.cardizemsettlement.com); *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231 (D. Del. 2002), *aff'd,* 391 F.3d 516 (3d Cir. 2004) (settlement $44,500,000; www.coumadinsettlement.com); *Nichols v. SmithKline Beecham Corp.,* No. 00-6222, 2005 WL 950616 (E.D. Pa. April 22, 2005) (settlement: $65,000,000; www.paxilclaims.com); *In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369 (D.D.C. 2002) (settlement: $135,285,600 ($72,000,000 for consumers and $28,000,000 for state agencies; $25,285,600 for third-party payors in *Illinois Brick* repealer states; and $10,000,000 for TPPs in non-*Illinois Brick* repealer states); *In re Synthroid Marketing Litig.,* 264 F.3d 712 (7th Cir. 2001) (settlement: $87,400,000).

none of those cases involved obstacles remotely comparable to those faced here.  In any event, the important point for purposes of this preliminary approval motion is that experienced and competent counsel believe that the proposed settlement, in the circumstances of this case, is fair, reasonable and adequate.  This factor heavily favors preliminary approval.

### 4. The Proposed Settlement Is Sufficiently in the Range of Fairness, Adequacy and Reasonableness to Permit Notice to the Members of the Class.

#### a. The Amount of the Recovery.

While recovery of $1,300,000 is certainly less than hoped for at the outset of this litigation, it fairly reflects the strength of Plaintiffs' claims in this Court.  The determination of a "reasonable" settlement is not susceptible to a mathematical equation yielding a particularized sum.  Rather, as Judge Friendly has explained, "[i]n any case there is a range of reasonableness with respect to settlement."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).  In fact, a settlement can be approved even when it amounts to only a small percentage of the recovery sought.  *See In re Milken and Assoc. Sec. Litig.,* 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993).[3]  As the court aptly recognized in *In re Union Carbide Sec. Litig.*, 718 F. Supp. 1099 (S.D.N.Y. 1989):

> [t]he dollar amount of the settlement itself is not decisive in the fairness determination . . . . Dollar amounts are judged not in comparison with possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.

718 F. Supp. at 1103.  The evaluating court must guard against demanding too large a settlement based on its view of the merits of the litigation because settlement is a compromise — a yielding

---

[3]  *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth of a single percent of the potential recovery.").

of the highest hopes in exchange for certainty and resolution. *See Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

While Plaintiffs believe that all of their claims are solidly grounded in law and fact, it must be conceded that the summary judgment ruling in *J.B.D.L.,* the related direct purchaser action, has rendered the likelihood of success at the district court level virtually nil.[4]  Plaintiffs' effort to stay this case pending the Sixth Circuit's decision, and later to dismiss the case and decertify the Class, so as to avoid summary judgment, have been rejected by the Court.[5]  In these circumstances, Plaintiffs' only hope of ultimately prevailing would likely have to begin with the appeal from an adverse judgment — a risky, costly and time consuming process.

In sum, given the risks associated with further litigation, the $1,300,000 recovery is sufficiently within the range of fairness, adequacy and reasonableness to permit notice to

---

[4]  In bringing these actions, the Plaintiffs confronted the same factual and legal hurdles faced by the direct purchaser class.  Because they did not deal directly with Wyeth, moreover, Plaintiffs face even more factual and legal obstacles.  In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that only direct purchasers have standing to recover damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  Accordingly, Plaintiffs had to rely upon state law in their quest for financial recovery for the Class.  In order for the Class to recover the theoretical maximum damages available, therefore, Plaintiffs would have to be successful on *every one* of a host of complex and hotly disputed legal and factual issues.

[5]  Because there was no possibility of awaiting the Sixth Circuit's decision in *J.B.D.L.*, Plaintiffs' Counsel determined that notice to the Class — thus forcing absent Class members to exercise opt-out rights or be bound by the outcome of this litigation — was not in the Class's best interest.  Accordingly, on May 4, 2006, Plaintiffs filed a motion to voluntarily dismiss the action, with prejudice as to the named plaintiffs only, and decertify the Class [Doc. No. 151].  This motion was opposed by Defendants [Doc. No. 153] and scheduled for hearing on August 4, 2006.  On August 1, 2006, Defendants filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [Doc. No. 166].  At the telephonic hearing held on August 4, 2006, the Court indicated that it would deny the motion to voluntarily dismiss the case and set a briefing schedule on Defendants' motion for summary judgment.  On August 25, 2006, the Court granted Plaintiffs' motion to extend the briefing schedule pending mediation before Judge Infante.

members of the Class.

### b.    The *Cy Pres* Distribution.

The administrative costs associated with distributing the proceeds of this settlement to Class members would exhaust the funds.  Accordingly, the settlement provides for a *cy pres* distribution for the benefit of the Class.  Antitrust class actions often aggregate the relatively small claims of consumers in order to attack wrongful business practices, so it is not unusual for there to be settlements in amounts that, for practical purposes, cannot be distributed directly to class members.  In *New York v. Keds Corp.*, 1994-1 Trade Cas. ¶70,549, 1994 WL 97201 (S.D.N.Y. Mar. 21, 1994), for example, over five million purchasers of Keds shoes suffered damages between $1 and $1.25 per pair due to alleged price-fixing.  The Attorneys General of the fifty states brought a consumer antitrust action and settled it for injunctive and monetary relief in the amount of $7.2 million.  Of the $7.2 million, $5.7 million was distributed to the fifty states, and through the states to designated charities or to any other charity benefitting women aged 15 to 44, the population that primarily purchased the price-fixed shoes.  The court held that "[i]n these circumstances, the *cy pres* resolution adopted by the settlement agreements is reasonable and adequate."  *Id.,*1994 WL 97201, *3.[6]

---

[6] *See also Bourlas v. Davis Law Assoc.*, 237 F.R.D.345 (E.D.N.Y. 2006) (granting preliminary approval to proposed *cy pres* settlement); *New York v. Salton Inc.,* 265 F. Supp. 2d 310 (S.D.N.Y. 2003) (approving *cy pres* distribution to non-profit or governmental entities); *In re Toys "R" Us Antitrust Litig.,* 191 F.R.D. 347, 353 (E.D.N.Y. 2000) (approving proposed settlement and certifying class, noting that the "decision to forego individual recoveries was sensible, given the difficulty of identifying proper claimants and the difficulty, especially the costs, that such recoveries and their administration would have entailed."); *Ramos v. Philip Morris Companies, Inc.*, 743 So.2d 24 (Fla. 3d DCA 1999) (upholding settlement where $300 million class recovery was used to establish research foundation); *New York v. Reebok Int'l, Ltd.,* 96 F.3d 44, 49 (2d Cir. 1996) (The "impracticality of attempting to distribute the settlement proceeds among the multitude of unidentified possible claimants is obvious."); *In re Agent*

-10-

Courts are justifiably skeptical of *cy pres* settlements that produce an indirect benefit for the class and a handsome attorneys' fee for counsel. The concern is that counsel might be tempted to surrender the class's strong claims in order to realize a quick fee. *See, e.g., In re Matzo Food Products Litig.*, 156 F.R.D. 600 (D.N.J. 1994). Such is not a concern in this case — Plaintiffs' Counsel seek no fee. In addition, the settlement was achieved with the assistance of a well-respected mediator and it accurately reflects the weakness of Plaintiffs' claims in light of the *J.B.D.L.* summary judgment ruling. *Cf. In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005) ("Although this Court agrees that a *cy pres* award is insufficient in many cases, and has made great efforts to ensure that individual consumers will actually reap some benefit from this case, the *cy pres* award here is made in light of the very weakness of the claims of residents in [the non-*Illinois Brick* repealer] states."). At all times, Plaintiffs' Counsel's effort were aimed at protecting the Class's best interests and not potential claims to attorneys' fees.

Upon final approval, the remainder of the common fund will be equally divided and distributed to: (1) the National Women's Health Resource Center (www.healthywomen.org ), a non-profit that develops and distributes objective women's health information based on the latest advances in medical research and practice; and (2) The Society for Women's Health Research (http://www.womenshealthresearch.org), the nation's only non-profit organization whose

---

*Orange Product Liability Litig.,* 818 F.2d 179, 184-85 (2d Cir. 1987) (approving use of portion of settlement fund to fund assistance programs for the class as a whole where distribution to individuals was not feasible), *cert. denied*, 484 U.S. 1004 (1988); *Williams Foods, Inc. v. Eastman Chemical Co.,* 2001-2 Trade Cas. (CCH) 73,414, 2001 WL 1298887 (D. Kan. Aug. 8, 2001) (" The Court finds that a *cy pres* award in the amount of $25,000 each to the United Community Services of Johnson County and the Children's Therapeutic Learning Center is fair, reasonable and adequate."); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1031-32 (N.D. Ill. 2000) (approving *cy pres* distribution), *aff'd*, 267 F.3d 743 (7th Cir. 2001), *cert. denied*, 535 U.S. 1018 (2002).

mission is to improve the health of all women through research, education and advocacy. Judge

Infante recommended to the parties that these organizations be designated as the *cy pres*

recipients.

     **5.**       **The Settlement Provides for A Comprehensive Notice Program.**

     Had notice of class certification been provided before settlement, it is unlikely that many

Class members would have opted-out,[7] notwithstanding warning language in a litigation notice

(as stern as the Court would have permitted) predicting that summary judgment would be

granted for Wyeth, as in *J.B.D.L.* The settlement here funds a more comprehensive notice

program than otherwise would have been possible and provides the Class with *more information*

upon which to make an opt-out decision with full knowledge of the consequences. As the Court

in *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825 (E.D.N.C. 1994)

explained:

> By reaching an agreement in principle prior to notification of the potential class
> members, the members could choose to be included or excluded based on the
> terms of the proposed settlement. If such agreement had been reached after
> notification, potential class members would have had to decide whether to opt-in
> or opt-out of the class without knowledge of the proposed settlement. Thus, the
> posture of the case at the time of the settlement favors final approval.

*Id.* at 829. The proposed notice informs the Class that, upon final approval, this case will be

over and preserving their claims, if any, will require them to opt-out. This action has tolled the

---

[7] For example, in *Blevins v. Wyeth-Ayerst Labs., Inc. & American Home Prods. Corp.*, Case No. 324380 (San Francisco, Cal., Sup. Ct.), the California case arising out of these circumstances, class notice was approved before the *J.B.D.L.* summary judgment ruling, but the deadline for opting out was October 31, 2005, several months later. *See* http://www.premarinclassaction.com/premarin/default.htm. Nonetheless, only three third-party payors excluded themselves by the deadline.

statutes of limitations[8] and, if *J.B.D.L.* is reversed by the Sixth Circuit, absent Class members

who opt-out will have the option of asserting those claims against Wyeth on an individual basis.[9]

These factors militate in favor of preliminary approval of the proposed settlement, as it is

within the range of what is fair, reasonable and adequate under the circumstances.

## II.    THE COURT SHOULD APPROVE PLAINTIFFS' SELECTION OF NOTICE ADMINISTRATOR AND THE PLAN OF NOTICE.

Plaintiffs' Counsel have retained Complete Claims Solutions, Inc. ("CCS"), an

administration firm specializing in consumer and antitrust class action settlements, and seeks its

designation as Notice Administrator.  CCS has significant experience in providing notice and

administering settlements of pharmaceutical antitrust litigation, including *In re Relafen Antitrust

Litig.*, 01-CV-12239 (D. Mass.); *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D.

Mich.); *In re Buspar Antitrust Litig.*, MDL No. 1413 (S.D.N.Y.); *VistaHealth Plan, Inc. v.

Bristol-Myers Squibb Co.* ("Taxol"), C.A. No. 01-01295 (D.D.C.); and *In re Warfarin Sodium

Antitrust Litig.*, No. 98-MD-1232 (D. Del.).  CCS, together with its media consultant

Kinsella/Novak Communications Ltd., has presented a plan for providing notice to the Class

("Plan of Notice").  *See*  Decl. Ex. A.  The total cost of the notice program is estimated at

$532,880.75, which will be paid out of the common fund.  Cafferty Decl. Ex. D.

---

[8] Pursuant to the class action tolling doctrine of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the statutes of limitations for the *individual* claims of any absent Class members have been tolled from July 6, 2001, the date the initial class action was filed [Doc. No. 1].

[9] *Andrews v. Orr*, 851 F.2d. 146, 148-49 (6th Cir. 1988) provides that *American Pipe* tolling does not apply for purposes of initiating a new class action.

A.    **The Plan of Notice**.

1.    **Notice to Third-Party Payors.**

In the course of managing previous pharmaceutical class action settlements, CCS has developed a proprietary database of approximately 40,000 third-party payors ("TPPs"), enabling them to provide direct mail notice to most all TPP Class members.  CCS will mail the *Notice of Pendency and Proposed Settlement of Class Action, Motion for Costs and Settlement Hearing* ("Notice"), which is attached as Exhibit 2 to the proposed Preliminary Approval Order (Agreement Ex. C), to all TPPs and recordkeepers in CCS's database.  The Notice will include the Exclusion Form.  In addition to direct mail, CCS recommends publication of the *Summary Notice of Pendency and Proposed Settlement of Class Action, Motion for Costs and Settlement Hearing* ("Summary Notice"), which is attached as Exhibit 1 to the proposed Preliminary Approval Order (Agreement Ex. C), in periodicals directed at the TPP industry, namely *National Underwriter* and *HR Magazine*.  *See* Cafferty Decl. Ex. A at 9-10.

2.    **Notice to Consumers.**

CCS, in coordination with its media consultant Kinsella/Novak Communications Ltd., will conduct a comprehensive media campaign to ensure that Class members are made aware of the Settlement and the steps they need to take in order to opt-out.  CCS will manage the printing, preparation and distribution of the Notice and Exclusion Forms.  At a minimum, these materials will be mailed to all consumer Class members who request them and, as noted below, will also be available on-line.  *See* Cafferty Decl. Ex. A at 11-21.

*Media Publication.*  CCS has proposed a notice campaign budgeted at $462,532.75.  The plan calls for publication of the Summary Notice the newspaper supplements *Parade* and *USA*

*Weekend*, which will be placed in more than 300 Sunday newspapers in the seventeen states. The Summary Notice will also be published in magazines targeted to reach the population that uses Premarin, namely *Better Homes & Gardens* and *Woman's Day*.  *See* Cafferty Decl. Ex. A at 18-19.  The plan has a reach level of 82.6% for all women using branded prescriptions and 77.7% for women aged 45-64, the population group most likely to have used Premarin during the Class Period.  *Id.* at 21.

*Notice on the World Wide Web.*  CCS has developed a website to provide another medium for potential Class members to learn about the litigation.  When the settlement notice program commences, the website www.premarinsettlement.com will provide access to the Notices and forms, as well as the Settlement Agreement, the relevant Orders of the Court, a page of "Frequently Asked Questions" ("FAQs"), and any important updates on the progress of the settlement.

*Toll-free telephone number*.  CCS will provide and staff a toll-free hotline number to answer questions from Class members and to respond to requests for copies of the Notice and exclusion forms.

**B.     The Proposed Plan of Notice Satisfies Rule 23 and Due Process.**

Rule 23(e)(1)(B) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise."  The "mechanics of the notice process are left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process."  *Grunin v. International House of Pancakes*, 513 F.2d 114, 121 (8th Cir.), *cert. denied*, 423 U.S. 864 (1975).  "In every case, reasonableness is a function of anticipated results, costs, and amount involved."  *In re*

*Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1099 (5th Cir. 1977); *In re Domestic Air Transport Antitrust Litig.*, 141 F.R.D. 534, 547 (N.D. Ga. 1992) (quoting *Nissan*).  In this case, the notice program proposed by Plaintiffs is similar to those implemented in a number of recent pharmaceutical antitrust class actions to notify end-payors.  *See, e.g., In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 63-64 (D. Mass. 2005).

### 1.    Direct Mail Notice to Third-Party Payors.

"It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirements of both Fed.R.Civ.P. 23 and the due process clause." *Zimmer Paper Products, Inc. v. Berger & Montague P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) (*citing Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-77 (1974)).  Rule 23, which effectively incorporated the due process standards suggested by the Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 318 (1950), "establishes varying notice requirements, depending on the nature of the class action and the content of the notice." *Zimmer*, 758 F.2d at 90.  In this case, direct mail to CCS's proprietary database of third-party payors, coupled with publication in industry periodicals (*National Underwriter* and *HR Magazine*), national magazines and newspapers is the best notice practicable under the circumstances.  *See, e.g., VistaHealth Plan, Inc. v. Bristol-Myers Squibb Co.*, 287 F. Supp. 2d 65 (D.D.C. 2003).

### 2.    Notice to Consumer Members of the Class.

Neither Plaintiffs nor Defendants have ready access to the names and addresses of the consumers who purchased Premarin.  Due process is satisfied by the proposed comprehensive

media campaign, with a publication program, website[10] and toll-free hot line.  This will notify

consumers and allow them to receive the Notice and exclusion form in the same manner

employed in other pharmaceutical class action settlements, *see Relafen,* 231 F.R.D. at 64-65*;*

*Lorazepam & Clorazepate*, 205 F.R.D. at 378; *Warfarin Sodium*, 212 F.R.D. at 252-53, and

many other consumer settlements.  *See In re Compact Disc Minimum Advertised Price Antitrust*

*Litig.,* 216 F.R.D. 197, 202-04, 218-19 (D. Me. 2003); *In re Compact Disc Minimum Advertised*

*Price Antitrust Litig.*, MDL No. 1361, Final Order and Judgment ¶4.4, 2003 WL 21685581 at *9

(D. Me. July 18, 2003); *State of N.Y. by Vacco v. Reebok Intern. Ltd.*, 903 F. Supp. 532, 533

(S.D.N.Y. 1995), *app. dismissed*, 96 F.3d 44 (2d Cir. 1996).  The Plan of Notice anticipates that

published notice will reach more than 80% of the consumer Class members.[11]

>    **3.      The Form and Content of the Notice and Summary Notice should be
>             Approved.**

The Court should approve the form and content of the proposed Notice, including the

exclusion form, and Summary Notice.  Rule 23(e) requires that notice of a proposed settlement

must inform class members: (1) of the nature of the pending litigation; (2) of the settlement's

general terms; (3) that complete information is available from the court files; and (4) that any

class member may appear and be heard at the Fairness Hearing.  *See Duhaime v. John Hancock*

---

[10] *See Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781, 786 (7th Cir. 2004) ("The World Wide Web is an increasingly important method of communication, and, of particular pertinence here, an increasingly important substitute for newspapers.").

[11] In *Mirfasihi*, Judge Posner stated that: "When individual notice is infeasible, notice by publication in a newspaper of national circulation (here *USA Weekend*, a magazine included in hundreds of Sunday papers) is an acceptable substitute."  356 F.3d at 786 (citations omitted).  In this case, *USA Weekend* is just one of four of publications that comprise the comprehensive media campaign.  *See* Cafferty Decl., Ex A at 18-19.

*Mut. Life Ins. Co.,* 177 F.R.D. 54, 61 (D. Mass. 1997) ("[T]he essential purpose of the [class]
notice . . . [is] to fairly apprise the prospective members of the class of the terms of the proposed
settlement and of the options that are open to them.") (*quoting Greenspun v. Bogan*, 492 F.2d
375, 382 (1st Cir. 1974)); 2 *Newberg on Class Actions* (1992 ed.) § 8.32, at 8-103.

The Notice clearly meets these requirements as it is written in plain English and includes:
(1) the case caption; (2) a description of the Class; (3) a description of the Settlement; (4) the
names of counsel for the Class; (5) a statement of the maximum amount of attorneys' fees ($0)
and costs ($325,000) that may be sought by Plaintiffs' Counsel; (6) the hearing date; (7) a
description of their right to appear at the hearing; (8) the deadline for filing objections to the
Settlement; (9) the deadline for filing requests for exclusion; (10) the consequences of exclusion;
(11) the consequences of remaining in the Class; and (12) the manner in which to obtain further
information.  *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 496
(D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir., 1998), *cert. denied*, 525 U.S. 1114 (1999); Manual
for Complex Litigation, Fourth § 21.633; *see also In re VMS Sec. Litig.*, C.A. No. 89 C 9448,
1992 WL 203832, *4 (N.D. Ill. Aug. 13, 1992) ("Class notice is sufficient if it 'may be
understood by the average class member.'") (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should grant preliminary approval to the proposed
class action settlement and schedule a fairness hearing.  The Court should also approve the
proposed forms of notice and plan of notice.  A proposed form of Order is annexed to the Motion
for Preliminary Approval.

Dated: January __, 2007                    Respectfully submitted,

                                    By:    /s/ Janet G. Abaray
                                           Janet G. Abaray

Janet G. Abaray                            Joseph E. Conley, Jr.
BURG SIMPSON ELDREDGE,                     BUECHEL & CONLEY
HERSH & JARDINE                            25 Crestview Hills Mall Road
312 Walnut Street, Suite 2090              Suite 104
Cincinnati, Ohio 45202                     Crestview Hills, Kty.  41017
Tel: (513) 852-5600                        Tel: (859) 578-6600

### *Co-Liaison Counsel for Plaintiffs*

Kenneth A. Wexler                          Marc H. Edelson
Jennifer F. Connolly                       HOFFMAN & EDELSON
WEXLER TORISEVA                            45 West Court Street
  WALLACE LLP                              Doylestown, Pennsylvania 18901
One North LaSalle, Suite 2000              (215) 230-8043
Chicago, Illinois 60602
(312) 346-2222

Stacey L. Mills                            Patrick E. Cafferty
Lori A. Johnson                            101 N. Main Street, Suite 450
HEINS MILLS & OLSON, P.C.                  Ann Arbor, MI 48104
3550 IDS Center, 80 South Eighth Street    (734) 769-2144
Minneapolis, MN 55402
(612) 338-4605

### *Co-Lead Counsel for Plaintiffs*