

# Notice Program

## *In Re Premarin Antitrust Litigation Notice Plan*

### Case No. C-1-01-447

### (Southern District of Ohio)

**KINSELLA/NOVAK**
COMMUNICATIONS, LTD.

2120 L Street, NW | Suite 205 | Washington, DC 20037
Phone: 202.686.4111 | Fax: 202.293.6961 | Email: info@kinsella-novak.com | http://www.kinsella-novak.com

**THE ART & SCIENCE OF LEGAL NOTIFICATION**

# Table of Contents

|  | Page |
|---|---|
| Firm Overview | 1 |
| Relevant Case Experience | 2 |
| Technical Approach | 3 |
| Class Definition | 5 |
| Situation Analysis | 6 |
| Product Background | 7 |
| Notice Plan Overview | 8 |
| Direct Notice to Third-Party Payors | 9 |
| Third-Party Payor Trade Publications | 10 |
| Paid Media Methodology to Reach Consumer Settlement Class Members | 11 |
| Target Audience | 12 |
| Demographics | 13 |
| Media Usage | 15 |
| Paid Media Program | 17 |
| Newspaper Supplements | 18 |
| Consumer Magazines | 19 |
| Print Readership | 20 |
| Media Delivery | 21 |

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

Notice Design                                                          22

Earned Media                                                          23

Informational Web Site                                                24

Toll-Free Telephone Support                                           25

Exhibit A – Newspaper Supplements by Carrier Newspaper

Exhibit B – Publication Notice

*In Re Premarin Antitrust Litigation*

# Firm Overview

Kinsella/Novak Communications, Ltd. ("KNC") is a nationally recognized legal notification firm specializing in media-based class action and bankruptcy notification programs in the mass tort, consumer and product liability arenas.

KNC has developed and directed some of the largest and most complex national notification programs in the country. The scope of the firm's work includes notification programs in antitrust, bankruptcy, consumer fraud, mass tort and product liability litigation. Specific cases have involved, among others, asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco and Holocaust claims. The firm has developed or consulted on over 250 notification programs, placing over $145 million in media notice.

KNC develops advertisements, press materials, Web sites and other notice materials that bridge the gap between litigation complexities and the need for a clear and simple explanation of legal rights. In addition to designing and producing notices in "plain language," all KNC notice programs are fully compliant with Rule 23 of the Federal Rules of Civil Procedure and comparable state guidelines. The firm employs industry-recognized tools of media measurement to quantify the adequacy of the notice for the court.

*In Re Premarin Antitrust Litigation*

# Relevant Case Experience

KNC has significant notification experience including consumer class actions involving pharmaceuticals.

## Pharmaceutical Cases

- *State of Connecticut v. Mylan Laboratories, Inc.,*
  MDL 1290, Misc. No. 99-276 (TFH-JMF) (Lorazepam and Clorazepate)

- *In re Buspirone Antitrust Litigation*,
  MDL-1413 (S.D.N.Y.) (BuSpar)

- *In re Cardizem* CD *Antitrust Litigation*,
  99-MD-1278 (E.D. Mich.) (Cardizem)

- *State of Ohio v. Bristol-Myers Squibb, Co.,*
  1:02-cv-01080 (D.D.C.) (Taxol)

## Other Selected Cases

- *In re Nasdaq Market-Makers Antitrust Litigation*,
  No. M21-68 (RWS), 94 Civ. 3996 (RWS), MDL No. 1203 (S.D.N.Y.) (securities)

- *In re Compact Disc Minimum Advertised Price Antitrust Litigation*,
  MDL No. 1361 (D. Me.) (prerecorded music products)

- *In re Toys "R" Us Antitrust Litigation*,
  MDL No. 1211, Master File No. CV-97-5750 (E.D.N.Y.) (toys and other products)

- *Cox v. Shell Oil Co.,*
  No. 199,844 (Tenn. Ch. Ct., Obion County) (polybutylene pipe)

- *Naef v. Masonite*,
  No. CV-94-4033 (Ala. Cir. Ct., Mobile County) (hardboard siding)

- *In re Holocaust Victims Assets Litigation*,
  No. CV 96-4849 (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.)

- *Ruff, et al. v. Parex, Inc*.,
  No. 96-CVS-0059 (N.C. Super. Ct., New Hanover County) (EIFS stucco)

- *Fettke v. McDonald's Corporation,*
  Case No. 044109 (Cal. Super. Ct., Marin County) (trans-fatty acids)

# Technical Approach

KNC's technical approach is based on its expertise as a leading provider of notice in class actions, knowledge of court-approved notice programs at the state and federal levels and years of experience in designing and implementing legal notification programs both nationally and internationally.

KNC begins by conducting detailed research on the claims that are the subject of the class action and how they relate to a population, its location and temporal characteristics. This analysis yields the demographic characteristics of class members — such as age, gender, income, and education level — and the geographic distribution of class members. This research provides the parameters for identifying and locating class members and shapes the scope of the notice program.

Specifically, KNC:

- Reviews demographic, product information and independent research, and establishes a demographic profile of the target audience. All media selections are based on this profile to ensure the optimum reach of potential class members and frequency of message exposure.

- Examines the geographic distribution of potential class members to determine effective geographic coverage.

- Evaluates and compares the relative effectiveness of media vehicles -- consumer magazines, newspapers, specialty publications, broadcast television, radio and the Internet -- in reaching the target audience.

- Analyzes publications using syndicated data sources and tools, such as the Audit Bureau of Circulation (ABC) statements, which certify how many readers buy or obtain copies of publications, and MediaMark Research ("MRI") which measures how many people open or read publications.

- Selects media available during the established notice period ensuring timely notice to class members.

- Ensures that published notices and long form notices are written in "plain language."

- Uses established advertising relationships to negotiate the deepest discounts on national advertising and to secure optimum placement with respect to the media habits of the target audience.

➤ Designs and implements an "earned media" program to further supplement the published notice through print, audio and video news releases and non-paid media outreach. Tracks and verifies all media placements and press stories developed through "earned media."

➤ Designs and maintains a Web site to enable class members to access all relevant information including long form notices, claim forms and court documents.

➤ Integrates all aspects of the notification program with designated claims administrators.

➤ Provides advice, affidavits, depositions and court testimony with respect to the design and implementation of the notification program.

*In Re Premarin Antitrust Litigation*

# Class Definition

The Proposed Settlement is on behalf of:

All "End Payors" (*i.e.*, the last persons and entities in the chain of distribution) in certain states (listed below) who purchased or reimbursed for purchases of Premarin®, other than for resale, at any time from March 24, 1999 (and from October 1, 1999 with respect to Nevada) up to the date of entry of the Preliminary Approval Order, as defined in the Court's Class Certification Orders of June 30, 2004 and February 2, 2005. The Class is comprised of five subclasses, which consist of: (a) consumers who purchased Premarin® ("Consumers"); and (b) third-party payors who reimbursed Consumers for the cost of Premarin® or paid for Premarin® on behalf of such Consumers ("Third-Party Payors"). The five subclasses certified by the Court are as follows:

(1)    A subclass of individual Consumers in Arizona, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin;

(2)    A subclass of Third-Party Payors in Arizona, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin;

(3)    A subclass of Consumers in Florida, Vermont and Massachusetts;

(4)    A subclass of Third-Party Payors in Florida, Vermont and Massachusetts; and

(5)    A subclass of Third-Party Payors in Nevada.

*In Re Premarin Antitrust Litigation*

# SITUATION ANALYSIS

This lawsuit alleges that the manufacturer of Premarin® violated federal antitrust laws and state antitrust, unfair competition, and unjust enrichment laws by entering into allegedly exclusive rebate contracts covering Premarin® with managed care organizations such as HMOs, insurance companies, or pharmacy benefit managers ("Third-Party Payors").

Defendant denies all of Plaintiffs' claims and says that it did nothing wrong. The Proposed Settlement is not an admission of wrongdoing or an indication that any law was violated. The Court has not ruled on the merits of Plaintiffs' claims or on the defenses made by Defendant.

A comprehensive list of Third-Party Payors is available for direct notice. However, a comprehensive list of Consumer Settlement Class Members is not available. Therefore, paid media notice will be used to provide notice to Consumer Settlement Class Members.

*In Re Premarin Antitrust Litigation*

# Product Background

Premarin® is a hormone therapy that contains a combination of estrogens. It is designed to help manage the symptoms of menopause, including hot flashes, night sweats, and vaginal dryness, as well as reduce your chances of developing osteoporosis (thin, weak bones).

According to most studies, the average age of menopause onset is 51, plus or minus several years either way.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Premarin Antitrust Litigation*

# Notice Program Overview

This program is submitted by KNC in connection with *In Re Premarin® Antitrust Litigation: Marjorie Ferrell, et al. v. Wyeth-Ayerst Laboratories, Inc., et al.*, Civil Action No. C-1-01-447, in the Southern District of Ohio. The program outlines procedures to provide notice of the Proposed Settlement of this class action, consistent with the requirements set forth in the Rule 23 of the Federal Rules of Civil Procedure.

Based upon the results of research on Settlement Class Members and their response to media and the media habits of the target audience, the following notice program is recommended:

## Third-Party Payor Notice

- Direct notice by first-class mail to All Third-Party Payors ("TPP") whose names and addresses are readily identifiable
- Published notice in trade publications.

## Consumer Notice

- Broad published notice in 17 states through the use of paid media, including newspaper supplements and consumer magazines.
- Direct notice by first-class mail to all individuals who request the detailed Notice of Proposed Class Action Settlement from the Claims Administrator as a result of seeing the Publication Notice. The toll-free information line will prominently appear in the Publication Notice.
- Earned media through a press release sent nationally to major national print and electronic outlets.

Electronic notice will also be provided to all Settlement Class Members through a dedicated Web site.

*In Re Premarin Antitrust Litigation*

# Direct Notice To Third-Party Payors

Direct mail notice to TPPs will consist of mailing the *Notice of Proposed Class Action Settlement* to appropriate identifiable TPP Class Members informing them of their legal rights and how they may participate in or opt-out of the class action. The *Notice of Proposed Class Action Settlement* will be sent to:

- Appropriate entities likely to be Class Members, in the proprietary TPP Database compiled by Complete Claim Solutions ("CCS"), the class administrator. The Database includes insurance companies, healthcare and welfare funds, employee benefit funds, third-party administrators, pharmacy benefit managers and other record keepers for noticing purposes in TPP class actions. The Database was compiled from contacting, researching and accessing the records of various databases and listings of affiliations, group insurance plans, self-insureds, ERISA funds, pharmacy benefit manager listings, etc. as follows:

    - Pharmacy Benefit Management Institute;
    - Benefits SourceBook;
    - Managed Care Information Centers;
    - Judy Diamond Associates;
    - AM Best Company;
    - Association of Managed Care Providers;
    - Society of Professional Benefit Administrators;
    - American's Health Insurance Plans;
    - Self-Insurance Institute of America; and
    - National Association of Insurance Commissioners.

    Included in the Database are:

    - Approximately 29,000 companies with 100 or more employees that have self-funded (fully or partially) plans, derived from Form 5500 filings;
    - 1,356 Third-Party Claim Administrators; and
    - 1,300 member companies of American Health Insurance Plans that provide or administer health insurance benefits to over 200 million Americans which represent 90 percent of the managed care market (HMOs, PPOs and POSs, etc.).

    The Database is regularly updated with new entries from the above sources as well as TPPs identified through other class action litigations.

*In Re Premarin Antitrust Litigation*

# THIRD-PARTY PAYOR TRADE PUBLICATIONS

Selected trade publications will be used to supplement the direct mail notice to TPPs as follows:



➢ A full-page ad (7" x 10") placed once in *National Underwriter Life & Health*, with an estimated circulation of 50,195.

➢ With a pass-along rate of 1.7 readers per copy, approximately 85,333 agents and brokers read the publication weekly. This includes 20,700 insurance company executives.

➢ *National Underwriter Life & Health* is the only weekly magazine serving the life, health and financial services market. It contains news and feature articles to help agents better understand products and markets, and insurance company executives identify new business opportunities. Topics covered include agency management, taxes, legislation, executive benefits, retirement planning and profitable sales ideas.

———————————————



➢ A full-page ad (8" x 10-7/8") placed once in *HR Magazine*, with an estimated circulation of 195,528, and a readership of 547,478.

➢ *HR Magazine* is the official publication of the Society for Human Resource Management. It is written for human resources professionals and executives and to further the professional aims of both the Society and the human resource management profession. The publication features new approaches and innovative best practices in all areas of HR management and informs on new models of ways of thinking. It is designed as a forum for trends and legal issues as well as new concepts used by human resources management professionals. It has the highest readership of any human resources publication.

———————————————

*In Re Premarin Antitrust Litigation*

# Paid Media Methodology To Reach Consumer Settlement Class Members

When developing notice programs, KNC: (1) identifies the demographics of class members and establishes a target audience; (2) outlines the methodology for selecting the media and other program elements and how they relate to product usage or exposure; and (3) provides results that quantify for the court the adequacy of the notice based upon recognized tools of media measurement.

In the wake of the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993) and *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999), the reliability of a notice expert's testimony should be tested against the standards developed within the media industry for determining to what degree and at what frequency a target audience has been reached. In assessing the expert's reliability, the court must determine whether the testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," (526 U.S. at 152). That showing would likely require evidence that the expert's data and methodology are similar to that used by professionals in the relevant field.

In keeping with the *Daubert* and *Kumho* rulings, KNC employs the methodology and measurement tools used in the media planning and advertising industry for designing and measuring the adequacy of a paid media program to reach a particular audience.

Since Consumer Settlement Class Members are not identifiable, paid media notice is required. Choosing a target audience encompassing the characteristics of Consumer Settlement Class Members is the first step in designing the paid media program. Media vehicles are chosen based on their ability to provide effective and cost-efficient penetration of the target audience. The selected media vehicles are then measured against the target audience to quantify the *reach* of the media program and the *frequency* of exposure to the media vehicles. *Reach* and *frequency* estimates are two of the primary measurements used to quantify the media penetration of a target audience.

> ✏ Reach is the estimated percentage of a target audience reached one or more times through a specific media vehicle or combination of media vehicles within a given period.

> ✏ Frequency is the estimated average number of times an audience is exposed to a vehicle carrying the message within a given period of time.

The measured delivery of media to the target audience will be representative of delivery to Consumer Settlement Class Members.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Premarin Antitrust Litigation*

# Target Audience

To develop a profile of the demographics and media habits of Consumer Settlement Class Members KNC analyzed syndicated data available from the 2006 Doublebase Survey[1] from MRI.

MRI is the leading U.S. supplier of multimedia audience research. As a nationally accredited research firm, it provides information to magazines, television, radio, Internet and other media, leading national advertisers and over 450 advertising agencies -- including 90 of the top 100 in the United States. MRI's nationally syndicated data are widely used by these companies as the basis for the majority of the media and marketing plans written for advertised brands in the United States.

Specifically, MRI provides data on audience size, composition and other relevant factors pertaining to major media vehicles. MRI presents a single-source measurement of major media, products, services and in-depth consumer demographic and lifestyle characteristics.

MRI provides data on individuals who use branded prescription drugs therefore, the primary target audience against which all media will be purchased and measured is:

> ✒ Women living in the 17 identified states[2] that have used a branded prescription to treat menopause/hormone replacement in the last 12 months[3] ("Women HRT[4] Users").

Reach estimates will also be provided for the broader audience of adults, which includes potential Consumer Settlement Class Members:

> ✒ Women living in the 17 identified states, 45 to 64 years of age ("Women 45-64"). This target encompasses the menopausal age range for most women.

---

[1] The study, conducted since 1979, surveys persons 18 years of age and older in the contiguous 48 states. MRI conducts more than 26,000 personal interviews with consumers in two waves annually each lasting six months and consisting of 13,000 interviews. Produced annually by MRI, the Doublebase study consists of two full years of data drawn from over 50,000 respondents. Consumer information is recorded on 500 product/service categories, 6,000 brands and various lifestyle activities. Respondents are selected based on the ability to project their responses nationally.

[2] Consumer Settlement Class Members are located in 17 identified states, including: Arizona, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin.

[3] Although the Class Period extends beyond the past 12 months, the demographics of these consumers would not differ materially over the Class Period.

[4] "HRT" means Hormone Replacement Therapy.

*In Re Premarin Antitrust Litigation*

# Demographics

Based on MRI data, the chart below outlines the demographics of Women HRT Users. For comparison purposes, the demographics of the total population of Women 45-64 are also provided.

| DEMOGRAPHICS | WOMEN HRT USERS | WOMEN 45-64 |
|---|---|---|
| **Gender** | | |
| Male | 9.8% | 0.0% |
| Female | 90.2% | 100.0% |
| **Age** | | |
| 18-34 | 6.0% | 0.0% |
| 35-44 | 8.6% | 0.0% |
| 45-54 | 39.0% | 57.6% |
| 55+ | 46.5% | 42.4% |
| **Education** | | |
| Graduated/Attended College | 64.5% | 55.5% |
| Graduated High School | 24.7% | 32.6% |
| **Household Income** | | |
| Under $29,999 | 21.2% | 24.9% |
| $30,000 - $49,999 | 15.5% | 18.0% |
| $50,000 - $74,999 | 33.8% | 22.5% |
| $75,000 + | 29.5% | 34.5% |
| $100,000+ | 21.3% | 20.9% |
| **Ethnicity** | | |
| Caucasian | 91.7% | 83.8% |
| African-American | 6.1% | 12.6% |
| Hispanic | 4.2% | 4.7% |
| Asian | 2.9% | 1.0% |
| Other | 2.5% | 2.8% |
| **Location**[5] | | |
| A & B Counties | 59.1% | 64.4% |
| C & D Counties | 40.9% | 35.6% |

---

[5] A Counties, as defined by A.C. Nielsen Company, are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the MSA (Metropolitan Statistical Area) and include the largest cities and consolidated areas in the United States. B Counties, as defined by A.C. Nielsen Company, are all counties not included under A that are either over 150,000 population or in a metro area over 150,000 population according to the latest census. C Counties, as defined by A.C. Nielsen Company, are all counties not included under A or B that either have over 40,000 population or are in a metropolitan area of over 40,000 population according to the late census. D Counties are, essentially, rural counties in the Nielsen classification system of A, B, C, D counties.

*In Re Premarin Antitrust Litigation*

Women HRT Users are more likely than the average adult to:

- Be 45-64 years of age.

- Have a higher education level.

- Have a household income of $50,000 - $75,000.

*In Re Premarin Antitrust Litigation*

# Media Usage

Consumers spend varying amounts of time with different media.  Certain demographic groups may be heavy consumers, light consumers or non-users of a particular medium.  For example, individuals who are less educated are likely to be heavy television viewers and light newspaper readers.  Conversely, highly educated individuals are more likely to be heavy newspapers readers and light television viewers.

KNC notice programs focus on the media types used most often by the target audiences. To examine the media habits of any target audience, data from MRI can be studied through a quintile analysis based on specific demographic profiles.  The respondents in the MRI survey are divided into five equal-sized groups each of which represents twenty percent of the survey respondents.

The quintiles from 1 to 5 indicate the amount of exposure to a medium from the heaviest (1) to the lightest (5).  The media usage in each quintile is expressed as an index.  An index of 100 is the average usage of a particular medium by the adult population as a whole.  Therefore, an index above 100 indicates a heavier usage of the medium than the average.  An index below 100 indicates a lighter usage of the medium than the average.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Premarin Antitrust Litigation*

The top two quintiles (heaviest and next heaviest usage) for each type of media are provided in the following chart for the target audience:

| MEDIA | WOMEN HRT USERS |
|---|---|
| **Magazine** | |
| Quintile 1 | 110.6 |
| Quintile 2 | 122.4 |
| **Newspaper** | |
| Quintile 1 | 152.5 |
| Quintile 2 | 149.2 |
| **Radio** | |
| Quintile 1 | 105.6 |
| Quintile 2 | 115.2 |
| **Television** | |
| Quintile 1 | 107.8 |
| Quintile 2 | 62.2 |
| **Internet** | |
| Quintile 1 | 122.1 |
| Quintile 2 | 104.2 |

This data indicates the following:

- Women HRT Users are above heavy consumers of magazines, newspapers and the Internet.
- Women HRT Users are slightly above average radio listeners and average television viewers.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Premarin Antitrust Litigation*

# PAID MEDIA PROGRAM

In order to reach the Consumer Settlement Class Members, KNC recommends the use of measurable paid media.  Paid media advertising is guaranteed to appear, allowing for control of the content, timing and positioning of the message, making it an invaluable part of any notice campaign.  Newspapers, consumer magazines, television, radio and the Internet, among other sources, offer paid media opportunities.

In considering which media to use for this case, KNC evaluated Women HRT Users' media consumption habits and the cost-effectiveness, exposure opportunities and reach potential of each media type. As demonstrated by the quintile analysis, Women HRT Users are heavy magazine and newspapers readers.  Therefore, print media was selected because of its ability to reach the target audience, and because of its value as a credible and tangible information source that allows for extended body copy.

In choosing which print media placements would be best for this case, KNC reviewed available consumer publications for their reach of the target audience. Newspaper supplements and consumer magazines are cost-effective vehicles for reaching Women HRT Users and are the recommended components of the paid media program.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Premarin Antitrust Litigation*

# NEWSPAPER SUPPLEMENTS

*Parade* and *USA Weekend*, inserts known as newspaper supplements, are carried in weekend or weekly editions of local newspapers reaching every media major market in the country. These magazines, published on newsprint, contain articles written for broad, general appeal and they encourage readership through brevity. Issues are typically less than 30 pages. For this Notice Program, newspaper supplements are recommended because of their broad geographic and demographic reach capability. (See Exhibit A.)

KNC recommends the following activity:



> ➤ A magazine-page ad (7" x 10-1/4") placed once in the state editions of the 17 identified states of *Parade,* with an estimated circulation of 8,094,685.

> ➤ *Parade* is carried in the Sunday edition of 124 daily newspapers throughout the 17 identified states and is the highest circulating magazine in the world. Carrier newspapers serve major urban and suburban markets in the U.S.

> ➤ 41.4% of Women HRT Users read an average issue of *Parade*.

———————————————



> ➤ A magazine-page ad (7" x 10-1/2") placed once in the state editions of the 17 identified states of *USA Weekend*, with an estimated circulation of 7,658,732.

> ➤ *USA Weekend* is inserted in the weekend edition of 181 daily newspapers in major markets complementing the U.S. markets served by *Parade*.

> ➤ Women HRT Users are over than 50% more likely to read an average issue of *USA Weekend.*

———————————————

*In Re Premarin Antitrust Litigation*

# Consumer Magazines

Most adults read one or more magazines during an average month and nearly three out of five adults read or look at a magazine daily.  In addition, heavy readers read 16 or more magazines per month.  Weekly magazines quickly accumulate readership and provide timely and efficient notice to readers.  The specific consumer magazines listed below were chosen because they are among the highest ranking in coverage of the target audience and they provide editorial content that appeals to Consumer Settlement Class Members.

KNC recommends the following:



- ✍ A full-page ad (7" x 10") will be placed once in the states editions of the 17 identified states of *Better Homes and Gardens,* with an estimated circulation of 2,306,000.

- ✍ *Better Homes and Gardens* is published monthly and is the largest-circulation home service magazine, featuring a wide-range of home and family subjects such as food and decorating.

- ✍ Women HRT Users are more than twice as likely to read average issue of *Better Homes & Gardens* than the average adult.

———————————————

**Woman's Day**

- ✍ A full-page ad (7-1/4"x 10") will be placed once in the states editions of the 17 identified states o *Woman's Day,* with an estimated circulation of 1,161,453.

- ✍ *Woman's Day* publishes 17 times a year covering food, family and health.

- ✍ The average issue of *Woman's Day* is read by 20.6% of Women HRT Users.

———————————————

*In Re Premarin Antitrust Litigation*

# Print Readership

Readership includes both primary readers and pass along readers. Primary readers purchased a publication or are members of a household where the publication was purchased. Pass-along readers are those who read the publication outside the home, in places such as a dentist's or doctor's office. The table below indicates the number of readers in the target audience of an average issue of the magazine:

| PUBLICATION | INSERTIONS | WOMEN HRT USERS | WOMEN 45-64 |
|---|---|---|---|
| *Better Homes and* | 1 | 326,000 | 4,450,000 |
| *Parade*[6] | 1 | 331,000 | 5,137,000 |
| *USA Weekend*[6] | 1 | 295,000 | 3,865,000 |
| *Woman's Day* | 1 | 165,000 | 3,182,000 |

---

[6] The readership estimates for *Parade* and *USA Weekend* are reflective of the broader readership measurement of the newspaper carrier groups into which these supplements are inserted. A recent custom study conducted by MRI indicates that the actual readership of the supplements is less than that of the carrier papers. While this study provided directional insight into the audience, the data provided is highly variable and insufficient for use in specific computation of reach and frequency. Therefore, the use of carrier paper readership for the newspaper supplements remains the accredited methodology and standard of the industry according to MRI and the Media Research Council.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Premarin Antitrust Litigation*

# Media Delivery

The paid media program outlined above delivers the following estimated reach and frequency measurements:[7]

> ➤ An estimated 82.6% of Women HRT Users will be reached with an average estimated frequency of 1.7 times, delivering an estimated 1,117,000 gross impressions.[8]

> ➤ An estimated 77.7% of Women 45-64 will be reached with an average estimated frequency of 1.7 times, delivering an estimated 16,340,000 gross impressions.

The paid media program provides Consumer Settlement Class Members with multiple exposure opportunities to media vehicles carrying the Publication Notice.

| TARGET | % OF TARGET REACHED | AVERAGE FREQUENCY | GROSS IMPRESSIONS |
|--------|---------------------|-------------------|-------------------|
| Women HRT Users | 82.6% | 1.7 | 1,117,000 |
| Women 45-64 | 77.7% | 1.7 | 16,634,000 |

---

[7] MRI is a sample-based survey. Therefore, estimates of audience and/or demographics from these surveys are subject to sampling and non-sampling error. The use of mathematical values from those surveys should not be regarded as a representation that they are exact to the precise mathematical value stated.

[8] Gross impressions are the total number of times a media vehicle containing the Publication Notice is seen. This is a duplicated figure, as some viewers (readers) will see several media vehicles (publications) that contain the Publication Notice.

*In Re Premarin Antitrust Litigation*

# Notice Design

## Print Design

The plain language Publication Notice will be designed to alert Settlement Class Members to the litigation through the use of a bold headline (Exhibit B).  This headline will enable Settlement Class Members to quickly determine if they are potentially affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Settlement Class definition and the legal rights available to Settlement Class Members.

Each advertisement will prominently feature a toll-free number, Web site and mailing addresses for Settlement Class Members to obtain the *Notice of Proposed Class Action Settlement* and other information.  The design of the Publication Notice takes into account empirical research developed over the past 30 years about how people read and assimilate information.

Recent revisions to Rule 23(c)(2) of the Federal Rules of Civil Procedure require class action notices to be written in "plain, easily understood language."  KNC applies the plain language requirement in drafting notices in federal and state class actions.  The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively transmit the necessary information to Settlement Class Members.

Magazine-page ads in newspaper supplements, and full-page ads in consumer magazines and trade publications will be used.  After reviewing the content and special sections of each publication, an appropriate position will be negotiated for placement of the Publication Notice.

*In Re Premarin Antitrust Litigation*

## Earned Media

The thrust of the earned media program is to amplify the notice to Consumer Settlement Class Members through the use of free media. A consumer-friendly press release will include the relief offered by the proposed settlement and the steps necessary to file and become eligible for said relief. The earned media portion of this Notice Program will augment the paid media program developed to reach the Settlement Class. The press release and earned media outreach will supplement the paid media program and may provide additional notice opportunities for potential Consumer Settlement Class Members.

Outreach to print and electronic media will focus primarily on key daily newspapers, wire services, newspaper bureaus nationally and major television and radio outlets nationally. Earned media activities will include but will not be limited to the following:

- A press release will be distributed on US Newswire's Full National Circuit reaching over 2,000 media outlets in the United States. The press release will highlight the toll-free telephone number and Web site address that Settlement Class Members can call or visit for complete information.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Premarin Antitrust Litigation*

# Informational Web Site

An informational interactive Web site is a critical component of the Notice campaign. A URL is a constant information source instantly accessible to millions. The Web site will be an informational resource that takes advantage of the Internet's capacity to provide easy and immediate access to pertinent information regarding the proposed settlement. Settlement Class Members will be able to download the *Notice of Proposed Class Action Settlement,* Claim Form and other related documents. Combining clean site design, consistent site navigation cues and built-in flexibility, the Web site will provide Settlement Class Members with easy access to the details of the litigation.

## Clean Design

The site will be cleanly designed for ease of use and comprehension. Web pages on the site will be simple, containing words, icons, documents and images.

A directory, located in a column on the left-hand side of the page, will provide links to the information available on the Web site. These can include "Court Documents," "Long Form Notice," "Claim Form" and "Questions/Links." It will also provide a toll-free number for individuals seeking additional information and the address of Class Counsel.

## Consistent Navigation Cues

Whenever the user goes from the homepage to another part of the site, links to the homepage and subsections remain on the left side of all pages, while the case title and cite remains fixed on top.

## Built-In Flexibility

Though simply designed, KNC's structured site is not restrictive. The site's basic architecture enables updates and new features to be added quickly.

*In Re Premarin Antitrust Litigation*

# Toll-Free Telephone Support

A toll-free interactive voice response system (IVR) will be established to service Settlement Class Members calling as a result of seeing the published notice. The greeting and subsequent prompts for the IVR system will be available in English, Spanish and French. Callers requesting the *Notice of Proposed Class Action Settlement* will be able to leave a message with their name and address information, in order for the Claims Administrator to mail them a *Notice of Proposed Class Action Settlement*.