Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARJORIE FERRELL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. C-1-01-447 |
| | ) | |
| v. | ) | Judge Sandra S. Beckwith |
| | ) | |
| WYETH-AYERST LABORATORIES, INC., *et al.*, | ) | Magistrate Judge Timothy S. Hogan |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF KENNETH A. WEXLER IN SUPPORT OF
PLAINTIFFS' MOTION FOR FINAL APPROVAL**

1. I am the founding member of Wexler Toriseva Wallace LLP. I am one of the attorneys for Plaintiffs in the above-captioned matter. I submit this declaration in support of Plaintiffs' Motion for Final Approval of Settlement.

2. On August 1, 2005, several months after prevailing on summary judgment in *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc., et al.* (Case No. 1:01-CV-704) ("*J.B.D.L.*"), Defendants approached Plaintiffs about potentially settling this case as well as the parallel case pending in California state court, *Blevins v. Wyeth-Ayerst Labs., Inc. & American Home Prods. Corp.*, San Francisco, California Superior Court (Case No. 324380) ("*Blevins*").

3. Plaintiffs analyzed Defendants' claims data and made a settlement offer on September 22, 2005. Defendants rejected that offer and made a counter-offer.

4. On October 18, 2005, after further discussion, Plaintiffs made a counter-offer. At the time that this offer was open, Plaintiffs' Motion to Stay Pending Appeal in Parallel Proceeding was pending. In Plaintiffs' view, it made no sense to expend the parties' and Court's

resources when there was an appeal pending which would decide whether or not the case would continue to be litigated. The Court, however, denied Plaintiffs' motion on October 21, 2005.

5. Thereafter, Defendants' line hardened considerably. While Defendants indicated that they were still willing to negotiate a settlement, the denial of the stay forced the settlement numbers into a much smaller universe.

6. Faced with the prospect of spending hundreds of thousands of dollars on an expert and notice which would bind the Subclasses to sure defeat under the Court's *J.B.D.L.* ruling, counsel for Plaintiffs concluded that it was in the best interests of the Class to continue to negotiate a settlement. One week after the Court's denial of Plaintiffs' motion to stay, Plaintiffs made another settlement demand, which Defendants rejected.

7. Prior to this, on November 23, 2005, the Court set a telephonic pretrial scheduling conference before Magistrate Judge Hogan for January 5, 2006. Plaintiffs' counsel contacted Defendants' counsel and suggested that the parties speak before the hearing. On January 4, 2006, Plaintiffs' counsel called Defendants' counsel to continue discussing settlement and made a counter-offer for a *cy pres* distribution with Defendants paying Plaintiffs' litigation expenses as well as the costs of notice. Plaintiffs also asked Defendants to postpone the conference before Magistrate Judge Hogan pending the parties' continuing settlement discussions. Defendants rejected that request.

8. On January 5, 2006, Magistrate Judge Hogan established a Calendar Order under which Plaintiffs were required to submit a notice plan by June 30 and trial was set for January 2007. After that order was entered, Plaintiffs accepted Defendants' challenge to develop a "creative" settlement offer and therefore proposed on January 12, 2006 that the parties enter into a "gamble" settlement pursuant to which the parties would settle for a set amount if the

Sixth Circuit affirmed this Court's summary judgment opinion in *J.B.D.L.* and another higher amount if the Sixth Circuit reversed the *J.B.D.L.* decision. Plaintiffs said that their gamble offer would expire on January 26, 2006. Defendants ultimately rejected this proposal.

9. On March 7, 2006, the parties resumed discussions again. At this time, Plaintiffs proposed settling the case for product that could be distributed to Class members, including prescription drugs in order to afford a benefit to the third-party payor Class members. On April 7, 2006, Defendants responded that they opposed a product settlement. Defendants countered that they were willing to give small coupons for a sum certain, with the unclaimed amount to be distributed *cy pres*. Defendants likewise said that they would pay fees, costs, notice and administrative costs in addition to the settlement amount.

10. Defendants later said that they could not agree to a product proposal and withdrew their previous offer to consider that type of settlement. However, Defendants still wanted to talk settlement and led Plaintiffs to believe the parties were on the verge of resolving the case.

11. In the meantime, the deadline for Plaintiffs to file expert reports was approaching on April 3, 2006. Plaintiffs, at that time, had no intention of exposing the Subclasses to an inevitable summary judgment and were particularly mindful of this Court's *J.B.D.L.* opinion excoriating the expert testimony submitted by the *J.B.D.L.* plaintiffs. At the same time, Plaintiffs believed that settlement was close at hand. Therefore, Plaintiffs did not believe it was prudent to expend the $250,000 that they were quoted for an expert opinion that would have been useless to the Subclasses. Instead, they moved the Court to extend the time for filing expert reports.

12. While this motion was pending, Plaintiffs made a counter-demand for a cash settlement to be distributed on a *cy pres* basis. Before Defendants responded, however, on April 19, 2006, the Court denied Plaintiffs' motion to extend the expert deadlines. Defendants then took everything under discussion "off the table." While they subsequently stated that they were still interested in settlement though now they insisted that costs of notice, fees and expenses would come out of any settlement fund created.

13. Plaintiffs' counsel and Defendants' counsel had an in-person meeting on April 28, 2006 to discuss the prospects of settlement. In advance of that meeting, Plaintiffs conducted an analysis of the numbers and concluded that a settlement at the numbers and with the terms being proposed by the Defendants would not be approved by the Court even if Plaintiffs agreed to them. Thus, at the in-person meeting, Plaintiffs proposed that Defendants stipulate to a voluntary dismissal of the named Plaintiffs' claims. Plaintiffs' counsel had concluded that it was in the best interests of the Subclasses to preserve their rights to bring individual claims if they believed it was in their interest to do so.

14. When Plaintiffs received no response to that proposal, Plaintiffs forwarded additional authority to Defendants for their consideration. On May 2, 2006, Defendants responded that they would not sign the proposed stipulation.

15. Thereafter, Plaintiffs' counsel made another counter-offer which Defendants rejected.

16. Plaintiffs then made an additional demand which was only slightly higher than Defendants' last offer prior to the Court's denial of Plaintiffs' motion to continue the expert report deadline.

17. Settlement negotiations did not progress. Notice had not yet issued, so the Subclasses would not be bound by a summary judgment decision. The deadline for giving notice, however, was fast approaching on June 1, 2006.

18. In order to protect the Subclasses from the adverse effect of notice, Plaintiffs filed a Motion for Voluntary Dismissal with Prejudice as well as a Motion to Suspend Class Notice Deadline on May 4, 2006. When Defendants opposed both motions, Plaintiffs filed an expedited motion for an in-person conference with the Court to "allow the parties to discuss the content of plaintiffs' proposed notice in the context of Plaintiffs' pending motions, as well as the implications of the parties' ongoing settlement efforts on the potential alternative means of resolving of this action."

19. After those motions were filed, Defendants responded with another counter-offer, not including costs, fees and notice costs. And although on May 18, 2006, the Court set a May 24, 2006 status conference before Magistrate Judge Hogan, Defendants refused to try to mediate a resolution through the Magistrate.

20. On May 24, 2006, Magistrate Judge Hogan entered an order staying the deadline to issue notice pending the Court's decision on Plaintiffs' Motion for Voluntary Dismissal. Shortly after the hearing, the parties spoke and Defendants' counsel stated that they had nothing further to say about settlement negotiations.

21. On August 1, 2006, three days before the scheduled hearing on Plaintiffs' Motion for Voluntary Dismissal, Defendants filed their motion for summary judgment. On August 4, 2006, this Court held a hearing on Plaintiffs' Motion for Voluntary Dismissal and ordered the parties to attempt to resolve this situation by agreement before August 18, 2006, after which the Court indicated it would set a briefing schedule requiring Plaintiffs to respond to

Defendants' motion for summary judgment. In this regard, Plaintiffs' counsel contacted Defendants' counsel to ask them if Plaintiffs' motion could be resolved through agreement. Defendants' counsel indicated that it could not and specifically stated that they believed these issues had to be addressed at an August 30, 2006 mediation scheduled to occur before (Ret.) Hon. Edward Infante in the *Blevins* action. For this reason, Plaintiffs filed the Motion for Extension of Briefing Schedule on Defendants' Motion for Summary Judgment Pending Conclusion of Mediation Before Judge Infante. On August 24, 2006, the Court granted Plaintiffs' motion.

22. On August 30, 2006, the parties participated in an all day mediation session presided over by Judge Infante. The parties were able to reach an agreement in principle. Thereafter, the parties negotiated the specific terms and conditions embodied in the Settlement Agreement.

23. The parties reached an impasse in negotiating these terms, which Judge Infante helped resolve during a teleconference on December 14, 2006.

24. In sum, the parties engaged in substantial protracted hard-fought settlement discussions for more than one year. The settlement agreement was the product of lengthy and difficult negotiations on both sides in an atmosphere where one of the parties (Defendants) were operating from a position of undeniably extreme strength. Indeed, the degree of that strength has been borne out by the recent affirmance of the *J.B.D.L.* summary judgment, which all but guarantees that the Class here would have received no benefits at all but for Class Counsel's persistence in pursuing and ultimately obtaining a settlement.

25. The Settlement Agreement provides that Defendants will pay $1,300,000 into an escrow account. The Settlement Agreement also provides for a specific release of Class

members' claims. This release will forever terminate this litigation once the settlement becomes effective as defined in the Settlement Agreement. The common fund has been used to pay for the costs of the Court-approved notice program.

26.  The Settlement Agreement further provides that Plaintiffs' Counsel may apply to the Court for an award of expenses in an amount not to exceed $325,000, to be paid from the common fund. Although Plaintiffs' Counsel have incurred an aggregate lodestar in excess of $3.7 million, they have elected not to apply for an award of attorneys' fees.

27.  Upon final approval, the remainder of the common fund will be equally divided and distributed to: (1) the National Women's Health Resource Center (www.healthywomen.org); and (2) The Society for Women's Health Research (http://www.womenshealthresearch.org).

Dated: June 1, 2007              /s/ Kenneth A. Wexler
                                 Kenneth A. Wexler