UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| MARJORIE FERRELL, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WYETH-AYERST LABORATORIES, INC., et al.,<br><br>Defendants. | Civil Action No. C-1-01-447<br><br>Judge Sandra S. Beckwith<br>Magistrate Judge Timothy S. Hogan |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT**

Plaintiffs United Food & Commercial Workers Midwest Health Benefits Fund, and Twin Cities Bakery Workers Health & Welfare Fund, Marjorie Ferrell, Mary D. Duda and Mary Seaworth (collectively "Plaintiffs"), by Plaintiffs' Counsel, submit this memorandum of law in support of their motion for final approval of the proposed settlement with Defendants Wyeth Pharmaceuticals (formerly Wyeth-Ayerst Laboratories, Inc.) and Wyeth (formerly American Home Products Corporation) (collectively "Defendants" or "Wyeth").

**INTRODUCTION**

On January 18, 2007, the Court entered its order: (1) granting preliminary approval to a proposed $1,300,000 settlement; (2) directing notice to the previously certified Class;[1] and (3)

[1] The Class is comprised of five subclasses of consumers and third party payors from the following states: Arizona, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada (third-party payor only), New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin. *See* Order of February 2, 2005 [Doc. No. 118] at 8.

scheduling a fairness hearing for June 15, 2007 [Doc. No. 179]. In accordance with the Court's order, notice of the settlement and hearing was provided to the Class in the manner specified. *See* Affidavit of Charlene Young [Doc. No. 181, May 14, 2007]. In response to the notice, approximately 3,449 consumers and 89 third-party payors ("TPPs") have exercised their rights to opt-out of the Class. *Id.* ¶ 14. With millions of Premarin consumers, the 3,449 consumer opt-outs constitute a small fraction of a percent of the Class.[2] Based on the 42,829 notice packets mailed to potential TPP Class Members, *id.* ¶ 6, the 89 TPP opt-outs constitute approximately 0.2%. As of this date, Plaintiffs have not received any objections to the settlement.[3]

For the reasons set forth below, Plaintiffs respectfully submit that the settlement merits final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

**BACKGROUND**

These consolidated antitrust actions have been brought on behalf of end-payors (*i.e.* the last persons or entities in the chain of distribution) who purchased or paid for the prescription drug Premarin® ("Premarin"), the conjugated estrogens product manufactured by Wyeth. In their Corrected Consolidated Amended Class Action Complaint ("Complaint," Doc. No. 31, Jan. 2, 2002), Plaintiffs alleged that this monopoly was the result of Defendants' ongoing anti-competitive and exclusionary conduct that has blocked consumer access to Cenestin® ("Cenestin"), another estrogen therapy manufactured by Duramed Pharmaceuticals, Inc. ("Duramed"). Plaintiffs allege that Defendants accomplished this through, among other things,

/2 Of the consumer exclusions, 3,305 are West Virginia women included on spreadsheets submitted by a single law firm. *Id.*¶ 14.

/3 The deadline for mailing objections is June 1, 2007. Plaintiffs will respond to any subsequently received objections in a separate filing, if necessary.

exclusive and "disguised" exclusive contracts with health plans and pharmacy benefits managers ("PBMs"), which either preclude or discourage these entities from placing Cenestin on their drug formularies, thereby depriving consumers of access to Cenestin. Plaintiffs allege that Defendants continued to increase the price of Premarin to levels that would not have been possible but for the blocking of consumer access to Cenestin.

Direct purchasers of Premarin also brought a class action against Wyeth based upon the same allegations in an action styled *J.B.D.L. Corp., v. Wyeth-Ayerst Laboratories, Inc.*, No. 1:01-CV-704 ("*J.B.D.L*"). CVS and Rite Aid opted out of the class and independently filed suit against Wyeth in Civil Action No. 1: 03-CV-781, which was then consolidated with *J.B.D.L.* In Amended Case Management Order No. 1 [Doc. No. 34, Jan. 9. 2002], discovery in this action was coordinated with discovery in the *J.B.D.L.* action.

On June 13, 2005, however, this Court granted summary judgment against the direct purchasers. *J.B.D.L. Corp., v. Wyeth-Ayerst Laboratories, Inc.*, No. 1:01-CV-704, 1:03-CV-781, 2005 WL 1396940 (S.D. Ohio, June 13, 2005). Because discovery was coordinated, summary judgment in this case was a virtual certainty absent a reversal in *J.B.D.L* by the Sixth Circuit. Plaintiffs sought to avoid that outcome with a motion to stay this action pending the outcome of the *J.B.D.L.* appeal [Doc. No. 137, August 5, 2005], but the Court denied that motion [Doc. No. 140, Oct. 21, 2005]. On August 1, 2006, Defendants filed a motion for summary judgment on grounds substantially identical to their *J.B.D.L.* motion [Doc. No. 166]. That motion was pending at the time a settlement was reached.

Following the summary judgment ruling in *J.B.D.L.*, settlement negotiations between counsel occurred frequently. The parties finally reached an agreement in principle during an all-

day mediation session with Hon. Edward A. Infante (Ret.), a nationally recognized mediator, on August 30, 2006. *See* Declaration of Kenneth A. Wexler in Support of Plaintiffs' Motion for Final Approval ("Wexler Decl.") ¶¶ 21-23; Declaration of the Honorable Edward Infante in Support of Plaintiffs' Motion for Final Approval of Settlement ("Infante Decl.") ¶¶ 2-8; . The parties thereafter negotiated the further details while drafting settlement papers, but reached an impasse on the *cy pres* disposition of settlement funds. In a mediation session on December 14, 2006, the parties accepted Judge Infante's recommendation of the following *cy pres* recipients: (1) the National Women's Health Resource Center (www.healthywomen.org ); and (2) the Society for Women's Health Research (http://www.womenshealthresearch.org). *See* Wexler Decl. ¶ 27; Affidavit of Elizabeth Battaglino Cahill ("Cahill Aff.") (of National the Women's Health Resource Center); Affidavit of Suzanne Stone ("Stone Aff.") (of Society for Women's Health Research).

Pursuant to the Settlement Agreement dated December 29, 2006 [Doc. No. 177, #7], Defendants agreed to pay $1,300,000 to resolve this class action. In accordance with the Court's January 18, 2007 order, the common fund has covered the cost of a comprehensive notice program. The Settlement Agreement further provides that Plaintiffs' Counsel may apply to the Court for an award of costs and expenses from the common fund not to exceed $325,000. Although Plaintiffs' Counsel have incurred an aggregate lodestar in excess of $4.1 million, they do not seek an award of attorneys' fees. *See* Declaration of Jennifer Fountain Connolly in Support of Co-Lead Counsel's Motion for Award of Partial Reimbursement of Expenses ("Connolly Decl.") ¶¶ 10-12. Because there is no practicable means to distribute the net settlement proceeds to individual Class members, the settlement contemplates a *cy pres*

distribution of the settlement proceeds to *cy pres* recipients who will make use of the funds to further their mission of benefitting women's health. *See* Stone Aff. ¶ 4; Cahill Aff. ¶ 4.

While the recovery in this case is undeniably modest, it does represent a fair, reasonable and adequate resolution, given the Court's summary judgment ruling in *J.B.D.L.* On May 10, 2007, the Sixth Circuit upheld this Court's ruling. *J.B.D.L. Corp., v. Wyeth-Ayerst Laboratories, Inc.*, No. 05-3860/3988, __ F.3d __, 2007 WL 1364624 (6th Cir. May 10, 2007).

**THE STANDARDS FOR FINAL APPROVAL**

Rule 23(e) of the Federal Rules of Civil Procedure requires court approval of any settlement of a class action. *Tennessee Ass'n of Health Maintenance Organizations, Inc. v. THA*, 262 F.3d 559, 565 (6th Cir. 2001). A court's role in evaluating a settlement "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Clark Equipment Co. v. Int'l Union, Allied Industrial Workers of America, AFL-CIO*, 803 F.2d 878, 879 (6th Cir. 1986) (quoting *Officers For Justice v. Civil Service Comm'n*, 688 F.2d 615 (9th Cir. 1982)). In *Williams v. Vukovich*, 720 F.2d 909, 920-21 (6th Cir. 1983), the Sixth Circuit outlined the procedure to be followed:

(1) the court must preliminarily approve the proposed settlement; *i.e.*, the court should determine whether the compromise embodied by the decree is illegal or tainted with collusion;

(2) the members of the class must be given notice of the proposed settlement by the best means practicable under the circumstances; and

(3) a hearing must be held to determine whether the settlement is fair to those affected, adequate and reasonable.

*Id.* *See also Fussell v. Wilkinson*, No. 1:03-CV-704, 2005 WL 3132321, at *3 (S.D. Ohio Nov. 22, 2005) (Beckwith, C.J.). Following the hearing on June 15, 2007, all of these requirements will be satisfied.

*First*, on January 18, 2007, the Court granted preliminary approval to the proposed settlement [Doc. No. 179]. During the hearing held on January 12, 2007, the Court stated as follows:

> Well, I appreciate your hard work. And I do understand that you [*i.e.*, Plaintiffs] had an uphill battle here, and as you say, this is probably the best resolution that could be obtained in under the circumstances, so I congratulate counsel for addressing the problem with common sense and expediency, and I mean that in the kindest possible sense.

Tr. 1/12/2007 [Doc. No. 180] pp. 14-15. As this Court has previously recognized, "[p]reliminary approval gives rise to a presumption that the settlement is fair, reasonable and adequate. Objectors, therefore, have the burden of persuading this Court that the proposed settlement is unreasonable." *Fussell v. Wilkinson*, 2005 WL 3132321, at *3 (citations omitted).

*Second*, provisions for notice to the members of the Class, both of the proposed settlement and the fact that a hearing would be held to determine whether the settlement was fair, adequate and reasonable, were approved by the Court's January 18, 2007 order. Notice has been provided in accordance with the order. *See* Affidavit of Charlene Young [Doc. No. 181]. The provision of notice allowed members of the Class a full and fair opportunity to consider the proposed settlement and to develop their respective responses.

*Third*, the fairness hearing has been scheduled for June 15, 2007. As this Court has recognized:

> There are six factors to be considered in assessing the fairness, adequacy and

> reasonableness of the proposed settlement. They are (1) the potential relief that plaintiffs may realize following a full trial on the merits balanced against the relief offered by the settlement; (2) the complexity of the litigation; (3) the status of the proceedings and the amount of discovery completed; (4) the nature of the negotiations; (5) the objections of the class members; and (6) the public interest.

*Fussell v. Wilkinson*, 2005 WL 3132321, at *3 (citing *Williams*, 720 F.2d at 922; *Bronson v. Board of Education of the City School District of Cincinnati*, 604 F. Supp. 68, 73 (S.D. Ohio 1984)); *see also In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508, 522 (E.D. Mich. 2003). Courts generally "consider the facts in the light most favorable to the settlement." *Patterson v. Stovall*, 528 F.2d 108, 112 (7th Cir. 1976). The relevant factors heavily favor final approval of the settlement.

## ARGUMENT

### I. THE COURT SHOULD APPROVE THE SETTLEMENT AS FAIR, REASONABLE, ADEQUATE AND IN THE BEST INTERESTS OF THE CLASS.

#### A. The Potential Relief That Plaintiffs May Realize Following a Full Trial on the Merits Balanced Against the Relief Offered by the Settlement.

While recovery of $1,300,000 is far less than hoped for at the outset of this litigation, it fairly reflects the strength of Plaintiffs' claims at the time of settlement. The determination of a "reasonable" settlement is not susceptible to a mathematical equation yielding a particularized sum. Rather, as Judge Friendly has explained, "[i]n any case there is a range of reasonableness with respect to settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). In fact, a settlement can be approved even when it amounts to only a small percentage of the recovery sought. *See In re Milken and Assoc. Sec. Litig.,* 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993). As the court aptly recognized in *In re Union Carbide Sec. Litig.*, 718 F. Supp. 1099 (S.D.N.Y. 1989):

> [t]he dollar amount of the settlement itself is not decisive in the fairness

> determination . . . . Dollar amounts are judged not in comparison with possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.

718 F. Supp. at 1103. The evaluating court must guard against demanding too large a settlement based on its view of the merits of the litigation because settlement is a compromise — a yielding of the highest hopes in exchange for certainty and resolution. *See Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

As in every case, Plaintiffs here would have to prove liability — "an all-or-nothing proposition"— before recovering damages on any scale. *Cardizem CD*, 218 F.R.D. at 523. While Plaintiffs believe that their claims are solidly grounded in law and fact, the summary judgment ruling in *J.B.D.L.* rendered the likelihood of establishing liability at the district court level virtually nil. Accordingly, Plaintiffs sought to stay this case pending the Sixth Circuit's decision in *J.B.D.L.*, but that motion was denied [Doc. No. 140, Oct. 21, 2005]. On August 1, 2006, Defendants filed a motion for summary judgment on grounds substantially identical to their *J.B.D.L.* motion [Doc. No. 166]. While the Court's "role at this stage of the proceeding is not to evaluate the merits of the litigation, since this would contravene the parties' decision to 'waive their right to litigate the issues involved in the case and thus save themselves the time, and the inevitable risk of litigation,'" *Wilkerson v. Martin Marietta Corp.,* 171 F.R.D. 273, 285 (D. Colo. 1997)(citation omitted),[4] it does not take much imagination to foresee the likely

---

[/4] *See also In re Vitamins Antitrust Litig.*, 2001-2 Trade Cas. (CCH) ¶73,361, 2001 WL 856290 (D.D.C. July 19, 2001) ("The Court must eschew any rubber stamp approval ... yet, at the same time, must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case."); *Mars Steel v. Continental Ill. Nat'l Bank*, 834 F.2d 677, 684 (7th Cir. 1987) ("The temptation to convert a settlement hearing into a full trial on the merits must be resisted.").

outcome of further litigation here. Plaintiffs' only hope of ultimately prevailing would likely begin with an appeal from an adverse judgment — a risky, costly and time consuming process. Absent settlement, the outcome of an appeal of summary judgment in this case would have undoubtedly been identical to *J.B.D.L. Corp., v. Wyeth-Ayerst Laboratories, Inc.*, No. 05-3860/3988, __ F.3d __, 2007 WL 1364624 (6th Cir. May 10, 2007) — though neither party knew this at the time of settlement — with the parties expending considerable time and money in the process.

Even if Plaintiffs had been able to somehow avoid summary judgment, it is uncertain how a jury would view the evidence. The trial would become a battle of experts, with conflicting testimony on esoteric economic principles applied to the complex pharmaceutical market. *See Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) ("The courts have recognized the need for compromise where divergent testimony would render the litigation an expensive and complicated 'battle of experts.'"), *aff'd*, 166 F.3d 581 (3rd Cir. 1999); *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 128 (S.D.N.Y.) ("[T]here can be no guarantee of what the jury will conclude."), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

Plaintiffs would also have to establish damages. As indirect purchasers, Plaintiffs and the Class incurred damages that were passed on by the direct purchasers, but the Court held that the direct purchasers incurred no damages. *See J.B.D.L.*, 2005 WL 1396940, *21 ("Absent proof of a causative link between the alleged monopolistic conduct and the alleged supracompetitive price, the 'but-for' Premarin prices offered by Leitzinger and Leffler are untenable."). While the outcome in *J.B.D.L.* is not binding on Plaintiffs here, convincing the Court to reach a different outcome (based on much of the same evidence) would have been an unenviable task. In

addition, how the Court would treat pass-on and set-off issues in these circumstances remains, at best, uncertain. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 393 (D.D.C. 2002) (approving indirect purchaser class settlement, noting as risk "defendants' denial that they proximately caused the alleged antitrust injury and damages when prices were passed down through many levels of distribution").

In sum, the record abundantly supports the conclusion that the settlement is "a compromise which has been reached after the risks, expense and delay of further litigation have been assessed." *Williams*, 720 F.2d at 922. Even if we assume that potential damages passed-on to end-payors in the states at issue exceeded "hundreds of millions of dollars,"[5] the $1,300,000 recovery is sufficiently within the range of fairness, adequacy and reasonableness to merit final approval. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth of a single percent of the potential recovery.").

---

/5 In applying to appeal this Court's class certification ruling, Defendants argued that: "Although plaintiffs have not yet quantified their alleged damages, it is likely that they will seek damages in the hundreds of millions of dollars." Petition of Defendants for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), July 15, 2004, at 19-20. Plaintiffs believe that damages would have been considerably less. Plaintiffs' economic expert, Dr. Gary French, proposed a "yardstick" approach, using as a benchmark the AWPs or direct prices for other pioneering drugs that have faced competition from a second branded therapeutic substitute. Plaintiffs could have established damages by demonstrating that, absent Wyeth's alleged anticompetitive agreements, the introduction of Cenestin in March 1999 would have restrained Wyeth's ability to increase prices for Premarin. In calculating direct purchaser damages, for example, Dr. Keith Leffler assumed a but for world in which Premarin's price increases would have averaged 7.5% per year after March 1999. *Cf. J.B.D.L. Corp., v. Wyeth-Ayerst Laboratories, Inc.*, __ F.3d at __, 2007 WL 1364624, at *5 ("... Wyeth increased the list price for Premarin by 15.8 percent on average every year from 1999 to 2003."). Given the Court's summary judgment ruling on liability in *J.B.D.L.*, however, Plaintiffs' Counsel believed it inadvisable to commission a damages report from Dr. French, which would have been extremely expensive.

**B. The Complexity of the Litigation.**

The complexity, expense and likely duration of the litigation weighs in favor of final approval of the settlement. Plaintiffs here confronted the exact same factual and legal hurdles faced by the direct purchaser class in *J.B.D.L.* and, because they did not deal directly with Wyeth, substantial *additional* factual and legal obstacles. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that only direct purchasers have standing to recover damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. Accordingly, Plaintiffs had to rely upon state law in their quest for financial recovery for the Class. In order for the Class to recover the theoretical maximum damages available, therefore, Plaintiffs would have to be successful on *every one* of a host of complex and hotly disputed legal and factual issues. If the settlement is not approved, the claims will be placed back on the litigation track and the Court will soon have to address Defendants' motion for summary judgment. It is beyond dispute that conducting further litigation against a well-financed pharmaceutical giant would be a complex and expensive undertaking. While the ultimate result of such litigation can be now be foreseen (given the Sixth Circuit's *J.B.D.L.* ruling), an expensive, complex and time-consuming process is assured. In these circumstances, it is abundantly reasonable "to take the bird in the hand instead of the prospective flock in the bush." *In re Prudential Sec. Inc. Ltd. Partnership Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) (citation omitted).

**C. The Status of the Proceedings and the Amount of Discovery Completed.**

The stage of the proceedings and the amount of discovery completed at the time a settlement is reached is relevant to the parties' knowledge of the strengths and weaknesses of the various claims in the case, and consequently affects the determination of the settlement's

fairness. "Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) (citation omitted).

In this case, Plaintiffs' Counsel certainly had an adequate appreciation of the merits before reaching the proposed settlement. Plaintiffs' Counsel reviewed in excess of 5.5 million pages of documents produced by Wyeth and third parties. In addition, Dr. Gary French, an expert economist of national reputation, was engaged to evaluate the economic theory of their claims, the potential damages. Discovery, which was coordinated with the *J.B.D.L.* action, has been completed and is closed. Counsel for Plaintiffs participated in more than a dozen depositions, including expert depositions, and reviewed the transcripts of more than 50 depositions taken in the *Duramed* and *J.B.D.L.* litigation. The risks Plaintiffs face on the merits are best demonstrated by the Court's analysis of the evidence in its summary judgment ruling in *J.B.D.L.,* which was upheld by the Sixth Circuit. Accordingly, this factor heavily favors approval of the proposed settlement.

**D. The Nature of the Negotiations.**

The settlement was negotiated over a period of several months and was ultimately concluded with the meditation assistance of Judge Infante. All in all, the settlement process spanned more than one-year and the dynamics shifted with each litigation event. Because of the extensive bargaining process employed throughout the settlement process, there can be little doubt that the Settlement Agreement was the product of good-faith negotiations. Wexler Decl. ¶¶ 2-27; Infante Decl. ¶¶ 2-8. *Cf. Cardizem CD*, 218 F.R.D. at 530 (negotiations with the assistance of experienced mediator demonstrated arm's length negotiations and favored

approval).

Moreover, Plaintiffs' Counsel have considerable experience in handling complex class actions in general, and antitrust class actions against pharmaceutical manufacturers in particular. The Court has previously determined that Plaintiffs' Counsel are adequate representatives of the Class. *See* Class Certification Opinion [Doc. No. 100] at 12 ("The record establishes that Plaintiffs' counsel is well qualified to prosecute this complex antitrust action, and has experience in several other large antitrust class actions."). In fact, one or more of the firms designated as Co-Lead Counsel have been involved at the leadership level in most pharmaceutical end-payor class action over the past decade.[6] Given this experience, Plaintiffs' Counsel have developed in-depth knowledge of the applicable law.

In any event, the important point for purposes of final approval is that experienced and competent counsel believe that the proposed settlement, in the circumstances of this case, is fair, reasonable and adequate. This factor heavily favors final approval. *See Hispanics United of DuPage County v. Village of Addison*, 988 F. Supp. 1130, 1170 (N.D. Ill. 1997) ("In determining the fairness of a class settlement, the Court is 'entitled to rely heavily on the opinion of competent counsel.'") (citation omitted); *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 281 (S.D.N.Y. 1993) ("[A]bsent evidence of fraud or overreaching, [courts] consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel.").

---

/6 *See, e.g., In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 85 (D. Mass. 2005); *In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508 (E.D. Mich. 2003), *app. dismissed*, 391 F.3d 812 (6th Cir. 2004); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004); *Nichols v. SmithKline Beecham Corp.*, No. 00-6222, 2005 WL 950616 (E.D. Pa. April 22, 2005); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *In re Synthroid Marketing Litig.,* 264 F.3d 712 (7th Cir. 2001).

**E. The Objections of the Class Members**.

"In litigation involving a large class, it would be extremely unusual not to encounter objections." *In re NASDAQ Market Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998). An absence of objections from class members, however, is evidence of the settlement's fairness and adequacy. *See PaineWebber Limited Partnerships Litig.*, 171 F.R.D. at 126 ("A favorable reception by the Class constitutes 'strong evidence' of the fairness of a proposed settlement and supports judicial approval."); *NASDAQ,* 187 F.R.D. at 478-79. On the other hand, "[a] settlement can be fair notwithstanding a large number of class members who oppose." *Cotton v. Hinton*, 559 F.2d at 1331.

In this case, notice of the Settlement was widely disseminated to members of the Class, advising them of the terms of the settlement, their right to object or opt out, and the procedures for submitting objections. *See* Affidavit of Charlene Young [Doc. No. 181]. As of this date, counsel have not received any objections to the settlement. This reaction, especially after the extensive notice program approved by the Court, favors final approval.[7]

While the extent of opt outs is a factor which the Court might consider, *New York ex rel. Vasco v. Reebok Int'l Ltd.*, 903 F. Supp. 532, 535-36 (S.D.N.Y. 1995), the number of opt outs does not detract from the sufficiency of the settlement in the circumstances of this case. In the

---

/7 *See In re Domestic Air Transp. Antitrust Litig*., 148 F.R.D. 297, 326 (N.D. Ga. 1993) (despite 268 objections "the Court finds the number of objections small"); *In re Orthopedic Bone Screw Prod. Liab. Litig*., 176 F.R.D. 158, 185 (E.D. Pa. 1997)("What is meaningful in this regard is that the relatively low objection rate 'militates strongly in favor of approval of the settlement.'") (citation omitted); *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313 (3d Cir. 1993) ("Less than 30 of approximately 1.1 million shareholders objected. This is an infinitesimal number."); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (29 objections out of 281 member class "strongly favors settlement").

abstract, there may be many reasons why a class member may elect to opt out of a class, not all of which necessarily reflect dissatisfaction with the settlement. As noted, the 3,449 consumer opt-outs constitute a small fraction of a percent of the Class. Of the consumer opt-outs, 96% were submitted by a single law firm pursuing unrelated litigation against Wyeth in West Virginia. Affidavit of Charlene Young [Doc. No. 181] ¶ 14. Based on the 42,829 notice packets mailed to potential TPP Class Members, *id.* ¶ 6, the 89 TPP opt-outs constitute approximately 0.2%. In any event, the issue that remains is whether the settlement, which will not bind these opt-outs, merits final approval. The record, as addressed herein, demonstrates that it does.

**F. The Public Interest.**

Courts have recognized that "[t]here is a strong public interest in private antitrust litigation." *Cardizem CD*, 218 F.R.D. at 530 (citing *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63(1983)). This is particularly important in the pharmaceutical industry where agreements to prevent or delay access to lower cost alternatives to popular brand-name prescription drugs can cause significant harm to society. *Id*. "Likewise, there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources. *Id.* (citing *Granada Investments Inc. v. DWG Corp*., 962 F.2d 1203, 1205 (6th Cir. 1992)); *see also Armstrong v. Bd. of School Directors of the City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980) ("In the class action context in particular, there is an overriding public interest in favor of settlement.").

In this case and in *J.B.D.L.*, the legality of Wyeth's exclusive and "disguised" exclusive contracts with health plans and PBMs has been vigorously litigated to the point that preserving judicial resources and securing the benefits of the proposed settlement are plainly in the public

interest.

**II. THE PROPOSED METHOD OF DISTRIBUTION IS FAIR, REASONABLE AND APPROPRIATE.**

The administrative costs associated with distributing the proceeds of this settlement to Class members would exhaust the funds. Accordingly, the settlement provides for a *cy pres* distribution for the benefit of the Class. At the recommendation of Judge Infante, the Settlement Agreement provides for distribution of the net settlement proceeds to: (1) the National Women's Health Resource Center, a non-profit organization that develops and distributes objective women's health information based on the latest advances in medical research and practice; and (2) the Society for Women's Health Research, the nation's only non-profit organization whose mission is to improve the health of all women through research, education and advocacy. *See* Stone Aff. ¶ 4; Cahill Aff. ¶ 4.

The proposed *cy pres* distribution here is consistent with settlements of numerous antitrust actions. In *New York v. Keds Corp.*, 1994-1 Trade Cas. ¶70,549, 1994 WL 97201 (S.D.N.Y. Mar. 21, 1994), for example, over five million purchasers of Keds shoes suffered damages between $1 and $1.25 per pair due to alleged price-fixing. The Attorneys General of the fifty states brought a consumer antitrust action and settled it for injunctive and monetary relief in the amount of $7.2 million. Of the $7.2 million, $5.7 million was distributed to the fifty states, and through the states to designated charities or to any other charity benefitting women aged 15 to 44, the population that primarily purchased the price-fixed shoes. The court held that "[i]n these circumstances, the *cy pres* resolution adopted by the settlement agreements is reasonable and adequate." *Id.,*1994 WL 97201, *3. *See also New York v. Salton Inc.,* 265 F.

Supp. 2d 310 (S.D.N.Y. 2003) (approving *cy pres* distribution to non-profit or governmental entities); *In re Toys "R" Us Antitrust Litig.,* 191 F.R.D. 347, 353 (E.D.N.Y. 2000) (approving proposed settlement and certifying class, noting that the "decision to forego individual recoveries was sensible, given the difficulty of identifying proper claimants and the difficulty, especially the costs, that such recoveries and their administration would have entailed."); *New York v. Reebok Int'l, Ltd.,* 96 F.3d 44, 49 (2d Cir. 1996) (The "impracticality of attempting to distribute the settlement proceeds among the multitude of unidentified possible claimants is obvious."); *In re Agent Orange Product Liability Litig.,* 818 F.2d 179, 184-85 (2d Cir. 1987) (approving use of portion of settlement fund to fund assistance programs for the class as a whole where distribution to individuals was not feasible).[8]

Courts are justifiably skeptical of *cy pres* settlements that produce an indirect benefit for the class and a handsome attorneys' fee for counsel. The concern is that counsel might be tempted to surrender the class's strong claims in order to realize a quick fee. *See, e.g., In re Matzo Food Products Litig*., 156 F.R.D. 600 (D.N.J. 1994). Such is not a concern in this case — Plaintiffs' Counsel seek no fee. In addition, the settlement — achieved with the assistance of a well-respected mediator — accurately reflects the weakness of Plaintiffs' claims in light of the *J.B.D.L*. summary judgment ruling. *Cf. In re Relafen Antitrust Litig*., 231 F.R.D. 52, 82 (D.

---

/8 *See also Ramos v. Philip Morris Companies, Inc.*, 743 So.2d 24 (Fla. 3d DCA 1999) (upholding settlement where $300 million class recovery was used to establish research foundation); *Williams Foods, Inc. v. Eastman Chemical Co.,* 2001-2 Trade Cas. (CCH) ¶ 73,414, 2001 WL 1298887 (D. Kan. Aug. 8, 2001) (" The Court finds that a *cy pres* award in the amount of $25,000 each to the United Community Services of Johnson County and the Children's Therapeutic Learning Center is fair, reasonable and adequate."); *In re Mexico Money Transfer Litig*., 164 F. Supp. 2d 1002, 1031-32 (N.D. Ill. 2000) (approving *cy pres* distribution), *aff'd*, 267 F.3d 743 (7th Cir. 2001); *In re Compact Disc Minimum Advertised Price Antitrust Litig*., 216 F.R.D. 197 (D. Me. 2003) (*cy pres* distribution of CDs as part of settlement).

Mass. 2005) ("Although this Court agrees that a *cy pres* award is insufficient in many cases, and has made great efforts to ensure that individual consumers will actually reap some benefit from this case, the *cy pres* award here is made in light of the very weakness of the claims of residents in [the non-*Illinois Brick* replealer] states.").

In the circumstances of this case, the proposed *cy pres* distribution is an appropriate disposition of the settlement proceeds that the Court should approve.

**CONCLUSION**

For the foregoing reasons, Plaintiffs and their counsel respectfully submit that the proposed settlement is fair, reasonable, adequate and in the best interests of the Class. Accordingly, the Court should: (i) approve the settlement; (ii) enter the proposed Order and Final Judgment; and (iii) authorize counsel to otherwise finalize such matters as may be required to effectuate the terms of the settlement.

Dated: June 1, 2007

Respectfully submitted,

By: s/Patrick E. Cafferty
One of Plaintiffs' Counsel

Janet G. Abaray
LOPEZ, HODES, RESTAINO, MILMAN, SKIKOS & POLOS
312 Walnut Street, Suite 2090
Cincinnati, Ohio 45202
Tel: (513) 852-5600

Joseph E. Conley, Jr.
BUECHEL & CONLEY
25 Crestview Hills Mall Road
Suite 104
Crestview Hills, Kty. 41017
Tel: (859) 578-6600

***Co-Liaison Counsel for Plaintiffs***

Kenneth A. Wexler
Jennifer F. Connolly
WEXLER TORISEVA WALLACE LLP
One North LaSalle, Suite 2000
Chicago, Illinois 60602
(312) 346-2222

Marc H. Edelson
HOFFMAN & EDELSON
45 West Court Street
Doylestown, Pennsylvania 18901
(215) 230-8043

Stacey L. Mills
Lori A. Johnson
HEINS MILLS & OLSON, P.C.
3550 IDS Center, 80 South Eighth Street
Minneapolis, MN 55402
(612) 338-4605

Patrick E. Cafferty
CAFFERTY FAUCHER LLP
101 N. Main Street, Suite 450
Ann Arbor, MI 48104
(734) 769-2144

***Co-Lead Counsel for Plaintiffs***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARJORIE FERRELL, et al.,

Plaintiffs,

v.

WYETH-AYERST LABORATORIES, INC., et al.,

Defendants.

Civil Action No. C-1-01-447

Judge Sandra S. Beckwith
Magistrate Judge Timothy S. Hogan

**CERTIFICATE OF SERVICE**

I, Patrick E. Cafferty, hereby certify that a copy of the foregoing *Plaintiffs' Memorandum in Support of Motion for Final Approval of Proposed Settlement* was electronically filed. Those attorneys who are registered with the Electronic Filing System may access these filings through the Court's System, and notice of these filings will be sent to these parties by the operation of the Court's Electronic Filing System.

Dated: June 1, 2007

By: s/Patrick E. Cafferty

CAFFERTY FAUCHER LLP
Patrick E. Cafferty
101 N. Main Street Suite 450
Ann Arbor, Michigan 48104
Tel: 734-769-2144
Fax: 734-769-2144
pcafferty@caffertyfaucher.com